PREET BHARARA
United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     MICHAEL D. LOCKARD
     JASON H. COWLEY
     ALEXANDER J. WILSON
One St. Andrew's Plaza
New York, New York 10007

JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,                :

                  Plaintiff,             :      **VERIFIED COMPLAINT**

           - v. -                        :    11  Civ.  CIV  9186

LEBANESE CANADIAN BANK SAL, ELLISSA      :
HOLDING COMPANY, HASSAN AYASH EXCHANGE
COMPANY, CYBAMAR SWISS GMBH, LLC, STE    :
NOMECO SARL, STE MARCO SARL, and THE
SALHAB TRAVEL AGENCY,                    :

                  Defendants;            :

ALL ASSETS OF LEBANESE CANADIAN BANK     :
SAL OR ASSETS TRACEABLE THERETO; ALL
ASSETS OF ELLISSA HOLDING COMPANY; ALL   :
ASSETS OF HASSAN AYASH EXCHANGE
COMPANY; ALL ASSETS OF CYBAMAR SWISS     :
GMBH, LLC, STE MARCO SARL, STE NOMECO
SARL, AND THE SALHAB TRAVEL AGENCY,      :
INCLUDING BUT NOT LIMITED TO ALL FUNDS
ON DEPOSIT IN THE BANK ACCOUNTS AS       :
PARTICULARLY DESCRIBED IN SCHEDULE A;
and ALL ASSETS OF 30 USED CAR BUYERS     :
IN THE UNITED STATES LISTED IN
SCHEDULE A, INCLUDING BUT NOT LIMITED    :
TO APPROXIMATELY $248 MILLION
PREVIOUSLY ON DEPOSIT AT APPROXIMATELY   :
57 BANK ACCOUNTS, AS DESCRIBED IN
SCHEDULE A, AND ALL PROPERTY TRACEABLE   :
THERETO,
                                         :
                  Defendants in rem.
- - - - - - - - - - - - - - - - - - - -x

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . 3

II.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . 7

III. STATUTORY AUTHORITIES . . . . . . . . . . . . . . . . . . . . 7

     The International Emergency Economic Powers Act . . . . . . 8

     The Terrorism Sanctions Regulations . . . . . . . . . . . . 8

     The Foreign Terrorist Organizations
         Sanctions Regulations . . . . . . . . . . . . . . . . . 10

     The Global Terrorism Sanctions Regulations . . . . . . . . 12

     Iran and Syria Nonproliferation Act . . . . . . . . . . . . 14

IV.  PROBABLE CAUSE FOR FORFEITURE . . . . . . . . . . . . . . . 15

     A.   Overview . . . . . . . . . . . . . . . . . . . . . . . 15

     B.   Hizballah . . . . . . . . . . . . . . . . . . . . . . . 16

     C.   Narcotics Trafficking in West Africa . . . . . . . . . 19

     D.   Lebanese Canadian Bank . . . . . . . . . . . . . . . . 24

     E.   Hassan Ayash Exchange Company . . . . . . . . . . . . . 34

     F.   The Ellissa Exchange, Ellissa Shipping Company,
          and Ellissa Car Parc in Cotonou . . . . . . . . . . . 35

     G.   Transfers from Ayash, Ellissa and Others to the
          United States to Buy and Ship Used Cars . . . . . . . 35

     H.   Cybamar Swiss Family of Companies . . . . . . . . . . . 37

     I.   The Link Between U.S. Car Buyers and the Salhab
          West African Bulk Money Courier Network . . . . . . . 39

     J.   Movement of Hundreds of Millions of Dollars from
          West Africa to Lebanon . . . . . . . . . . . . . . . . 40

     K.   Used Car Buyers in the U.S. Receive Wire Transfers
          for Buying and Shipping Used Cars as Part of the
          Money Laundering Scheme . . . . . . . . . . . . . . . . 45

V.   CLAIMS FOR FORFEITURE . . . . . . . . . . . . . . . . . . . 58

VI.  CIVIL MONEY LAUNDERING PENALTIES . . . . . . . . . . . . . 63

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I.   NATURE OF THE ACTION

1. This _in_ _rem_ forfeiture action and civil money laundering complaint arises out of an investigation by the Drug Enforcement Administration ("DEA") and other federal law enforcement agencies of a scheme to launder money through the United States financial system and the United States used car market. As part of the scheme, funds are transferred from Lebanon to the United States in order to purchase used cars, which are then shipped to West Africa and sold for cash. Cash proceeds of these car sales are then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon. The cash is often moved through bulk cash smuggling.

2. Hizballah members and supporters are involved at various points in the money laundering scheme. Hizballah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance and facilitate the purchase of some of the used cars in the United States. Because Hizballah is a designated Foreign

3

Terrorist Organization, a Specially Designated Terrorist, and a Specially Designated Global Terrorist (discussed more fully below), the money laundering scheme also involves violations of the International Emergency Economic Powers Act of 1977 ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1705.

