UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

               Plaintiff,

    -against-

LEBANESE CANADIAN BANK SAL, et al.

    Defendants,

ALL ASSETS OF LEBANESE CANADIAN BANK,
SAL OR ASSETS TRACEABLE THERETO; ALL
ASSETS OF ELLISSA HOLDING COMPANY; ALL
ASSETS OF HASSAN AYASH EXCHANGE
COMPANY, et al.,

            Defendants in rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SWORN CLAIM OF MANHEIM
AUTOMOTIVE FINANCIAL
SERVICES, INC. CONTESTING
<u>FORFEITURE OF PROPERTY</u>**

11-CV-9186 (RJH)

      COMES NOW Manheim Automotive Financial Services, Inc. ("MAFS"), an innocent

owner/lienholder, and respectfully submits its Sworn Claim Contesting Forfeiture of Seized

Property pursuant to 18 U.S.C. § 983 and Rule C of the Supplemental Rules for Certain

Admiralty and Maritime Claims, showing the Court as follows:

      1.     MAFS is a Delaware corporation with its principal place of business in Atlanta,

Georgia. MAFS is in the business of providing floor plan financing to licensed automobile

dealers for the wholesale purchase of used cars, primarily at auto auctions.

      2.     MAFS provided such floor plan financing, in the ordinary course of its business,

to Cedar Exports Auto Sales, Inc. ("Cedar Exports") for the purchase of motor vehicles pursuant.

3.    Prior to MAFS extending said financing, Cedar Exports signed a Promissory Note agreeing to repay any money borrowed from MAFS. A true and correct copy of said Promissory Note is attached hereto as **Exhibit "A."**

4.    Cedar Exports also executed a Security Agreement in favor of MAFS, granting MAFS a lien and security interest in all of Cedar Exports' vehicle inventory, proceeds, and certain other assets. Moreover, the Security Agreement and the Uniform Commercial Code gives MAFS a right to take immediate possession of the inventory upon Cedar Exports' default. A true and correct copy of said Security Agreement is attached hereto as **Exhibit "B."**

5.    MAFS perfected its lien and security interest by filing a Financing Statement with the Tennessee Secretary of State on August 13, 2008. A true and correct copy of said Financing Statement is attached hereto as **Exhibit "C."**

6.    Under the financing agreements described above, MAFS provided purchase money for the acquisition of several vehicles by Cedar Exports, including without limitation the following vehicles seized by the Drug Enforcement Agency (the "Vehicles"):

   (i)    2006 Mercedes E350W (VIN WDBUF56J86A907254) (Asset ID 12-DEA-557837)

   (ii)   2004 Mercedes C230 (VIN WDBRF40J34F479344) (Asset ID 12-DEA-557829)

   (iii)  2005 BMW X3-I6 (VIN WBXPA93495WD21575) (Asset ID 12-DEA-557842)

      (iv)    2007 Lexus IS350 (VIN JTHBE262375013707) (Asset ID 12-DEA-557850)

7.     Cedar Exports failed to repay MAFS for the Vehicles in accordance with the terms of the financing agreements described above and is in breach of said agreements.

8.     The Vehicles are part of the property at issue in the instant forfeiture proceeding.

9.     At present, Cedar Exports owes MAFS approximately $62,056.46 for financing that MAFS provided to Cedar Exports for vehicle inventory. Pursuant to the attached Security Agreement and Financing Statement, this debt is secured by Cedar Exports' entire vehicle inventory, including the Vehicles.

10.     MAFS had no knowledge of the alleged criminal activity that resulted in the Drug Enforcement Agency's seizure of the Vehicles from Cedar Exports. MAFS is an innocent lienholder and will be injured if restitution and/or return of the Vehicles is not made to MAFS promptly, as the Vehicles are depreciating rapidly and daily. MAFS would not have extended financing to Cedar Exports had it known of any unlawful conduct.

11.     As a perfected secured lender that had no knowledge or suspicion of any illegal activities by Cedar Exports or its owners, MAFS has priority over the DEA and other claimants to the Vehicles.

12.     MAFS asserts its interest in and right against the Vehicles pursuant to Title 18 U.S.C.A. § 983 and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims.

13.     Attached hereto is the Affidavit and Verification of Randall Derr, a duly authorized representative of MAFS, swearing to the accuracy of the facts included herein and all attachments hereto.

14.     As set forth in the attached Affidavit and Verification of Randall Derr, the undersigned is the attorney for MAFS and has authority to submit this Sworn Claim Contesting Forfeiture of Seized Property on behalf of MAFS.

WHEREFORE, MAFS respectfully requests that the Court recognize the superiority of MAFS's Claim to the Vehicles, find that MAFS is an innocent owner under § 983(d), and promptly release the Vehicles to MAFS to reduce MAFS' likely losses.  In the alternative, MAFS requests that this Court require the DEA to compensate MAFS for its losses pursuant to 18 U.S.C. § 983(d)(5).


DATED:      Garden City, New York
            February 27, 2012

                              BOND, SCHOENECK & KING, PLLC

                              By: _____
                                  Jessica C. Satriano (JS0981)
                                  *Attorneys for Claimant Manheim*
                                  *Automotive Financial Services, Inc.*
                                  1399 Franklin Avenue, Suite 200
                                  Garden City, New York 11530
                                  (516) 267-6300; jsatriano@bsk.com

## AFFIDAVIT AND VERIFICATION

I, Randall Derr, a duly authorized agent of Manheim Automotive Financial Services, Inc. ("MAFS"), having fully reviewed the foregoing Sworn Claim Contesting Forfeiture of Seized Property, hereby affirm and swear that the facts set forth in the Claim, including all attachments thereto, are truthful and accurate in every respect. MAFS' legal counsel, Jessica Satriano of Bond, Schoeneck & King, PLLC, and Stacey Carroll of Dow Lohnes PLLC, have full authority to represent MAFS in this proceeding. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Randall Derr
Director, Manheim Automotive Financial Services, Inc.


SWORN to and SUBSCRIBED

Before me this 27th day

of February, 2012

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRETCHEN L. LEIBLEY, Notary Public
Penn Twp., Lancaster County, PA
My Commission Expires April 30, 2015

# EXHIBIT A

**PROMISSORY NOTE**

$ 400,000.00

City, State: MOUNT JULIET, TN

Date: July 21, 2010

FOR VALUE RECEIVED, the undersigned <u>CEDAR EXPORTS AUTO SALES, INC.</u>, a <u>TENNESSEE CORPORATION</u> ("Borrower"), promises to pay to Manheim Automotive Financial Services, Inc. ("Lender"), or order, at its place of business at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328, or at such other place as may be designated in writing by the holder of this Promissory Note ("Note"), so much of the principal sum of <u>FOUR HUNDRED THOUSAND DOLLARS ($ 400,000.00)</u>, which has been or may be advanced by Lender pursuant to the terms of a Security Agreement dated as July 21, 2010_, and related loan agreements, between Borrower and Lender (the "Security Agreement"), together with interest on the unpaid principal balance advanced hereunder from the date of the Advance until paid, at a fluctuating Interest Rate per annum equal to the Index Rate plus an Applicable Percentage as set forth below, provided however that amounts outstanding with respect to the following types of Advances may not exceed the limits listed below:

| Types of Advances | Amount | Applicable Percentage |
|---|---|---|
| Advances for Inventory Finance Loan | $ 400,000.00 | 2.00 % |

The initial Advance, all subsequent Advances, and all payments made on account of principal may be reflected on monthly statements if provided by Lender to Borrower. The aggregate unpaid principal amount shown on any monthly statement shall be rebuttable presumptive evidence of the principal amount owing and unpaid on this Note. The failure to record the date and amount of any Advance on such monthly statement or provide such monthly statement or the Advance of amounts exceeding the limits of this Note shall not, however, limit or otherwise affect the obligations of Borrower under the Security Agreement or under this Note to repay the principal amount of the Advances together with all interest accruing thereon.

"Index Rate" shall mean the "Prime Rate" published in The Wall Street Journal on the date(s) noted below (in the event no such rate is published in The Wall Street Journal on such date(s), the Index Rate shall be the "Prime Rate" published therein for the most recent business day preceding the last business day of such month on which such rate was published) or, in the event The Wall Street Journal does not quote a "Prime Rate," the rate quoted as the "Prime Rate" in a publication as Lender may, from time to time, hereafter designate in writing. The Index Rate shall be determined by Lender on the last Business Day of each calendar month and the Interest Rate based on such Index Rate shall be in effect for the following month. Interest shall be calculated on the basis of a 360-day year for actual days elapsed.