3.   Lebanese financial institutions and exchange houses play a key role in these money laundering channels.  For example, on January 26, 2011, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Ayman Joumaa, a Lebanese narcotics trafficker and money launderer, under the Foreign Narcotics Kingpin Designation Act, codified at Title 21, United States Code, Sections 1901 to 1908 (the "Kingpin Act").  The same day, OFAC designated, among others, the Hassan Ayash Exchange Company and the Ellissa Exchange Company (the "Ellissa Exchange") -- two Lebanese exchanges houses -- for their roles in Joumaa's laundering of narcotics proceeds.  In addition, Ellissa Group SA, Ellissa Holding, Ellissa Megastore, Ellissa Parc Cotonou, and Ellissa Shipping, the latter three of which are located in Benin, were designated (the Ellissa companies collectively, "Ellissa Holding").  OFAC also designated Phenicia Shipping Offshore SARL

for being owned or controlled by members of Ayman Joumaa's
organization.

4.   On February 10, 2011, the U.S. Department of the
Treasury, Financial Crimes Enforcement Network ("FinCEN") issued
a finding and a proposed rule, pursuant to Section 311 of the USA
PATRIOT Act, Title 31, United States Code, 5318A, that the
Lebanese Canadian Bank SAL ("LCB") is a financial institution of
primary money laundering concern (the "311 Action").   The
proposed rule would prohibit U.S. financial institutions from
opening or maintaining correspondent or payable-through accounts
for LCB.   The 311 Action was based, inter alia, on FinCEN's
determination that there was reason to believe that LCB has been
routinely used by drug traffickers and money launderers operating
in various countries in Central and South America, Europe,
Africa, and the Middle East, including by at least one narco-
trafficker who is a supporter of Hizballah and another who
provides financial support to Hizballah.   FinCEN also determined
that there was reason to believe that LCB managers are complicit
in the network's money laundering activities.

5.   As a result of its identification as a financial
institution of primary money laundering concern, LCB was no
longer able to operate in the United States.   Although the
proposed rule prohibiting U.S. financial institutions from

opening or maintaining correspondent or payable-through accounts
for LCB was not yet in effect, financial institutions in the
United States nonetheless terminated their correspondent banking
relationships with LCB, cutting off LCB's access to the United
States financial system.  Prior to its identification as a
financial institution of primary money laundering concern, LCB
maintained correspondent accounts with financial institutions in
the Southern District of New York.

6.    In or about September 2011, another Lebanese
financial institution, Société Générale de Banque au Liban
("SGBL"), completed the acquisition of certain assets and
liabilities of LCB.

7.    Between approximately January 2007 and early 2011,
at least $329 million was transferred by wire from accounts held
in Lebanon at LCB, Federal Bank of Lebanon ("Federal Bank"),
Middle East and Africa Bank ("MEAB"), and BLOM Bank ("BLOM") to
the United States through their correspondent bank accounts with
U.S. financial institutions located in the Southern District of
New York and elsewhere for the purchase of used cars.  Of that
amount, $141,522,091 was transferred from accounts held by Hassan
Ayash Exchange Company and $61,747,524 was transferred from
accounts held by the Ellissa Exchange, with the remaining
$126,281,969 transferred from accounts held by others.

8.   For the reasons set forth in more detail below, the United States seeks civil money laundering penalties against LCB, Hassan Ayash Exchange Company, Ellissa Holding, Cybamar Swiss GMBH, LLC ("Cybamar Swiss"), STE Marco SARL, STE Nomeco SARL, and the Salhab Travel Agency (collectively, the "Defendant Entities"), in the amount of at least $446 million, representing the sum of the funds laundered by each of those entities.

9.   In addition, as set forth in more detail below, the United States seeks the forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (a)(1)(C), of property involved in or traceable to the money laundering offenses and property traceable to the IEEPA offenses alleged in this Complaint.  Those assets include all assets of LCB, Hassan Ayash Exchange Company, Ellissa Holding, Cybamar Swiss, STE Marco SARL, STE Nomeco SARL, the Salhab Travel Agency, and all assets of 30 used car purchasers as described in more detail in Schedule A to this Complaint, including, but not limited to, funds transferred to certain bank accounts also described in more detail in Schedule A to this Complaint and all property traceable thereto (collectively, the "Defendant Properties").

## II.   JURISDICTION AND VENUE

10.   This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

7

11.   Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

### III.   STATUTORY AUTHORITIES

### The International Emergency Economic Powers Act

12.   This in rem forfeiture and civil money laundering penalty action relates to violations of regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-1705.  IEEPA gives the President certain powers, defined in Section 1702, to respond to threats with respect to which the President has declared a national emergency.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

13.   As described below, the President has issued executive orders, and the Department of State and the Department of the Treasury have promulgated regulations, pursuant to the IEEPA that prohibit a broad range of conduct with respect to Hizballah, including providing goods or services to Hizballah or

any transactions or dealings in property in which Hizballah has
an interest.