Principal and interest hereunder shall be due and payable by Borrower on the dates and in the manner as follows:

(a) **Subject to any payment changes resulting from changes in the Index Rate, Borrower will pay (i) regular monthly installments of interest, due as of each payment date, commencing on the fifteenth (15th) day of the first month after the Date of this Note, with all subsequent payments to be due on the fifteenth (15th ) day of each month thereafter or such other dates as may be specified by Lender; and (ii) payments of principal required by Lender from time to time if the Vehicle is subject to Lender's curtailment program.**

(b) Any Advance for a Vehicle shall be payable on the earliest of:

   i.   forty-eight (48) hours from the time of sale or within twenty-four (24) hours from the time Borrower receives payment by or on behalf of the purchaser of such Vehicle;

   ii.   the Maturity Date (as defined below) for such Advance; or

   iii.   the termination of the Security Agreement.

The "Maturity Date" for any Advance shall mean the date upon which the Advance is to be repaid as set forth in the Security Agreement; provided however, if no such date is specified by Lender, then the Advance shall be deemed due upon demand of Lender. Borrower may prepay at any time all or part of the principal balance under this Note subject to any penalties specified in the Lender Guidelines for Inventory Finance Loans. All principal and interest, costs, and expenses due hereunder are payable in lawful money of the United States of America.

This Note has been executed and delivered pursuant to the Security Agreement. Terms defined in the Security Agreement and not otherwise defined herein are used herein with the meanings defined for those terms in the Security Agreement. Upon the occurrence of an Event of Default, all amounts owed under the Loans shall, at the option of Lender, mature and be immediately due and payable. Any Advance in default shall bear interest at a rate equal to the Interest Rate plus three percent (3%) until paid in full.

The obligations under this Note are secured by the Collateral pledged by Borrower to Lender pursuant to the Security Agreement.

Borrower and all others who may become liable for all or any part of this obligation, hereby agree to be jointly and severally bound, and jointly and severally waive and renounce presentment, protest, demand, notice of dishonor, and any and all lack of diligence or delays in collection or endorsement hereof, and expressly consent to any extension of time, release of any party liable for this obligation or any

C. 1

993710

guaranty of this obligation, release of any security which may have been or which may hereafter be granted in connection herewith or any guaranty of this obligation, or any other indulgence or forbearance which may be made without notice to said party and without in any way affecting the liability of such party.

Nothing contained herein nor in any transaction related hereto shall be construed or shall so operate either presently or prospectively (a) to require the payment of interest at a rate greater than is now lawful in such case to contract for, but shall require payment of interest only to the extent of such lawful rate or (b) to require the payment or the doing of any act contrary to law; but if any clause or provision herein contained shall otherwise so operate to invalidate this Note and/or the transaction related hereto, in whole or in part, then such clause(s) and provision(s) only shall be held for naught as though not contained herein and the remainder of this Note shall remain operative and in full force and effect.

If for any reason, interest in excess of the amount as limited in the foregoing paragraph shall have been paid hereunder, whether by reason of acceleration or otherwise, then in that event any such excess interest shall constitute and be treated as a payment of principal hereunder and shall operate to reduce such principal by the amount of such excess, or if in excess of the then principal indebtedness, such excess shall be refunded upon notice and demand from Borrower.

The rights and remedies of Lender as provided in this Note or any document securing this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against Borrower, any guarantor of these obligations, or any security for the debt evidenced by this Note, at the discretion of Lender.

The rights and obligations of Borrower and Lender shall be binding upon and benefit the successors, assigns, administrators, and transferees of the parties.

Borrower agrees that if, and as often as, this Note is placed in the hands of an attorney for collection, to defend or enforce any of Lender's rights hereunder, under the Security Agreement, under any other agreements related to this Note, or under any documents securing this Note, whether or not litigation is commenced, Borrower shall pay to Lender its reasonable attorneys' fees (including, but not limited to, bankruptcy and appeals), together with all court costs and other expenses which are incurred or paid by Lender in connection therewith.

IN NO EVENT WILL LENDER BE LIABLE TO BORROWER FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, WHETHER OR NOT LENDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IN NO EVENT WILL LENDER BE LIABLE TO BORROWER FOR DAMAGES IN EXCESS OF THE SUMS PAID BY BORROWER TO LENDER UNDER THIS NOTE.

BORROWER HEREBY KNOWINGLY AND VOLUNTARILY AGREES AND CONSENTS TO WAIVE BORROWER'S CONSTITUTIONAL RIGHT TO A TRIAL BY JURY FOR ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST LENDER, WHETHER IN THE NATURE OF CONTRACT, TORT, OR OTHERWISE, AND WHETHER ARISING UNDER THIS NOTE OR OTHERWISE. BORROWER AGREES AND UNDERSTANDS THAT ANY SUCH CLAIMS SHALL BE TRIED BEFORE A JUDGE WITH NO JURY. BORROWER HAS FULLY READ THIS SECTION, HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL REGARDING SAME, AND BORROWER COMPLETELY UNDERSTANDS THIS SECTION'S CONTENTS AND THE CONSEQUENCES OF WAIVING BORROWER'S RIGHT TO A TRIAL BY JURY. NOTWITHSTANDING ANY OTHER CHOICE-OF-LAW PROVISION IN THIS NOTE, THE LAWS OF THE STATE OF BORROWER'S LOCATION SHALL CONTROL THE ENFORCEABILITY AND INTERPRETATION OF THIS PROVISION ONLY, AND SHOULD A COURT FIND ANY PART OF THIS SECTION TO BE UNENFORCEABLE, THE REMAINDER OF THIS SECTION AND NOTE REMAIN IN FULL FORCE AND EFFECT.

Failure to exercise any right or option herein given to Lender shall not constitute a waiver of the right to exercise the same at a later time or upon the occurrence of any subsequent event permitting such exercise.

This Note and the transactions hereunder shall be governed and construed in accordance with the internal laws of the State of Georgia, where the Lender has its principal place of business, where payment is to be made, and where Lender negotiated the terms of this Note and the Security Agreement, without reference to the conflict of laws principles of such State. Jurisdiction and venue for its enforcement shall exist, nonexclusively, in the courts of Georgia.

Buyer may not assign this Note or any of the rights or interests, or delegate any of its obligations, hereunder, by operation of law or otherwise, in whole or in part, without the prior written consent of Lender.

This Note may not be changed, modified, amended, or terminated orally, but may only be changed, modified, amended, or terminated by an agreement in writing signed by both Borrower and Lender, except that this paragraph may not be changed, modified, amended, or terminated under any circumstance. If the original version of this Note cannot be found, a facsimile transmission or e-mail transmission of a portable document format version of this Note executed by Borrower shall be deemed to be an original. Lender may, in its discretion, keep and store only an electronic copy of this Note, and any photostatic, microphotographic, photographic, optical image, or other reproduction of such executed by Borrower, shall be admissible in evidence in any proceeding before any court, board, bureau, department, commission,

or agency of the state, in lieu of and without accounting for the original of such writing or record, if such reproduction accurately reproduces or forms a durable medium for reproducing the original.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized officer as of the date first above written.

CEDAR EXPORTS AUTO SALES, INC.
a  TENNESSEE    CORPORATION

By: _____  ◄─ *SIGN HERE*

Name: KHALIL ABDEL-KHALEK

Title: President

GUARANTOR ACKNOWLEDGEMENT in his/her individual capacity and as Guarantor of this Promissory Note:

_____  ◄─ *SIGN HERE*
KHALIL ABDEL-KHALEK

_____  ◄─ *SIGN HERE*

_____  ◄─ *SIGN HERE*

REVISED July. 2010                          C. 3                          993710

# EXHIBIT B

**TNAA**

## MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC.
### LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this "Agreement") is dated and entered into as of the date listed below between Manheim Automotive Financial Services, Inc. (more specifically defined in Section 1 below as "Lender") and the undersigned borrower ("Borrower").