## The Terrorism Sanctions Regulations

14.   On January 23, 1997, President William Jefferson
Clinton issued Executive Order 12947, declaring a national
emergency pursuant to the IEEPA and other statutes with respect
to the threat to the national security, foreign policy, and
economy of the United States posed by grave acts of violence
committed by foreign terrorists that disrupt the Middle East
peace process.  Executive Order 12947 blocked all property
subject to U.S. jurisdiction in which any of 12 designated
terrorist organizations, including Hizballah, had an interest.
See 60 Fed. Reg. 5079 (Jan. 23, 1997).

15.   To implement Executive Order 12947, OFAC issued
the Terrorism Sanctions Regulations, Title 31, Code of Federal
Regulations, Part 595.  The Terrorism Sanctions Regulations
("TSR") generally block the property of "Specially Designated
Terrorists" ("SDTs"), consisting of the 12 organizations
designated in Executive Order 12947 and any persons designated by
the Secretary of State that are found to have committed, or to
pose a significant risk of committing, acts of violence that have
the purpose or effect of disrupting the Middle East peace process
or that assist in, sponsor, or provide financial, material, or

technological support for, or services in support of, such acts of violence.

16.   Subpart 595.201(a) of the TSR provides, in relevant part:

> [N]o property or interests in property of a specially designated terrorist, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in.

17.   Subpart 595.204 of the TSR prohibits transactions with, or for the benefit of, an SDT:

> Except as otherwise authorized, no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.

18.   Subpart 595.205 of the TSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the TSR:

> Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this part, is hereby prohibited. Any attempt to violate the prohibitions set forth in this part is hereby prohibited. Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited.

## The Foreign Terrorist Organizations Sanctions Regulations

19.   On October 8, 1997, the U.S. Department of State further designated Hizballah as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act, codified at Title 8, United States Code, Section 1189.  See 62 Fed. Reg. 52650 (Oct. 8, 1997).  Section 219 of the Immigration and Nationality Act authorizes the Secretary of State to designate as an FTO foreign organizations that engage in terrorist activity, or retain the capability and intent to engage in terrorist activity or terrorism, and whose terrorist activity or terrorism threatens the security of U.S. nationals or the national security of the United States.

20.   To implement Section 219 of the Immigration and Nationality Act, OFAC issued the Foreign Terrorist Organizations Sanctions Regulations, Title 31, Code of Federal Regulations, Part 597.  The Foreign Terrorist Organizations Sanctions Regulations ("FTOSR") generally block the property of FTOs and prohibit certain transactions with, or for the benefit of, FTOs by U.S. persons.

21.   Subpart 597.201(a) of the FTOSR provides, in relevant part:

> Upon notification to Congress of the
> Secretary of State's intent to designate an
> organization as [an FTO] . . . any U.S.
> financial institution receiving notice from
> the Secretary of the Treasury . . . shall,
> except as otherwise provided in such notice,
> block all financial transactions involving
> any assets of such organization within the
> possession or control of such U.S. financial
> institution until further directive from the
> Secretary of the Treasury, Act of Congress,
> or order of court.

22.  Subpart 597.204 further prohibits attempts and

conspiracies to violate or to evade the prohibitions of the

FTOSR.

### The Global Terrorism Sanctions Regulations

23.  On September 23, 2001, in the wake of the

September 11, 2001, terrorist attacks, President George W. Bush

issued Executive Order 13224, declaring a national emergency

pursuant to IEEPA and other statutes with respect to the threat

to the national security, foreign policy, and economy of the

United States posed by grave acts of terrorism and threats of

terrorism committed by foreign terrorists, including the

terrorist attacks in New York, Pennsylvania, and at the Pentagon,

and the continuing and immediate threat of further attacks on

United States nationals or the United States.  Executive Order

13224 identified 12 individuals and 15 entities whose assets were

blocked.  See 66 Fed. Reg. 49079 (Sept. 23, 2001).

12

24.  On October 31, 2001, the Secretary of State identified Hizballah, among others, as a specially designated global terrorist ("SDGT") pursuant to Executive Order 13224 because it had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.  <u>See</u> 67 Fed. Reg. 12633 (Mar. 19, 2002).

25.  To implement Executive Order 13224, OFAC issued the Global Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 594 ("GTSR").

26.  Subpart 594.201 of the GTSR provides, in relevant part:

> [P]roperty and interests in property of the following persons [including SDGT's] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . . .

27.  Subpart 594.204 of the SDGT further prohibits certain transactions with, or for the benefit of, an SDGT:

> Except as otherwise authorized, no U.S. person may engage in any transaction or dealing in property or interests in property of persons whose property or interests in property are blocked pursuant to § 594.201(a), including but not limited to the making or receiving of any contribution

13

of funds, goods, or services to or for the
benefit of persons whose property or
interests in property are blocked pursuant to
§ 594.201(a).

28. Subpart 594.205 of the SDGT further prohibits

attempts and conspiracies to violate or to evade the prohibitions

of the SDGT:

(a) Except as otherwise authorized, and
notwithstanding any contract entered into or
any license or permit granted prior to the
effective date, any transaction by any U.S.
person or within the United States on or
after the effective date that evades or
avoids, has the purpose of evading or
avoiding, or attempts to violate any of the
prohibitions set forth in this part is
prohibited.