A. WHEREAS, Borrower wishes to purchase motor vehicles from time to time through various automotive auctions, directly from other motor vehicle dealers, or otherwise for Borrower's inventory ("Vehicles"); and

B. WHEREAS, Borrower requests and Lender agrees to finance the acquisition of eligible Vehicles and other eligible Collateral under the Loans made by Lender to Borrower pursuant to this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, the parties agree as follows:

**1. Definitions.**

When used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

o "Advance" has the meaning set forth in Section 2(a).

o "Advance/Fee Schedule" means the schedule to this Agreement substantially in the form attached hereto as Exhibit A, which indicates, as applicable: (i) the maximum total Advances which may be outstanding under the Loans and (ii) the amount of fees applicable to each Advance.

o "Agreement Date" means the date on which this Agreement is executed.

o "Applicable Percentage" has the meaning set forth in each of the Promissory Notes.

o "Billing Period" means a calendar month or such other period announced by Lender as the billing period for Advances under this Agreement.

o "Borrower" has the meaning set forth in the introduction to this Agreement.

o "Business Day" means a day other than Saturdays, Sundays, bank holidays, or other days on which the principal office of Lender is not open for business.

o "Collateral" has the meaning set forth in Section 5.

o "Commitment Termination Date" means for each Loan hereunder, the earliest of (a) the date of termination of Lender's obligations to make Advances or permit the Loans to remain outstanding pursuant to Section 13, or (b) the date of indefeasible prepayment in full by Borrower of the Loans whereby the applicable Loan Commitment is reduced to zero dollars ($0), and Borrower acknowledges in writing that the applicable Loan is permanently terminated.

o "Customer" means a customer of Borrower who purchases a Vehicle pursuant to a Customer Contract together with any Guarantor thereof.

o "Customer Contract" means a vehicle retail installment sale contract or other chattel paper which Borrower uses to secure a Receivables Loan from Lender.

o "Environmental Laws" means all federal, state and local laws, regulations, codes, plans, orders, decrees, judgments, injunctions, notices or demand letters issued, entered, or promulgated, approved or otherwise relating to pollution or protection of the environment.

o  "Event of Default" means any of the events specified in Section 14.

o  "Guaranties" means the guaranties of payment and performance of all or some of Borrower's indebtedness and obligations under the Loans, executed and delivered by the Guarantors, substantially in the form attached hereto as Exhibit B.

o  "Guarantors" means those Persons who have executed and delivered Guaranties.

o  "Indemnified Person" has the meaning set forth in Section 17.

o  "Index Rate" means the base Prime Rate as more specifically set forth in each of the Promissory Notes.

o  "Initial Term" has the meaning set forth in Section 4.

o  "Intercreditor Agreement" has the meaning set forth in Section 12.

o  "Interest Rate" means the Index Rate plus the Applicable Percentage.

o  "Inventory Finance Loan" means a regular inventory financing line of credit.

o  "Lender" has the meaning set forth in the introduction to this Agreement as well as including all of the direct and indirect operating subsidiaries of Manheim, Inc., for all of whom it is hereby acknowledged Manheim Automotive Financial Services, Inc. acts as agent in signing this Agreement, to the extent of obligations owed or to be owed by Borrower to any of them, now or hereafter.

o  "Lender Guidelines" means the guidelines and procedures for each Loan type, substantially in the form attached hereto as Schedule I, as modified by Lender from time to time in its discretion.

o  "Loan Commitments" means the aggregate amount available to Borrower as designated under the Advance/Fee Schedule, as such commitments may be reduced, amortized, or adjusted from time to time in accordance with this Agreement.

o  "Loan Documents" has the meaning set forth in Section 24.

o  "Loans" means, collectively, any Inventory Finance Loan, Rental Fleet Loan, Receivables Loan, and any other loans provided by Lender to Borrower hereunder, and any other loans, advances, or indebtedness owing from Borrower to Lender, whenever arising, all of which are secured by this Agreement.

o  "Maturity Date" means the date upon which an Advance is due as set forth in the Loan Documents; provided, however if no such date is specified, then the Advance shall be deemed due upon demand of Lender.

o  "Notice of Advance" has the meaning set forth in Section 2(a).

o  "Outside Purchases" means purchases of Vehicles at auctions not operated by Lender or its affiliates, i.e. non-Manheim auctions.

o  "Person" means any individual, sole proprietorship, partnership, corporation/LLP/LLC, or resident or general partnership (whether or not for profit), joint venture, association, estate, trust, or unincorporated organization (whether foreign, territorial, national, federal, state, commonwealth, parish, county, city, municipal, local or otherwise, including, without limitation, any instrumentality, division, agency, body, or department thereof). Unless the context otherwise requires, "Person" shall not include Lender.

o  "Power of Attorney" has the meaning set forth in Section 12.

o  "Promissory Note(s)" has the meaning set forth in Section 2(b).

o  "<u>Receivables Loan</u>" means a line of credit provided by Lender to Borrower for working capital secured by specific Customer Contracts (in addition to other general Collateral), with each Advance based on the wholesale value of the underlying Vehicle.

o  "<u>Renewal Term</u>" has the meaning set forth in <u>Section 4</u>.

o  "<u>Rental Fleet Loan</u>" means an inventory financing line of credit for Borrower's rental vehicle fleet.

o  "<u>Rental Vehicle</u>" means a Vehicle financed hereunder and used in Borrower's inventory of daily rental vehicles in the ordinary course of business.

o  "<u>Subordination Agreement</u>" has the meaning set forth in <u>Section 12</u>.

o  "<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as enacted in the state where the Borrower is located and the version in effect as of the Agreement Date.

o  "<u>Vehicle</u>" has the meaning set forth in Recital A.

All other terms contained in this Agreement shall, when the context so indicates, have the meanings provided for by the Uniform Commercial Code.

2.  <u>Loan Terms</u>.

Lender agrees to make the Loans to Borrower during the term of this Agreement and so long as there has not occurred an Event of Default, in a total aggregate principal amount not to exceed the amount set forth on the Advance/Fee Schedule for all such Loans, and Borrower promises to repay such Loans on the terms and conditions set forth below and in the Advance/Fee Schedule, Lender Guidelines, the Promissory Note(s), and any other Loan Documents:

(a)  <u>Advances; Notice of Advance</u>. Subject to the terms and conditions hereof, Lender agrees to make advances (each, an "Advance") available to Borrower from time to time until the Commitment Termination Date. The aggregate principal amount of Advances outstanding shall not at any time exceed the Loan Commitments as set forth on the Advance/Fee Schedule. Until the Commitment Termination Date and subject to the terms and conditions hereof, Borrower may from time to time borrow, repay, and re-borrow under this <u>Section 2</u> and in accordance with the Promissory Notes and Advance/Fee Schedule. Lender, in its sole discretion, may require Borrower to provide advance written notice (each such notice, a "Notice of Advance") prior to making any Advance hereunder.

(b)  <u>Promissory Note</u>. Borrower shall execute and deliver to Lender a Promissory Note to evidence each Loan Commitment. Each Promissory Note shall be in the principal amount of each applicable Loan Commitment, dated the Agreement Date and substantially in the form attached hereto as <u>Exhibit C</u> (each a "Promissory Note," and collectively the "Promissory Notes"). The Promissory Notes shall represent the obligations of Borrower to pay the amount of the Loan Commitments or, if less, the aggregate unpaid principal amount of all Advances to Borrower together with interest and fees thereon as prescribed in <u>Section 3</u>. The entire unpaid balance of the Loans and all other non-contingent obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

(c)  <u>Repayment of Loans</u>. Each Advance, from time to time as necessary on or after the Agreement Date, for the purchase of a Vehicle shall be payable in full on the earliest of:

  i.  forty-eight (48) hours from the time of the Vehicle sale or within twenty-four (24) hours from the time Borrower receives payment by or on behalf of the purchaser of such Vehicle; or

  ii.  the Maturity Date for such Advance; or

  iii.  the termination of this Agreement.

In addition, payments of principal shall be made at Lender's request to offset depreciation pursuant to Lender's curtailment program as applicable. The maximum amount of Advances outstanding at any one time under any Loan shall not exceed the amount set forth in the applicable Promissory Note, although Borrower shall be liable for any amounts borrowed. Any payments made by Borrower pursuant to this Section 2 may be applied as follows: first, to fees and expenses of Lender then due and payable; second, to interest then due and payable on the Loans; and third, to the principal balance of the Loans. The aggregate unpaid principal amount shown on any monthly statement shall be rebuttable presumptive evidence of the principal amount owing and unpaid on the Loans. The failure to record the date and amount of any Advance on such monthly statement or provide such monthly statement or the Advance of amounts exceeding the limits of any Promissory Note, shall not, however, limit or otherwise affect the obligations of Borrower under this Agreement or under any other Loan Documents to repay the principal amount of the Advances together with all interest accruing thereon.

(d) Payments Received from Manufacturers or Distributors. At the request of Lender, in the event that Borrower receives any payments from holdback reserves, manufacturer rebates, incentive payments, finance reserves, or any other form of payment from a manufacturer or a distributor, such payments shall be immediately forwarded to Lender, and Lender shall apply such sums to the outstanding balance with respect to the applicable Loans.

(e) Repayment of Other Loans. Lender may withhold from an Advance the amount required by any floorplan finance creditor or other creditor of Borrower to release such creditor's lien on Vehicles or as described in Customer Contracts. Lender may forward any withheld amounts directly to the applicable creditor(s).