(b) Except as otherwise authorized, and
notwithstanding any contract entered into or
any license or permit granted prior to the
effective date, any conspiracy formed for the
purpose of engaging in a transaction
prohibited by this part is prohibited.

### Iran and Syria Nonproliferation Act

29. On November 22, 2005, President George W. Bush

signed into law the Iran Nonproliferation Amendments Act of 2005,

which, in part, expanded the scope of the Iran Nonproliferation

Act of 2000. Accordingly, the Iran Nonproliferation Act of 2000

was renamed the Iran and Syria Nonproliferation Act. On April

23, 2007, the U.S. Department of State issued a determination

that, inter alia, Hizballah and any successor, sub-unit, or

14

subsidiary, had engaged in activities warranting the imposition

of measures pursuant to the Iran and Syria Nonproliferation Act

(currently the Iran, North Korea, and Syria Nonproliferation Act,

codified as amended at 50 U.S.C. § 1701 note), which provides for

penalties on foreign persons and entities for the transfer to or

acquisition from Iran since January 1, 1999, or the transfer to

or acquisition from Syria since January 1, 2005, of equipment and

technology controlled under multilateral export control lists or

otherwise having the potential to make a material contribution to

the development of weapons of mass destruction or cruise or

ballistic missile systems.  <u>See</u> 72 Fed. Reg. 20158 (Apr. 23,

2007).  This State Department determination regarding Hizballah

expired on April 17, 2009.

### IV.   <u>PROBABLE CAUSE FOR FORFEITURE</u>

**A.   Overview of Money Laundering Scheme**

        30.   This civil forfeiture action relates to a trade-

based money laundering scheme involving the purchase of used cars

and other vehicles in the United States for shipment and sale

abroad, with funds provided by banks, currency exchanges, and

individuals associated with, funded by, controlled by, or

directed by the Lebanon-based terrorist organization known as

Hizballah.

15

31.  Among the documents reviewed by law enforcement
agencies in their investigation of this matter are wire transfer
records from approximately January 1, 2007, through early 2011
(the "Wire Transfer Period").  In the United States, the Federal
Reserve Banks operate a major wire transfer system (the Fedwire
Funds Service); the Clearing House Payments Company L.L.C.
operates another, called CHIPS.  Both systems are used to make
large-value or time-critical domestic and international payments
in U.S. dollars.  Wire transfers can also be accomplished through
other means, including book transfers or proprietary networks,
and may be facilitated by communication systems such as SWIFTNet.
The wire transfer information obtained in the investigation
reveals the date, amount, beneficiary, originator, and various
other details about the transfers.  Analysis of the comment
section data contained within the wire transfer records also
reveals, in some cases, the purpose for the transactions and the
names of the individuals or entities responsible for initiating
the transactions, or on whose behalf the transactions were
ordered other than the originating account holder.

32.  As described more fully below, the key
participants and facilitators of the money laundering scheme
include Hizballah members and supporters, the Lebanese Canadian
Bank, the Hassan Ayash Exchange Company, Ellissa Holding and its

subsidiaries and affiliates, Ayman Saied Joumaa, the Cybamar Swiss group of companies, and their principals, members of the Salhab family, used car lots in West Africa, money couriers operating in West Africa and the Middle East, and used car buyers in the United States.

**B.    Hizballah**

33.   Hizballah is a Lebanon-based terrorist organization formed in approximately 1982.  Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.

34.   According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and political support from Syria; and funding from private donations and profits from legal and illegal businesses.

35.   Hizballah operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state."  As discussed above, Hizballah has been identified as a

terrorist organization by the U.S. Government under numerous

sanctions regulations.

36.   In testimony before the Subcommittee on Near

Eastern and South Central Asian Affairs of the Senate Committee

on Foreign Relations in June 2010, the U.S. Department of State

Coordinator for Counterterrorism described Hizballah as follows:

> Hizballah's persistence as a well-armed
> terrorist group within Lebanon, as well as
> its robust relationships with Iran and Syria,
> and the transfer of increasingly
> sophisticated missiles and rockets to
> Hizballah, threaten the interests of the
> United States, Lebanon, and our partners in
> the region, especially Israel.
>
> * * *
>
> Hizballah remains the most
> technically-capable terrorist group in the
> world and a continued security threat to the
> United States. Hizballah is responsible for
> some of the deadliest terrorist attacks
> against Americans in history, and the United
> States has designated it as a Foreign
> Terrorist Organization since 1997.
>
> * * *
>
> There has been much debate over the political
> identity of Hizballah, as well as the
> prospects for Hizballah to become a
> legitimate political party within Lebanon.
> Following Lebanon's bloody civil war, other
> militias disbanded or were integrated into
> Lebanon's legitimate defense force, the
> Lebanese Armed Forces (LAF). However, despite
> the group's rhetoric and political
> campaigning, there remains today no
> meaningful distinction between the military
> and political wings of Hizballah, as

Hizballah's own leaders regularly acknowledge
publicly. . . . Hizballah is the lone
militia that refused to disarm following the
signing of the Taif Accord, which marked the
end of Lebanon's tragic civil war.