(f) Mandatory Prepayments under Customer Contracts. Immediately upon receipt by Borrower of any prepayments from Customer, Borrower shall repay the applicable Loan in an amount equal to all such payments. Any mandatory prepayments will be applied in the order determined by Lender in its discretion. Additionally, upon the occurrence of any of the following events, Borrower shall immediately repay amounts outstanding under the applicable Loan to the extent secured by affected Customer Contracts: (i) Borrower repossesses a Vehicle subject to a Customer Contract (at Lender's discretion, repossessed Vehicles subject to a Customer Contract may be re-contracted within sixty (60) days from the date of repossession, provided, that, Lender receives written notice from Borrower within ten (10) days of the repossession date); (ii) a Vehicle subject to a Customer Contract suffers significant damage or is totaled (at Lender's discretion, repayment accommodations may be offered on contracts with verified insurance claims pending); (iii) skip accounts, or a Customer has failed to make a full scheduled payment due under a Customer Contract, and such failure has continued for more than fifty-nine (59) days after the due date of the payment; (iv) Borrower fails to provide Lender with perfected title, or provide to Lender verification that Borrower is recorded as lien holder, within thirty (30) days from Borrower's receipt of original title; or (v) the termination of this Agreement.

(g) Use of Proceeds; Restrictions. The proceeds of the Loans shall only be used to purchase Vehicles to be held as inventory of Borrower. Each Vehicle financed through the Loans shall be floor planned or otherwise placed into Borrower's inventory, as applicable, within seven (7) days of its acquisition hereunder. Unless otherwise expressly approved in writing by Lender, Loans shall not be used to finance trade-ins, salvage units, wrecked units, inoperable units, flood-damaged units, personal watercraft, Canadian imports, gray market cars, motorcycles, scooters, trailers, kit cars, snowmobiles, wreckers, ATVs, limousines, RVs, buses, vehicles over 1 ton, boats, collector or classic cars, electric cars, Smart Cars, golf carts, or "drivers"/demos. Vehicles financed by Lender are not to be used for Borrower's personal use. Lender will not finance Vehicles intended for export. Any Attempt by Borrower to finance any vehicle prohibited in this Section 2(g) constitutes an Event of Default under this Agreement. Any additional restrictions set forth in any Lender Guidelines are hereby incorporated by reference and made a part of this Agreement.

(h) Time of Payments. Payments on Loans received by Lender in good funds no later than 1:00 P.M. in the time zone where Lender is located, shall be credited to Borrower's account within one (1) Business Day after the date of Lender's receipt of such payments or within one (1) Business Day after the date the Lender's bank records a wire transfer of such payment.

3. Interest/Fees.

(a) Rates of Interest. The Loans shall bear interest until paid in full at a per annum rate equal to the Interest Rate.

(b) _Interest Rate._ The Index Rate shall be determined by Lender on the last Business Day of each calendar month and the Interest Rate based on such Index Rate shall be in effect for the following month. Interest shall be calculated on the basis of a 360-day year for actual days elapsed and shall be payable on the fifteenth (15th) day of each month for the preceding month or on such other day as Lender may from time to time indicate.

(c) _Interest Accrual on Advances._ Interest on each Advance shall begin to accrue on the date of the Advance for such Vehicle and continue accruing on the aggregate unpaid Loan amount(s) with payments credited as specified in Section 2(h). In the event Lender pays an auction or other seller directly on Borrower's behalf, the date of Advance shall be the date of Borrower's purchase unless Lender, in its discretion, chooses a later date.

(d) _Default Rate of Interest._ Any Advance which is in default hereunder shall bear interest at a rate equal to the Interest Rate plus three percent (3%) until such Advance is paid in full.

(e) _Administration Fees._ In addition to interest on each Advance, Borrower shall pay an administration fee or fees in the amount set forth on the Advance/Fee Schedule.

(f) _Late Fees._ In addition to interest, Lender may charge a late fee as set forth in the Advance/Fee Schedule on any Advance not paid in accordance with Section 2.

(g) _Other Fees._ Lender may also charge Borrower for other reasonable expenses or costs, such as inspection fees, incurred in servicing and monitoring the Loans and Collateral.

## 4. Term.

The initial term of this Agreement shall commence on the Agreement Date and shall continue for one (1) year thereafter (the "Initial Term"). After the Initial Term, this Agreement shall automatically renew for one (1) year successive terms (each a "Renewal Term") unless terminated by either party notifying the other in writing no later than ninety (90) days prior to the commencement of any Renewal Term. In addition to Lender's right to terminate this Agreement as set forth in Section 13 below, this Agreement may be terminated at any time by Lender or by Borrower, if not in default, by either party providing the other party ninety (90) days' prior written notice. In addition to any and all rights and remedies available to Lender under this Agreement, at law, and in equity, Lender may terminate this Agreement immediately upon an Event of Default by Borrower.

## 5. Collateral.

(a) _Pledge of Collateral._ For the purpose of securing the Loans, or any other indebtedness of Borrower or any Guarantor to Lender, Borrower hereby grants Lender a security interest in all Vehicles, inventory, parts and accessories inventory, equipment, fixtures, accounts, deposit accounts, accounts receivable, holdback reserves, manufacturer rebates and incentive payments, payment intangibles, instruments, securities and security accounts, and general intangibles of Borrower now owned and hereafter acquired, wherever located; all accessions to, substitutions for, and all replacements of any of the foregoing; all chattel paper, documents, instruments, monies, documents of title, residues and property of any kind related to any of the foregoing; all books and records of Borrower related to any of the foregoing, including without limitation, computer programs, print-outs, and other computer hardware and software materials and records pertaining to any of the foregoing; together with all proceeds and products of the foregoing, including, without limitation, proceeds of insurance policies insuring any of the foregoing (collectively, "Collateral"). The security interest granted in this Agreement is in addition to and not in substitution of any right of offset, netting, or reclamation that Lender may have against Borrower pursuant to any contract or applicable law.

(b) _Further Assurances._ Borrower shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Lender may deem desirable to protect the Collateral or otherwise obtain the full benefits of this Agreement and of the rights and powers herein granted, including without limitation, the following: (i) execute such supplemental documents or financing statements as Lender may require to evidence or perfect the security interest granted hereunder or under any other Loan Document; (ii) use its best efforts to secure all consents and approvals necessary or appropriate for the assignment to Lender, or for Lender to receive the benefit of, any Customer Contract, and to enable Lender to enforce the security interests granted hereunder or under any other Loan Document; (iii) provide Lender and its agents and contractors with full access to the Collateral, including any and all books and records, related thereto; (iv) authorize Lender to file any financing or continuation statements

under the Uniform Commercial Code with respect to the security interest granted hereunder or under any other Loan Document; and (v) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by bills of sale and any other instruments of transfer executed for Borrower) promptly after Borrower receives the same.

(c) Certificate of Title; Audit Rights. Lender may obtain and retain the certificate of title in its possession until the applicable Vehicle is sold by Borrower and Borrower's debts and obligations to Lender are paid in full. Lender shall have the right to inspect the Vehicles and other Collateral and Borrower's books and records at any time and without advance notice. Borrower agrees to retain and preserve its books and records at its principal place of business for a period of at least three (3) years from the date of final billing under this Agreement.

6. **Use and Protection of Collateral.** Borrower shall (a) maintain, exhibit, and sell the Vehicles and other Collateral only in the ordinary course of business solely at the designated places of business listed on Exhibit D hereto; (b) protect and secure the Vehicles and other Collateral; (c) maintain and preserve the Vehicles and other Collateral in good order and condition; (d) not impair the value of the Vehicles or other Collateral; (e) keep the Vehicles and other Collateral free of taxes, liens, or encumbrances, and any sums which may be paid by Lender, in its discretion, in release or discharge thereof shall be paid by Borrower to Lender upon demand; (f) not use the Vehicles and other Collateral illegally or improperly; and (g) notify Lender monthly and upon request of the location of each Vehicle. If the Loans being made hereunder include a Rental Fleet Loan, Borrower may rent the Rental Vehicles in the ordinary course of business solely at the designated places of business listed on Exhibit D, provided that Borrower shall not sell or otherwise dispose of the Rental Vehicles, or hold the Rental Vehicles as inventory for sale, except that Borrower may liquidate certain Rental Vehicles at the end of such vehicle's ordinary rental life consistent with Borrower's standard past business practices.

7. **Insurance.**

Borrower is responsible for insurance covering the Vehicles and other Collateral against all risks, with an insurance company acceptable to Lender (including without limitation, liability insurance covering each Vehicle at a minimum level as reflected in the attached insurance requirement letter and business interruption insurance) of such types and in such amounts as Lender may reasonably require and will provide to Lender copies of insurance policies and certificates properly endorsed to show Lender's interest as loss payee, additional insured, and certificate holder, in form and substance satisfactory to Lender. Such endorsement shall provide that the insurance companies will give Lender at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of Borrower or any other Person shall affect the right of Lender to recover under such policy or policies of insurance in case of loss or damage. Borrower hereby directs all insurers under such policies of insurance to pay all proceeds payable thereunder directly to Lender. Proceeds payable to Lender under any such policies shall be applied to the indebtedness due Lender under this Agreement on such basis as Lender shall determine.