* * *

Despite the devastating effects of its 2006
war with Israel and the 2008 domestic
conflict in Lebanon, which Hizballah
initiated, Hizballah remains today one of the
best armed and most dangerous militias in the
world. Its capabilities exceed those of the
legitimate Lebanese security services and the
United Nations Interim Force in Lebanon
(UNIFIL). . . .

Hizballah also claims publicly to have
reconstituted and improved its arsenal since
the 2006 war. As Lebanon has no domestic arms
industry, this would have undoubtedly been
accomplished by means of smuggling activity
via Syria and Iran. In 2008 alone, Iran
provided hundreds of millions of dollars to
Hizballah and trained thousands of Hizballah
fighters at camps in Iran. Iran continues to
assist Hizballah in rearming, violating
Security Council resolution 1701. . . .

While Iran continues to provide a significant
portion of Hizballah's funding, Hizballah has
also broadened its sources of financial
support in recent years. Hizballah is now
heavily involved in a wide range of criminal
activity, including the drug trade and
smuggling. It also receives funds from both
legitimate and illicit businesses that its
members operate, from NGOs under its control,
and from donations from its supporters
throughout the world. Hizballah also has
established its own commercial and
communications networks outside the Lebanese
legal system that in essence rob the Lebanese
treasury of the tax revenues that would come

via legitimate licensing, registration, and
tax reporting.

37. Hizballah has developed links to money laundering
and narcotics trafficking.  Since in or around 2006, such
narcotics trafficking has been condoned through the issuance of
fatwas by radical Islamic clerics.  The narcotics trade has
become a source of revenue for Hizballah.

C.   Narcotics Trafficking in West Africa

38. During the last decade, drug trafficking
organizations have increasingly used countries along or near the
West African coast as trans-shipment hubs for importing massive
quantities of narcotics, particularly cocaine from South America,
to be later distributed in Europe or elsewhere within Africa.
Through a combination of privately owned aircraft and maritime
vessels, these organizations, predominantly based in Venezuela
and Colombia, have transported hundreds of tons of cocaine, worth
billions of dollars, to West African nations such as Benin,
Sierra Leone, and Togo.

39. According to a 2010 report by the U.S.
Congressional Research Service, law enforcement officials seized
at least 46 metric tons of cocaine bound for Europe via West
Africa between 2005 and 2008.  As much as 300 metric tons of
cocaine, worth approximately $13.5 billion, is estimated to be
trafficked through West Africa to Europe each year.  The

wholesale profits reaped by narco-traffickers during this period
are estimated to be approximately $3.5 billion per year.

40.   Narco-traffickers connected to the money
laundering scheme are heavily involved in this West African
narcotics trade.  For example:

a.   Ayman Joumaa's drug-trafficking organization
transports, distributes and sells multi-ton bulk shipments of
South American cocaine through West Africa.  Joumaa and his
organization operate in Lebanon, West Africa, Panama and
Colombia, and launder proceeds from their illicit activities, as
much as $200 million per month, through various channels,
including bulk cash smuggling operations and Lebanese exchange
houses.  Joumaa's organization uses, among other things,
Hizballah couriers to transport and launder narcotics proceeds.
Joumaa's organization pays fees to Hizballah to facilitate the
transportation and laundering of narcotics proceeds.  For
example, Joumaa's organization sends bulk cash shipments through
the Beirut International Airport, and pays Hizballah security to
safeguard and transport the cash to its recipient.

b.   As described above, these activities led OFAC
to designate Joumaa as a Specially Designated Narcotics
Trafficker, pursuant to the Foreign Narcotics Kingpin Designation
Act.  On November 23, 2011, Joumaa was charged in an indictment,

United States v. Ayman Joumaa, 11 Cr. 560 (TSE), filed in the
Eastern District of Virginia, with conspiracy to distribute
narcotics and conspiracy to commit money laundering.  The
indictment alleges that Joumaa and his co-conspirators
coordinated the shipment of tens of thousands of kilograms of
cocaine, including at least 85,000 kilograms of cocaine sold to
Los Zetas, a Mexican drug cartel, between in or around 2005 to in
or around 2007.  The indictment also alleges that Joumaa
laundered hundreds of millions of dollars in drug proceeds from
West Africa, Europe, Mexico and the United States, largely for
cocaine suppliers in Colombia and Venezuela, who paid Joumaa's
organization a fee of between 8% and 14% of the laundered
proceeds.