In the event Borrower, at any time or times hereafter, shall fail to obtain or maintain any of the policies of insurance required in this Agreement or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower under this Agreement, may (but shall be under no obligation to do so) at any time or times thereafter obtain and maintain such policies of insurance and pay such premium and take any other action with respect thereto which Lender deems advisable. All sums so disbursed by Lender, including, without limitation, attorneys' and paralegals' fees, court costs, expenses and other charges relating thereto, shall be payable, on demand, by Borrower to Lender and shall be additional indebtedness due Lender under this Agreement and be secured by the Collateral.

8. **Borrower's Financial Condition.**

Borrower represents that it now has, and covenants that it will have at the time of any Advance through the date of repayment of the Loans, (a) reasonably adequate cash and equity capital to conduct its business and pay its debts as they mature, (b) capital and other financial resources reasonably adequate to engage in the business in which it is engaged or in any business or transaction in which it may engage hereafter, (c) the ability to pay its debts and all debts it incurs hereafter as they mature, and (d) ownership of property unencumbered and not hypothecated in any fashion to the benefit of a third party, having a value, at a fair valuation, greater than the sum of its debts. Borrower

further warrants that it has not incurred and will not incur any other indebtedness, and that no other lender has or will acquire a perfected security interest in any of the Collateral, other than as disclosed on Schedule II attached hereto.

### 9. Borrower's Financial Statements and Records.

(a) As soon as possible, but not later than six (6) months after the close of each fiscal year of Borrower, Borrower agrees to provide Lender with the audited financial statements of Borrower as certified by Borrower's independent certified public accountant, or in lieu of audited financial statements, certified copies of Borrower's federal income tax returns from the previous calendar year.

(b) Upon request of Lender, Borrower agrees to provide Lender with Borrower's unaudited interim financial statements, including balance sheets and statements of income and expense as of the month-end and for the portion of Borrower's fiscal year then elapsed, as prepared in accordance with generally accepted accounting principles and fairly presenting the financial position at such date and results of operations of Borrower for such period.

(c) Upon request of Lender, Borrower agrees to provide Lender with Borrower's bank statements and any other financial information requested by Lender.

(d) Borrower certifies that each financial statement, bank statement, and any other document provided under this Section 9 shall be complete, accurate, and current in all respects.

(e) Borrower shall maintain for five (5) years, and make available to Lender upon request, all financial statements and records of Borrower related to the transactions hereunder, including, but not limited to, bank statements, canceled checks, sales invoices, proof of payment for any Collateral, and deal jackets or other sale files.

### 10. Other Agreements of Borrower.

(a) Borrower represents and warrants that it has correctly set out (i) on the signature page of this Agreement, as applicable, its legal name, state of incorporation, formation, or residency, and address of its principal place of business and (ii) on Exhibit D hereto, all locations at which Collateral will be kept.

(b) Without Lender's prior written consent, which consent Lender may withhold in its absolute discretion, Borrower agrees that it shall not: (i) make any distributions of its property or assets, except distributions of earnings or payments of principal and interest to service indebtedness in the ordinary course; (ii) sell, issue, or redeem, retire, purchase or otherwise acquire, directly or indirectly any of its stock, which would reduce, in the aggregate and on cumulative basis, either the cash position or "tangible net worth" of Borrower (as defined below) by more than ten percent (10%); (iii) make any material change in its capital structure, or make any material change in any of its business objectives, purposes, or operations; (iv) make any loans or other advances of money or any loans or advances of inventory or other property, to any Person, including, without limitation, any officer, director, stockholder, employee, or affiliate of Borrower, other than (A) advances against commissions, and other similar advances to employees in the ordinary course of business, and (B) loans not exceeding an aggregate of ten percent (10%) of the outstanding balance of the Loans at any time; (v) incur additional indebtedness or grant a security interest in the Collateral to other lenders beyond that set forth on Schedule II attached hereto; (vi) allow Borrower's "tangible net worth" as defined above to be less than 50% of the Loan Commitments at any time; (vii) allow the annual salaries of officers to exceed 110% of salaries in effect in the immediately preceding year; (viii) pay out any bonus to any employee, officer, or representative of Borrower which would reduce the "tangible net worth" below the level set forth above; (ix) undertake or permit any of its equity holders to undertake any transaction or series of transactions that would result in the equity holders of Borrower as of the Agreement Date owning and controlling the economic and voting rights associated with the ownership of less than seventy-five percent (75%) of all classes of the outstanding equity of Borrower on a fully diluted basis, unless Borrower first provides Lender thirty (30) days' prior written notice describing the proposed transaction in reasonable detail and Lender consents in writing to the proposed transaction, which consent Lender may withhold in its absolute discretion; or (x) engage in any transaction or series of transactions to sell, liquidate, or otherwise transfer, all or substantially all of its assets, unless Borrower first provides Lender thirty (30) days' prior written notice describing the proposed transaction in reasonable detail and Lender consents in writing to the

proposed transaction, which consent Lender may withhold in its absolute discretion.

(c) Borrower shall (i) obtain and maintain all licenses and permits necessary for it to purchase and sell Vehicles (and receive proceeds) through wholesale facilities without payment of state retail sales tax and also to sell Vehicles at retail, if applicable.

(d) Borrower agrees the Loans are commercial loans made for a commercial purpose and hereby waives, to the fullest extent allowed by law, the protections of any Federal or state laws and regulations intended to protect consumers or regulate consumer loans.

(e) Borrower agrees that Lender may, in its discretion, communicate and share credit, transaction, and Collateral information related to Borrower or any Guarantor with any third-party, including other creditors, merchants, or counter-parties to Borrower or any Guarantor, for purposes of evaluating an extension of credit to Borrower, evaluating the increase or decrease of any Loan amount, and/or monitoring or collecting any existing Loan or Collateral, and hereby ratifies any such prior exchanges.

(f) The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report for purposes of evaluating extensions of credit to Borrower and expressly ratifies any such prior obtained report.

## 11. Environmental Matters.

(a) Borrower represents that it is currently in compliance, and covenants and agrees that it shall continue to manage and operate its business in compliance, with all Environmental Laws.

(b) Borrower shall send to Lender within five (5) days of receipt, any citation, notice of violation, or other notice of potential liability from any governmental or quasi-governmental authority empowered to regulate or oversee any of the foregoing activities.

(c) Borrower agrees to indemnify, defend with counsel reasonably acceptable to Lender, at Borrower's sole cost, and hold Lender harmless against any claim, response, or other costs, damages, liability, or demand (including, without limitation, attorneys' fees and costs incurred by Lender) arising out of any claimed violation of Borrower or Borrower's agents of any Environmental Laws or breach of any of the foregoing covenants or agreements. The foregoing indemnity shall survive repayment of all indebtedness due Lender under this Agreement.

## 12. Conditions Precedent.

Lender shall have no obligation to make the Loans or any Advances on the Agreement Date or at anytime hereafter unless and until the following conditions have been and continue to be satisfied, all in form and substance satisfactory to Lender and its counsel:

(a) No Proceedings. No action, proceeding, investigation, regulation, or legislation shall have been instituted, threatened, or proposed before any court, governmental agency, or legislative body to enjoin, restrain, or prohibit, or to obtain substantial damages in respect of, or which is related to or arises out of this Agreement, or the consummation of the transactions contemplated hereby or thereby, or which, in Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Agreement.

(b) No Material Adverse Change. There shall not have occurred any material adverse change in the financial condition, results of operations, businesses, or prospects of Borrower, or any event, condition, or state of facts which could materially adversely affect the financial condition, results of operations, businesses, or prospects of Borrower, as determined by Lender in its sole discretion.

(c) Due Diligence. Lender shall have completed its business and legal due diligence with results satisfactory to Lender.

(d) Compliance. All of the representations and warranties of Borrower herein and in the Loan Documents shall be true and correct in all material respects on and as of the Agreement Date and the date of any subsequent

Advance, as if made on and as of such date and time before and after giving effect to the making of the proposed Advance. Borrower shall have performed and shall be in compliance with all the applicable terms and provisions of this Agreement and the Loan Documents and no Event of Default shall have occurred and be continuing, on and as of the Agreement Date and the date of any subsequent Advance, before and after giving effect to the making of the proposed Advance. Each request by Borrower for an Advance shall, in and of itself, constitute a representation and warranty that Borrower, as of such date, is in compliance with this Section 12.

(e) Commitment. After any Advance, the outstanding principal amount of the Loans would not exceed the Loan Commitments.