          c.    Another drug trafficking organization, led by
Maroun Saade, was also involved in the transportation and
distribution of large quantities of cocaine and other narcotics
in West Africa.  On February 8, 2011, Saade, along with other
defendants, was charged in an indictment, United States v. Maroun
Saade, et al., 11 Cr. 111 (NRB), filed in the Southern District
of New York with offenses arising from an agreement to sell
approximately one thousand kilograms of cocaine or more to
individuals he believed to be affiliated with the Taliban and to

transport and distribute Taliban-owned heroin in West Africa.[1]
Saade is a member of the Free Patriotic Movement, a Lebanese
Christian organization allied with Hizballah, and has provided
services to Hizballah members engaged in narcotics trafficking
and bulk cash smuggling in West Africa.  Saade is a close
associate of Oussama Salhab, a Hizballah operative who, among
other things, controls a network of money couriers who have
transported millions of dollars in cash from West Africa to
Lebanon.  As described more fully below, see ¶¶ 72-73, Saade has
paid bribes to obtain the release of money couriers working for
Salhab who were detained by Togolese authorities.  For example,
after Salhab's and an employee's arrest by Togolese law
enforcement on July 21, 2010, for smuggling bulk currency across
the Togo/Ghana border, Saade secured Salhab's release.  Saade has
also bribed government officials to terminate certain
investigations, most notably an investigation into narcotics

---

[1]  Saade is charged with conspiracy to commit
narcoterrorism, in violation of Title 21, United States Code,
Section 960a and Title 18, United States Code, Section 3238;
conspiracy to import cocaine, in violation of Title 21, United
States Code, Section 963; conspiracy to import heroin, in
violation of Title 21, United States Code, Section 963;
conspiracy to provide material support to terrorists, in
violation of Title 18, United States Code, Sections 2339A and
3238; conspiracy to acquire and transfer anti-aircraft missiles,
in violation of Title 18, United States Code, Sections 2332g and
3238.

trafficking by Imad Zbib, a prominent Hizballah representative in Togo.  Saade has also facilitated the operations of Hizballah operative Oussama Salhab (discussed below, see ¶¶ 56-59, 68-73).  See ¶¶ 72-73.

d.   Zbib is a close associate of Salhab and a West African narco-trafficker.  Zbib's organization has, for example, transported loads of two to three metric tons of cocaine from South America to Togo via maritime shipping.  Zbib distributes this cocaine in Europe, transporting it concealed in used cars nominally purchased for several used car lots he owns in Togo.  Zbib personally transported bulk United States and Euro currency in the amount of at least approximately $2,068,520 and €974,490 across the Togo/Ghana border in 2007 and 2008.

e.   Between at least 2007 and 2009, a Colombia-based drug trafficking organization connected to this conspiracy shipped thousands of kilograms of cocaine from South America to West Africa.  In July 2008, a plane carrying 600 kilograms of cocaine was seized in Sierra Leone, leading to the arrest of several members of the organization.  On July 7, 2009, several of these members and other co-conspirators were charged in an indictment, United States v. Geraldo Quintana-Perez, et al., 08 Cr. 977 (RPP), filed in the Southern District of New York with conspiracy to distribute narcotics in violation of Title 21,

United States Code, Section 846, and other charges.

**D.    Lebanese Canadian Bank**

41.   Prior to being identified by FinCEN as a financial institution of primary money laundering concern in the 311 Action, LCB was Lebanon's eighth-largest bank, headquartered in Beirut and having approximately 35 branches throughout Lebanon. As of 2009, LCB's total assets were worth more than $5 billion. LCB had a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, Dubai-based Tabadul for Shares and Bonds LLC, and Prime Bank Limited of Gambia.  LCB owned 51 percent of Prime Bank, with remaining shares held by local and Lebanese partners.  LCB served as the sole correspondent bank for Prime Bank.

42.   Following FinCEN's identification of LCB as a financial institution of primary money laundering concern in the 311 Action, LCB entered into an agreement with SGBL for SGBL to acquire certain assets and liabilities of LCB.  SBGL completed this acquisition in or about September 2011.

43.   Between approximately January 2007 and approximately February 10, 2011, approximately $229,872,953 was transferred from accounts at LCB to United States car buyers for buying and shipping used cars.

44.   Prior to being identified as an entity of primary money laundering concern by FinCEN in the 311 Action, LCB had poor anti-money laundering controls and, indeed, knowingly conducted business with Hizballah-controlled entities and individuals and entities linked to, among other things, African diamond smuggling, money laundering, and narcotics trafficking.

a.   For example, LCB maintained a banking relationship with the Yousser Company for Finance and Investment (the "Yousser Company") and Bayt al-Mal.  These relationships were managed by LCB's branch on Airport Road in Beirut.  Loans to the Yousser Company were guaranteed by, among others, "Hussain Shami," a director of the company. On September 7, 2006, OFAC designated the Yousser Company, Bayt al-Mal, and an individual named Husayn al-Shami as SDGTs pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations.  OFAC described the Yousser Company and Bayt al-Mal as "Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks. . . . Institutions considering dealing with these two entities are now on notice as to their true character."  Al-Shami was described as the head of Bayt al-Mal and:

a senior Hizballah leader who has served as a
member of Hizballah's Shura Council and as
the head of several Hizballah-controlled
organizations, including the Islamic
Resistance Support Organization. Shami is
also responsible for foreign donations to
Hizballah fundraising organizations.

b.    LCB also maintained a banking relationship

with Farah Company, a subsidiary of "Yousser Finance & Investment

Company, Limited Liability Company." This banking relationship

was also managed by the LCB Airport Road branch in Beirut.