(f) Loan Documentation. Borrower must provide, on or prior to the Agreement Date, the following documents, each duly executed and delivered to Lender, and each to be in form and substance satisfactory to Lender and its counsel: (i) copies of all filing receipts or acknowledgments issued by any governmental authority to evidence any filing or recordation necessary to perfect the security interests of Lender in the Collateral and evidence in a form acceptable to Lender that such security interests constitute valid and perfected first priority interests in the Collateral; (ii) certified copies of Borrower's casualty and liability insurance policies, together with loss payable and additional insured endorsements to the casualty insurance policies, as required under Section 7; (iii) the Promissory Notes, executed and delivered to Lender; (iv) as applicable, articles of incorporation, partnership agreement, operating agreement, bylaws, or any other governing documents of Borrower (or proof of state of residency if an individual); (v) certified resolutions from Borrower's board of directors, board of managers, or general partner, as applicable, authorizing execution of the Loan Documents; (vi) an opinion from Borrower's counsel in form and substance satisfactory to Lender which opines on Borrower's ability to execute the Loan Documents and perform its obligations thereunder; (vii) the Guaranties duly executed by each Guarantor, if applicable; (viii) an incumbency certificate from Borrower's Secretary, or other duly authorized officer, member, manager, or partner, as applicable, in form and substance satisfactory to Lender; (ix) duly executed Lender Guidelines; (x) a duly executed power of attorney substantially in the form attached hereto as Exhibit E ("Power of Attorney"); (xi) duly executed intercreditor agreement(s) substantially in the form attached hereto as Exhibit F ("Intercreditor Agreement"), if applicable; (xii) duly executed subordination agreement(s) substantially in the form attached hereto as Exhibit G ("Subordination Agreement"), if applicable; (xiii) good standing certificates from each state where Borrower is incorporated or formed, as applicable; (xiv) written instructions from Borrower to Lender as to the disbursement to any Person of the proceeds of the Loan; (xv) the name and address of any other creditor with a lien on the Collateral together with copies of the loan documents executed with said creditor; (xvi) appropriate financing statements and other documents as necessary to perfect or maintain Lender's security interest in the Collateral; and (xvii) such other documents, instruments, and agreements as Lender shall request. To the extent that Lender has not received any of the foregoing on the Agreement Date or date of the Advance, as applicable, Borrower shall provide the same within thirty (30) days of such date.

(g) Customer Contracts. In the event that the Loans include a Receivables Loan, the following shall apply:

  i.  Customer Contract Representations and Warranties. Each of the representations and warranties of Borrower set forth in this Section 12(g)(i) shall be true, accurate, and complete, as determined by Lender. To induce Lender to make the Loans, Borrower makes the following representations and warranties to Lender with respect to each Customer Contract, each and all of which shall survive the execution and delivery of this Agreement: (A) the Customer Contract was duly and validly executed by the Customer and each guarantor or support party and is valid and legally enforceable against Customer and each guarantor or support party in accordance with its terms; (B) no part of the cash down payment was a trade-in by the Customer, loaned by Borrower, or other public or private party or institution, to the Customer, or a rebate from Borrower or any other party; (C) all statements of fact in the Customer Contract and in any credit application, including, but not limited to, the Customer's name, address, and social security number, are true, correct, complete, and accurate; (D) title to the Vehicle is free from all defects, claims, liens, and encumbrances, except for the security interest of Borrower; (E) the Vehicle is not a salvage or a rebuilt vehicle, is adequately and correctly described in the Customer Contract, was manufactured for sale in the United States, and complies with all equipment and safety requirements imposed under federal and other applicable law, and the Vehicle's age does not exceed the current model year less ten (10) years; (F) the Customer Contract expressly provides that the Vehicle is being sold to the Customer "AS IS" and expressly disclaims all warranties, including, without limitation, all implied warranties of merchantability and fitness for a particular purpose; (G) Borrower

complied with all requirements of federal, state, and local law (including, without limitation, the Federal Truth in Lending Act, the Federal Truth in Mileage Act, and similar state laws) in connection with the negotiation, execution, and delivery of the Customer Contract and all notices and disclosures required by law were properly and timely delivered to the Customer; (H) the Vehicle was delivered in accordance with all requirements of the Customer Contract and applicable law; (I) the Vehicle's mileage and equipment indicated on the credit application, vehicle option checklist, bill of sale, and the Customer Contract are complete and accurate; (J) the Customer has no claim, damages, or causes of action against Borrower arising out of the sale of the Vehicle; and (K) the Customer Contract is freely assignable by Borrower and its successors and assigns.

ii. <u>Customer Contract Documentation.</u>  Borrower shall provide to Lender each Customer Contract and other agreements, certificates, and other documents set forth in the Lender Guidelines, and as otherwise requested by Lender from time to time.

### 13. Termination or Suspension of Financing.

Notwithstanding anything to the contrary set forth herein, Lender may terminate or suspend financing under this Agreement, immediately and without further notice, as follows:

(a) Upon the occurrence of an Event of Default as defined in <u>Section 14</u> of this Agreement or in any other Agreement with, or guaranty to, Lender;

(b) If Lender, in its sole discretion, elects to terminate the Loans, provided however that Lender shall give Borrower ninety (90) days' prior written notice of such termination;

(c) If Lender, in its sole discretion, determines that future financing for Borrower is not justified due to changes in Borrower's financial condition or any other material change in Borrower's business;

(d) If Borrower fails to use the Loans for a continuous sixty (60) day period; or

(e) If Lender's business or the economy requires Lender, in its sole discretion, to eliminate the applicable Loan program(s) for all similar borrowers.

All debts, obligations, and remedies existent at the time of any suspension or termination shall continue in effect until the indebtedness of Borrower under this Agreement is paid in full.

### 14. Event of Default.

An "Event of Default" shall include the following: (a) a default by Borrower in the payment or performance of any obligation or promise under this Agreement or any other agreement with, or guaranty to, Lender, including, without limitation, any Lender Guidelines executed by Borrower; (b) any representation or warranty, whether made in or pursuant to this Agreement or any other obligation or debt to Lender, which is found to be untrue; (c) the institution of a proceeding in bankruptcy, receivership, or insolvency by or against Borrower or its property or by or against any Guarantor; (d) an assignment by Borrower or any Guarantor for the benefit of creditors; (e) Borrower is or becomes unable to pay its debts as such debts become due; (f) a default by any Guarantor in the payment or performance of any obligation under a Guaranty; (g) the death or incompetence of any Guarantor; (h) the termination of any Guaranty; or (i) if Lender shall deem itself insecure. Time is of the essence in the performance of all obligations of Borrower under the Loan Documents.

### 15. Offset.

As additional security for payment and performance of all indebtedness due Lender under this Agreement and any other agreement with Lender, Borrower hereby gives Lender a lien on, and Lender shall also have right of offset against, all of Borrower's deposits, credits, sums owing, Vehicles, and any other Collateral now or hereafter in the possession or control of Lender or in transit to Lender. Lender may at any time apply any or all of the property (or the proceeds thereof) to any amounts due under said indebtedness. Borrower expressly waives any requirement of maturity or mutuality among the various entities comprising "Lender."

**16. Rights and Remedies upon Default.**

Upon the occurrence of an Event of Default as set forth in Section 14 or if Vehicles, Customer Contracts, or other Collateral are in danger of misuse, loss, seizure, or confiscation, Lender may, in its discretion, accelerate the entire outstanding amount due from Borrower under this Agreement and may take immediate possession of Vehicles, Customer Contracts, or other Collateral without demand or further notice and without legal process. In furtherance thereof, Borrower shall, if Lender so requests, assemble Vehicles, Customer Contracts, or other Collateral and make them available to Lender at a reasonable place designated by Lender. Lender shall have the right, and Borrower hereby authorizes and empowers Lender, to enter upon the premises wherever Vehicles, Customer Contracts, and other Collateral may be and remove same. Borrower shall pay all expenses and reimburse Lender for any expenditures, including reasonable attorneys' fees and legal expenses (including, but not limited to, bankruptcy and appeals), in connection with (i) Lender's exercise or defense of any of its rights and remedies under this Agreement, and (ii) any third party claims to title and/or Collateral. In the event of such repossession by Lender, in addition to the rights specified in this Agreement, all the rights and remedies afforded by applicable law shall apply. Borrower agrees that any motor vehicle collateral repossessed by Lender after default may be disposed of by Lender at the regular sale of any Manheim-affiliated wholesale auto auction, through Manheim online, or at any other National Auto Auction Association member and that such a sale is commercially reasonable. Lender shall have the right to present for payment immediately any payment instrument from Borrower, notwithstanding any other agreement. Should Lender elect to proceed through court process, Borrower waives any court or state law bond requirements for possessory or injunctive relief.

**17. Indemnity.**

Borrower agrees to indemnify Lender, and Lender's respective officers, directors, employees, attorneys, agents, and representatives (each, an "Indemnified Person"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever (including, without limitation, attorneys' fees and court costs incurred by Lender) which may be imposed on, incurred by, or asserted against any Indemnified Person in any litigation, proceeding, or investigation instituted or conducted by any governmental agency or instrumentality or any other Person, including Borrower and any Guarantor, with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement, whether or not an Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person.