c.    LCB maintained a banking relationship with

Lebanese Arab Company for Touristic Services SARL, a company

owned by the Al Mabarat Association, or "Mabarat Khairiah,"

Hamzeh Safieddine, Mohammed Fadlallah, Kamal Makki, and Ali

Fadlallah. The relationship was managed by LCB's branch on

Airport Road in Beirut. On January 25, 1995, Mohammad Hussein

Fadlallah was designated by the U.S. Department of the Treasury

as a Specially Designated Terrorist pursuant to Executive Order

12947, see 60 Fed. Reg. 5084 (Jan. 24, 1995) and the Terrorism

Sanctions Regulations, and had been called Hizballah's spiritual

leader by OFAC.[2] Fadlallah was the founder of the Al Mabarat

Association.

d.    LCB maintained a banking relationship with

Rayan (Offshore) LLC. Rayan was owned by, among others, Colonel

_____

[2]   Fadlallah died on July 3, 2010.

Rida el-Moussaoui, the brother-in-law of LCB Executive Board
Member and Deputy General Manager Mohammed Hamdoun and a former
officer in the Lebanese security forces; and Nawaf Moussaoui, a
Hizballah public spokesperson and presently a member of the
Lebanese Parliament for the Loyalty to the Resistance Bloc,
Hizballah's political party.

        e.    LCB maintained a banking relationship with
Matrix SAL Off-shore, a company controlled by Kassem Mohamad
Ajami and Mohamad Ali Ezzedine.  Ajami and Ezzedine also owned
Babylon Enterprises Nigeria Limited.  Ajami and Ezzedine are
business associates of Ali Tajideen's company, Tajco.  On
December 9, 2010, OFAC designated Ali Tajideen, his brother
Husayn Tajideen, and their company, Tajco SARL -- along with a
network of businesses owned or controlled by them in Gambia,
Sierra Leone, the Democratic Republic of Congo, Angola, and the
British Virgin Islands -- as SDGTs pursuant to Executive Order
13224 and the Global Terrorism Sanctions Regulations.  OFAC
described Ali Tajideen as a former Hizballah commander and the
Tajideen brothers as Hizballah fundraisers.  Their company,
Tajco, was described as an international trade and real-estate
company that purchased and developed properties in Lebanon on
behalf of Hizballah and that generated millions of dollars in
proceeds used to provide financial support to Hizballah.  Ali and

Husayn Tajideen's brother, Kassim Tajideen, was designated a SDGT on May 27, 2009, and described by OFAC as an important financial contributor to Hizballah who runs a network of businesses in Lebanon and Africa.

    f. LCB maintained a banking relationship with individuals and entities involved in the African diamond smuggling trade. For example, LCB maintained a banking relationship with Nazem Ibrahim Ahmad, a Belgian of Lebanese origin trading in rough diamonds. On October 8, 2002, the United Nations Security Council's Panel of Experts on the Illegal Exportation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo ("DRC") issued a report, S/2002/1146, addressing possible actions to help bring an end to the plundering of the natural resources of the DRC and the effect of those actions on the humanitarian and economic situation of the DRC. The report described the Sierra Gem Diamonds Company, whose principals were Nazem Ahmad, Hassan Ahmad, and Said Ali Ahmad, as associated with one of three Lebanese clans that purchased $150 million in diamonds from the DRC in 2001. The report alleged that the three clans, including the Ahmad clan, had ties to Hizballah and also were involved in counterfeiting, money-laundering and diamond smuggling. In response to an LCB customer due diligence report on Ahmad and the UN report

S/2002/1146, the LCB credit department stated that "we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon," and authorized an increase in credit limits for Ahmad.

   g. In or about September 2003, Ahmad Safa, the Associate General Manager for Branches and Operations, granted exceptions for certain LCB clients from LCB's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon. The clients granted exceptions by Safa included individuals and entities related to Hizballah.

   (1) For example, the Yousser Company, which has been designated as a SDGT by OFAC as discussed above, was exempted from signing CTSs for cash transactions up to $50,000 per week at the Nabatieh branch and up to $60,000 per day at the Airport Road branch.

   (2) The Farah Company for Tourism, a subsidiary of the Yousser Company, was exempted from signing CTSs for cash transactions up to 50,000,000 Lebanese pounds[3] per week at the Nabatieh branch.

---

 [3] As of September 1, 2003, the exchange rate was approximately $1.00 per 1,515 Lebanese pounds, or approximately $33,000 per 50 million Lebanese pounds.

(3)  Hussein Ali Mohamed Chami (Husayn al-Shami), who has been designated as a SDGT by OFAC as discussed above, and Wahid Mahmoud Sbeity, another owner of the Yousser Company, were exempted from signing CTSs for cash transactions up to $30,000 per week at the Nabatieh branch.  Al-Shami, along with two other directors of the company, were exempted from signing CTSs for cash transactions up to $200,000 per day and up to 200,000,000 Lebanese pounds[4] per day at the Airport Road Branch.