**18. DAMAGE WAIVER. IN NO EVENT WILL LENDER OR ANY OTHER INDEMNIFIED PERSON BE LIABLE TO BORROWER FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, WHETHER OR NOT LENDER OR SUCH OTHER INDEMNIFIED PERSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IN NO EVENT WILL LENDER OR ANY OTHER INDEMNIFIED PERSON BE LIABLE TO BORROWER FOR DAMAGES IN EXCESS OF THE SUMS PAID BY BORROWER TO LENDER UNDER THIS AGREEMENT.**

**19. WAIVER OF RIGHT TO TRIAL BY JURY. BORROWER HEREBY KNOWINGLY AND VOLUNTARILY AGREES AND CONSENTS TO WAIVE BORROWER'S CONSTITUTIONAL RIGHT TO A TRIAL BY JURY FOR ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST LENDER, WHETHER IN THE NATURE OF CONTRACT, TORT, OR OTHERWISE, AND WHETHER ARISING UNDER THIS AGREEMENT OR OTHERWISE. BORROWER AGREES AND UNDERSTANDS THAT ANY SUCH CLAIMS SHALL BE TRIED BEFORE A JUDGE WITH NO JURY. BORROWER HAS FULLY READ THIS PARAGRAPH, HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL REGARDING SAME, AND BORROWER COMPLETELY UNDERSTANDS THIS PARAGRAPH'S CONTENTS AND THE CONSEQUENCES OF WAIVING BORROWER'S RIGHT TO A TRIAL BY JURY. NOTWITHSTANDING ANY OTHER CHOICE-OF-LAW PROVISION IN THIS AGREEMENT, THE LAWS OF THE STATE OF BORROWER'S LOCATION SHALL CONTROL THE ENFORCEABILITY AND INTERPRETATION OF THIS PROVISION ONLY, AND SHOULD A COURT**

FIND ANY PART OF THIS PARAGRAPH TO BE UNENFORCEABLE, THE REMAINDER OF THIS PARAGRAPH AND AGREEMENT REMAIN IN FULL FORCE AND EFFECT.

### 20. Successors and Assigns.

This Agreement shall be binding upon the parties' successors and assigns, provided however that Borrower shall have no right of assignment, without the prior written consent of Lender.

### 21. Savings Clause.

Any provision in this Agreement prohibited by law shall be ineffective to the extent of such prohibitions without invalidating the remaining provisions in this Agreement. If any provision of this Agreement is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, such provision will be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement will remain in full force and effect.

### 22. Power of Attorney.

Upon the occurrence of an Event of Default, Borrower irrevocably appoints Lender as Borrower's lawful attorney and Lender may, without notice to Borrower, in Borrower's or Lender's name(s): (a) endorse the name of Borrower upon any items of payment or proceeds of Collateral and deposit the same to the account of Lender on account of the indebtedness due under this Agreement; (b) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to the Collateral; (c) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access; (d) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or the Collateral; (e) file or prosecute any claim, litigation, suit, or proceeding in any court of competent jurisdiction or before an arbitrator, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to Borrower whenever payable and to enforce any other right in respect of the Collateral; and (f) with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contracts and/or the Collateral and other matters relating thereto.

At all times under this Agreement, with or without the occurrence of an Event of Default, Borrower irrevocably appoints Lender as Borrower's lawful attorney and Lender may, without notice to Borrower, in Borrower's name or Lender's name: (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire Vehicles or secure the Loans; (b) make, settle, and adjust claims under policies of insurance, as are required under Section 7, and to endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect to such policies of insurance; and (c) endorse the name of Borrower upon any document, instrument, certificate, or other evidence of title, state registration documents, trust receipt, or related or similar documents, and checks or other items of payment as necessary to pay for or protect the Collateral as determined by Lender.

### 23. Applicable Law and Consent to Jurisdiction.

This Agreement and the other Loan Documents and all transactions hereunder and thereunder shall be governed by and construed in accordance with the internal laws of the State of Georgia, where Lender has its principal place of business, where payment is to be made, and where Lender negotiated the terms of and executed this Agreement and the other Loan Documents, without reference to the conflict of laws principles of such State. Jurisdiction and venue for its enforcement shall exist, nonexclusively, in the courts of Fulton County, Georgia.

### 24. Entire Agreement and Amendments.

This Agreement, including the exhibits and schedules hereto, along with the other loan documents executed on or near this date, and any supplemental agreements, documents, certificates, or instruments between the parties executed on or near this date or in the future, including, without limitation, any Lender Guidelines, Promissory Notes, Subordination Agreement, Advance/Fee Schedule, and Power of Attorney (collectively, the "Loan Documents"), constitute the entire agreement of the parties, and supersede all other promises or representations. Any

amendment or modification to this Agreement must be made in writing and must be executed by Borrower and Lender; provided however that this Section 24 may not be amended in any circumstance.

**25. Cumulative Rights.**

The rights, powers, and remedies of Lender under this Agreement shall be in addition to all rights, powers, and remedies given to Lender by virtue of any statute or rule of law, any agreements, instruments, or documents evidencing or securing the Loans or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently, without impairing Lender's security interest in the Collateral.

**26. Counterparts.**

This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument. A facsimile transmission or e-mail transmission of a portable document format version of this Agreement executed by a party shall be deemed to be an original. Lender may, in its discretion, keep and store only an electronic copy of this Agreement and/or any of the other Loan Documents, and any photostatic, microphotographic, photographic, optical image, or other reproduction of such Loan Document(s), executed by the parties hereto or thereto, shall be admissible in evidence in any proceeding before any court, board, bureau, department, commission, or agency of the state, in lieu of and without accounting for the original of such writing or record, if such reproduction accurately reproduces or forms a durable medium for reproducing the original.

Executed July 21, 2010

BORROWER: CEDAR EXPORTS AUTO SALES, INC., a TENNESSEE CORPORATION

By: _____ ← SIGN HERE

Title: President

Address: 7877 EAST GATE BLVD.
MOUNT JULIET, TN 37122

State of _Tennessee_

County of _Davidson_

LENDER: Manheim Automotive Financial Services, Inc.

By: _____

Title: _____

Address: 6205 Peachtree Dunwoody Road
Atlanta, Georgia 30328

This instrument was acknowledged before me on _9-1_ _2010_ by _____ (identified by driver's license number _TN 101015424_) from the State of _Tennessee_ ) for the purposes and in the capacity noted therein as his free and voluntary act.

NOTARIZE

_____
Notary Public  9-3-12

[Notary seal: ROSIE SHANNON, STATE OF TENNESSEE, NOTARY PUBLIC, DAVIDSON COUNTY]

# EXHIBIT A

## Advance Fee Schedule

See attached.

993710

## Advance/Fee Schedule to
## Security Agreement dated June 7, 2010 (the "Agreement")

1.   (a)    Borrower: CEDAR EXPORTS AUTO SALES, INC

      (b)    Lender: Manheim Automotive Financial Services, Inc.

2. Inventory Finance Loan

| | | |
|---|---|---|
| (a) | Maximum Advance Availability | $ 400,000.00 |
| (b) | Administrative Fee | $ 70.00 |
| (c) | Late Fee (per Vehicle at 7 and 14 days after due date without further notice) | $ 75.00 |
| (d) | Inspection Fee | $ 80.00 |

3. Lender and Borrower hereby agree that the only charge imposed by Lender upon Borrower for the use of money in connection with the Loans is and shall be the Interest Rate expressed in the Agreement and the Promissory Note. Borrower shall pay to Lender an initial administrative setup and loan and title processing fee in the amount set forth above on each Vehicle financed hereunder. Due to the additional administrative burden, cars floored from an outside source (i.e. a non-Manheim auction) may be subject to additional fees per the Guidelines applicable to the loan type. Borrower shall also pay NSF fees on any returned payments as set by MAFS from time to time. Such administrative fees and all other charges imposed in connection with the Loans, including, without limitation, any commitment fees, loan fees, facility fees, origination fees, discount points, default and late charges, prepayment fees, reasonable attorney's fees, and other reimbursement for costs and expenses paid by Lender to third parties are and shall be deemed to be charges made to compensate Lender for underwriting and administrative services and costs, and other services, costs, or losses performed or incurred, and to be performed or incurred, by Lender in connection with the Loan and shall under no circumstances be deemed to be charges for the use of money. All such charges shall be fully earned and nonrefundable when due.

4. Borrower acknowledges and agrees that Lender reserves the right to amend the Advance availability amounts and Fees set forth above, as well as the Interest Rate(s) applicable to the Loans, from time to time. In such event, the Borrower agrees to execute a replacement Promissory Note(s) and/or Advance/Fee Schedule, as requested by Lender. Lender may amend the Advance availability amounts immediately at its discretion, but Lender will provide Borrower with fifteen (15) days advance notice of amendments to Fees or Interest Rate(s), unless Lender is terminating or suspending financing. In addition to the other grounds noted in the Security Agreement, Borrower acknowledges and agrees that Lender may terminate or suspend financing if Borrower fails to use the program for a 60-day period. By executing this Schedule, Borrower acknowledges that the terms and conditions set forth in the Agreement, Promissory Note, and related Loan Documents shall be ratified and confirmed in all respects.

Date: June 7, 2010

Borrower: CEDAR EXPORTS AUTO SALES, INC

By: _____ ← SIGN HERE

Title: Presi dent _____

Manheim Automotive Financial Services, Inc.:

By: _____

Title: _____

A. 1

993710

# EXHIBIT C



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
UCC DEPT 676-645-2719

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

BTFS FILING SERVICES
8351 ROSWELL ROAD
SUITE 287
ATLANTA, GA 30350

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CEDAR EXPORTS AUTO SALES, INC. | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7877 EAST GATE BLVD. | MOUNT JULIET | TN | 37122 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | TENNESSEE | 0566887 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6205 PEACHTREE DUNWOODY ROAD | ATLANTA | GA | 30328 | |

4. This FINANCING STATEMENT covers the following collateral:

All Vehicle inventory, parts and accessories inventory, equipment, fixtures, accounts, holdback reserves, manufacturer rebates and incentive payments, accounts, payment intangibles, instruments, securities and security accounts, and general intangibles of the Borrower now owned and hereafter acquired, wherever located; all accessions to, substitutions for and all replacements of any of the foregoing; all chattel paper, documents, instruments, monies, residues and property of any kind related to any of the foregoing; all books and records of Borrower related to any of the foregoing, including without limitation, computer programs, print-outs and other computer hardware and software materials and records pertaining to any of the foregoing; together with all proceeds and products of the foregoing, including, without limitation, proceeds of insurance policies insuring any of the foregoing ("Collateral").

Maximum principal indebtedness for Tennessee recording tax purposes is $ 100,000.00

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] [ADDITIONAL FEE] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
993710 TN-DOS   TENNESSEE RECORDING TAX DUE: $112.70

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

## AFFIDAVIT AND VERIFICATION

I, Randall Derr, a duly authorized agent of Manheim Automotive Financial Services, Inc. ("MAFS"), having fully reviewed the foregoing Sworn Claim Contesting Forfeiture of Seized Property, hereby affirm and swear that the facts set forth in the Claim, including all attachments thereto, are truthful and accurate in every respect. MAFS' legal counsel, Stacey A. Carroll of Dow Lohnes PLLC, has full authority to represent MAFS in this proceeding. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Randall Derr
Director, Manheim Automotive Financial Services, Inc.

SWORN to and SUBSCRIBED

Before me this _17th_ day

of February, 2012

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
FRANCES R. TAYLOR, Notary Public
Penn Twp., Lancaster County, PA
My Commission Expires June 26, 2013

Notary Public

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2012 the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Jason H. Cowley
Sharon Cohen Levin
Alexander J. Wilson
United States Attorney's Office, S.D.N.Y.
One St. Andrew's Plaza
New York, New York 10007
*Attorneys for the Plaintiff and Counter Defendant United States of America*

Michael D. Lockard
United States Attorney's Office, S.D.N.Y.
86 Chambers Street
New York, New York 10007
*Attorneys for the Plaintiff and Counter Defendant United States of America*

Alexander H. Benson
Alexander H. Benson Fields, PLLC
2000 Town Center, Ste. 1780
Southfield, MI 48323
*Attorneys for Defendant Eagle Auto Sales, Inc.*

Neil B. Mooney
The Mooney Law Firm, LLC
1911 Capital Circle North East
Tallahassee, FL 32308
*Attorneys for Defendant Global Shiiping Services Inc.*

Jeffrey Martin Schwaber
David Christopher Driscoll, Jr.
Stein Sperling, Bennett, De Jong,
Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850
*Attorneys for Defendant ARZ Export LLC*

David S. Weinstein
Clarke Silvergate, P.A.
799 Brickell Plaza, Suite 900
Miami, FL 33131
*Attorneys for Defendant Car UZD and Mid Overseas Inc. d/b/a Car UZD, and Defendants-in-Rem Car UZD and Mid Overseas, Inc.*

Bradley S. Defoe
Eric M. Nemeth
Varnum LLP
39500 High Pointe Blvd., Suite 350
Novi, MI 48375
*Attorneys for Defendant Auto Rama, Inc.*

Lawrence J. Murphy
Varnum, Riddering, Schmidt & Howlett, LLP
251 N. Rose St., 4th Floor
Kalamazoo, MI 49007
*Attorneys for Defendant Auto Rama, Inc.*

R. Daniel Boyce
Nexsen Pruet
4141 Parklake, Suite 200
Raleigh, NC 27612
*Attorneys for Defendant Cary Auto Sales Inc.*

Thomas E. Dwyer
Dwyer Partners LLP
One Broadway, 14th Floor
Cambridge, MA 02142
*Attorneys for Defendant Poliproject Inc. d/b/a*
*Fouad Autotrade*

Elias Muawad
Law Offices of Elias Muawad, P.C.
36700 Woodward Ave., Suite 209
Bloomfield Hills, MI 48304
*Attorneys for Defendant HH Automotive Inc.,*
*and Defendants-in-Rem United Quality Auto*
*Sales, Inc. and HH Automotive Inc. Detroit, MI*

Vinoo P. Varghese
Esther Ann Nguonly
Varghese & Associates, P.C.
65 Broadway, 7th Floor
New York, NY 10006
*Attorneys for Defendant Jean Y. Chedid*
*Trading Est d/b/a Jean Y. Chedid*

Isaac Garcia-Dale
Dwyer & Brennan
7 Dey St., Suite 1401
New York, NY 10038
*Attorneys for Defendant Poliproject Inc. d/b/a*
*Fouad Autotrade*

Timothy P. Shusta
Phelps Dunbar, LLP
100 South Ashley Drive, Suite 1900
Tampa, FL 33602
*Attorneys for Defendants H&D Export and*
*Import Inc., Mansour Brothers Auto Trading*
*Inc., Safari Enterprises LLC, and Sahari*
*Motors*

Joseph R. Arnone
Arnone Law Offices
22330 Greater Mack Avenue
St. Clair Shores, MI 48080
*Attorneys for Defendants United Auto*
*Enterprise, Inc., and United Quality Auto Sales*
*Inc., and Defendant-in-Rem United Quality*
*Auto Sales, Inc.*

Anthony Aaron Joseph
Maynard Cooper & Gale P.C.
1901 Sixth Avenue North, Suite 2400
Birmingham, AL 35203
*Attorneys for Defendant World Auto Sales LL*
*and Defendant-in-Rem World Auto Sales LLC*

Alessandra Deblasio
Law Offices of Alessandra DeBlasio
40 Exchange Place, Suite 2010
New York, NY 10005
*Attorneys for Defendant-in-Rem Cedar Exports*
*Auto Sales, Mt. Juliet, TN*

Nabih Hussein Ayad
Nabih H. Ayad & Associates, P.C.
2200 Canton Center Road, Suite 220
Canton, MI 48187
*Attorneys for Defendant-in-Rem A&J Auto*
*Sales Inc. Lancing MI*

Scott Andrew Resnik
Emily Stern
Katten Muchin Rosenman, LLP (NYC)
575 Madison Avenue
New York, NY 10022
*Attorneys for Defendants-in-Rem EZ Auto
Export LLC, Ezedine Brothers LLC, Auto Care
LLC d/b/a Golden Eagle Motors, and Kasaab
Auto Dealer LLC*

Steven Leigh Kessler
Law Offices of Steven L. Kessler
122 East 42nd Street, Suite 606
New York, NY 10168
*Attorneys for Claimants Abdou Baaklini and
Baaklini North America, Inc., and Counter-
Claimants Baaklini North America, Inc. and
Abdou Baaklini*

Alex V. Hernandez
Pullman & Comley, LLC (Stamford)
4 Stamford Plaza
107 Elm Street
Stamford, CT 06902-3834
*Attorneys for Defendant-in-Rem MGM Global
Trading LLC*

Tristan Scott Cowperthwait
Pullman & Comley, LLC (Bridgeport)
850 Main Street, 8th Floor
Bridgeport, CT 06601
*Attorneys for Defendant-in-Rem MGM Global
Trading LLC*

Joseph B. Schmit
Phillips Lytle LLP (Madison Ave.)
437 Madison Avenue, 34th Floor
New York, NY 10022
*Attorneys for Claimant Dealer Services
Corporation*

Jessica C. Satriano (JS0981)
*Attorneys for Claimant Manheim
Automotive Financial Services, Inc.*
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
(516) 267-6300; jsatriano@bsk.com