(4)  In other words, the Yousser Company, its subsidiary the Farah Company, and its owners and directors collectively were granted exemptions from signing CTSs disclosing the source of funds for cash transactions totaling up to $80,000 and 50,000,000 Lebanese pounds per week at the Nabatieh branch and up to $260,000 and 200,000,000 Lebanese pounds per day at the Airport Road branch.

(5)  The Al Mabarat Association, whose founder was designated a SDT as discussed above, and the Lebanese Arab Touristic Company, a company owned by the Al Mabarat Association, were exempted from signing CTSs for cash transactions up to $55,000 per day and $22,000 per day, respectively, at the Airport Road branch.

---

[4]  As of September 1, 2003, approximately $132,000.

(6)   Al-Aytam, another organization founded by Fadlallah, was exempted from signing CTSs for cash transactions up to $50,000 per day at the Airport Road branch.

(7)   The Al-Shahid Foundation, which OFAC designated as a SDGT pursuant to Executive Order 13224 on July 24, 2007, see 72 Fed. Reg. 60715, was exempted from signing CTSs for cash transactions up to $100,000 per day at the Airport Road branch.

h.   On October 16, 2006, the LCB Anti-Money Laundering Special Committee discussed, among other things, recent OFAC designations of LCB clients the Yousser Company and Hussein Chami (Husayn al-Shami).  Committee members were directed to take the OFAC listing seriously and to avoid implicating the bank with irregular situations with U.S. banking institutions. However, LCB continued to maintain banking relationships with the Yousser Company and al-Shami.

i.   When FinCEN identified LCB as an entity of primary money laundering concern in the 311 Action, it noted that exchange houses with accounts at LCB were used by Ayman Joumaa to launder hundreds of millions of dollars in proceeds of narcotics trafficking.  As described by FinCEN, exchanges and companies related to Joumaa originated over $66 million in wire transfers from Lebanese banks since January 2006, with approximately one-

half of the wire transfers and approximately 94% of the funds originating from LCB, indicating that LCB is the favored bank for these Joumaa-related entities, particularly for illicit banking activity.

45.   LCB also had substantial banking relationships with the Hassan Ayash Exchange and the Ellissa Exchange.   LCB maintained these relationships, despite substantial violations of LCB's anti-money laundering and compliance policies.

a.   The Ellissa Exchange, the Hassan Ayash Exchange, and their principals held accounts with LCB through LCB's branch in Verdun, Beirut.   The Ellissa Exchange was introduced to LCB as a client through the Hassan Ayash Exchange.

b.   A 2006 LCB customer due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut.   The report further noted that LCB had limited "know your customer" files for these clients and that another Lebanese bank had closed its accounts with the Ellissa Exchange.   The report described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

c.   As a result of this 2006 due diligence report, the LCB Anti-Money Laundering Special Committee directed Ahmad Safa to ensure that the Ellissa Exchange accounts complied with LCB reporting and diligence requirements.  Despite this direction, however, the Ellissa Exchange accounts continued to operate with inadequate diligence and reporting.

d.   In approximately 2006, at Ahmad Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, in particular U.S. dollars.  Prior to Safa's intervention, LCB had maintained a diversified source of foreign currencies.

**E.   Hassan Ayash Exchange Company**

46.   The Hassan Ayash Exchange Company is a money exchange based in Beirut, Lebanon.  The Hassan Ayash Exchange is owned and controlled by Mahmoud Hassan Ayash ("Hassan Ayash") and his son, Hassan Mahmoud Ayash.  The exchange's principal office is located adjacent to the Caesar Park Hotel in Beirut, which is owned by Ayman Joumaa.

47.   Wire transfers originating from the Hassan Ayash Exchange Company totaling approximately $141,522,091 were sent to United States accounts for the purpose of purchasing or shipping cars between in or about January 2007 and in or about January 2011.

48.   Hassan Ayash and the Hassan Ayash Exchange Company facilitate bulk cash transfers and money laundering by, among others, Ayman Joumaa and Joumaa's narcotics trafficking and money laundering network.

49.   Hassan Ayash has stated that he has family ties to Hizballah, including Secretary General Hassan Nasrallah, the leader of Hizballah.   Hassan Ayash has further stated that his connections to important people in Lebanon help him provide services for clients of the Hassan Ayash Exchange.   Hassan Ayash requires that an existing client of the Hassan Ayash Exchange Company vouch for a prospective client before the prospective client can establish an account with the exchange to transfer large amounts of money.

F.   **The Ellissa Exchange, Ellissa Shipping Company, and Ellissa Car Parc in Cotonou**

50.   The Ellissa Holding Company owns or controls approximately nine companies in Lebanon, Benin and the DRC, including the Ellissa Exchange, a money exchange based in Sarafand, Lebanon; Ellissa Group SA, which owns a car park in Cotonou, Benin, for receiving and selling used cars imported to the Cotonou port; and Ellissa Shipping, which is principally engaged in shipping used cars to Benin through the Cotonou port. The Ellissa Holding Company is principally owned and controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi.