UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

          Plaintiff,

- v. -

LEBANESE CANADIAN BANK SAL, et al.,

          Defendants;

ALL ASSETS OF LEBANESE CANADIAN BANK SAL OR ASSETS TRACEABLE THERETO, et al.,

          Defendants *in rem*.

- - - - - - - - - - - - - - - - - - - - - x

**AFFIDAVIT OF ALI KASSAB IN SUPPORT OF DEFENDANT *IN REM* KASSAB AUTO DEALER LLC'S PETITION FOR RELEASE OF <u>RESTRAINED ASSETS</u>**

11 Civ. 9186 (PAE)

State of New York  )
                    ) ss:
County of New York )

      ALI KASSAB, being duly sworn, deposes and states:

      1.    I am the sole owner of Kassab Auto Dealer LLC ("Kassab Auto" or the "Company"), which has been named as a defendant *in rem* in this action. (the "*In Rem* Action"). I submit this affidavit based on my personal knowledge and in support of my petition for relief from restraints imposed by the Post-Complaint Restraining Order Pursuant to 18 U.S.C. § 981(a)(1)(c), and 983(j) and Rule G(7) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture (the "*Ex Parte* Restraining Order").

      2.    Kassab Auto is a well-regarded and established used car business that has not been accused of, and has had no involvement with, nor knowledge of, the unlawful money laundering, drug trafficking or Hizbollah activities alleged in the Verified Complaint. Although the Government has never questioned the lawfulness of Kassab Auto's business operations, the pendency of the *In Rem* Action and the restraints imposed by the *Ex Parte* Restraining Order

1

have had a crippling effect on Kassab Auto and me personally. The *Ex Parte* Restraining Order restrains *all* of my company's assets, thereby preventing the business from functioning in any way. As a result, I am facing substantial hardship and at great risk of losing my business, Kassab Auto, which I have worked hard to build over the past four years.

**Establishing Kassab Auto's Used Car Export Business**

3.  I am a lawful permanent U.S. resident of the United States. I was born and raised in Beirut, Lebanon. I came to the United States in August 2003, to attend college courses, improve my English language skills and seek out better business opportunities.

4.  After working in the retail clothing business in New Jersey for a few years, I learned from family members and friends that there was a Lebanese business community in Cotonou, Benin in west Africa, who were successfully involved in that country's used car industry. The Lebanese car salesmen in Benin were in need of dealers they could trust in the United States who had the necessary dealer licenses and know-how to find good deals on cars at auctions in the United States and to ship the cars to Benin.

5.  I have always had an entrepreneurial spirit and at the time wanted to start my own business. This looked like an excellent opportunity so I began to learn the business. I gained experience by purchasing cars at auctions on behalf of other licensed car dealers.

6.  In 2008, I established Kassab Auto, a New Jersey LLC. At about the same time, my father established a companion family business, Kassab Auto Dealer, in Lebanon, which obtained dealership license in Beirut. I thereafter registered as an export dealer with various automobile auction houses in the U.S. This allowed me to purchase cars for export on behalf of my own company.

2

7. I developed my customer base through referrals from family, friends and business associates who were involved in the used car industry in Benin. My first customers were friends of my father. Subsequently, one of my brothers moved to West Africa to work in the business. He was both a customer and also helped me to develop relationships with other car salesman in Benin. Although that brother eventually returned to Lebanon, another of my brothers moved to west Africa and he is currently living in Benin and works with me in the used car export business

8. Over the past four years, I have worked hard to build Kassab Auto. I developed a good reputation among car sellers in Benin for finding quality cars, in good condition and at favorable prices. As a result, I have established a base of close to 30 customers. Thus far, all of my customers are involved in the used car market in west Africa.

9. Transactions are handled in the same general manner for all of my customers. Customers typically contact me with a request for specific make and model cars. The necessary funds are wired in advance of the purchase to my account at the U.S. banks I use in New Jersey. Thereafter, I purchase most of the cars at auctions that I attend in the tri-state area, including the Manheim and ADESA auction houses. I arrange for the cars to be shipped by ground from the auction houses to ports on the east coast. The cars are then shipped via freight to the port in Cotonou, Benin. Ground transportation costs in the United States are paid by Kassab Auto, but intercontinental freight costs are paid by my customers in Benin. Kassab Auto earns on average $100 per car on these transactions.

10. <u>No</u> transactions are handled in cash. Customers wire funds directly to Kassab Auto's banks accounts and Kassab Auto, in turn, pays the auction houses by wire transfers from, or checks drawn on, Kassab Auto's bank accounts. During the time frame relevant to this action

3

– 2008 through 2011 – Kassab Auto used the business accounts at Bank of America and TD Bank which are mentioned in the Verified Complaint. *See* Verified Complaint, Ex. A. p. 6.[1]

11. The Government has claimed the right to forfeiture of funds transferred into Kassab Auto's accounts solely because the orginators of the transfer were allegedly involved in, or facilitating, the alleged money laundering scheme. The alleged unlawful transferors, however,[2] were <u>not</u> my customers. They were the financial institutions or money exchangors that provided wire transfer services to my customers. My customers have explained that they believed those institutions and exchanges provided a safer and more reliable alternative to banks in Benin, which they thought were not well equipped to handle international wire transfers. I never had reason to believe that my customers were even aware of or even had the suspicion that these financial institutions had any connection whatsoever with Hizbollah.

**Kassab Auto Did Not Have Any Relationships, or
<u>Engage in Transactions, With the Alleged Wrongdoers</u>**

12. The Verified Complaint in this action alleges a complex scheme by members and supporters of Hizbollah to use the used car markets in Benin and the U.S. to launder money and smuggle the proceeds of drug trafficking and other criminal activities to Lebanon to support terrorist activities. I had no involvement in, or knowledge of, any such activities. As Kassab Auto's sole member, I can attest that the company had no involvement in, or knowledge of such activities.

---

[1] The Verified Complaint describes an alleged scheme during the period 2007 to 2011, but as noted above, Kassab Auto did not begin conducting business until 2008.

[2] The Verified Complaint alleges that there were 150 wire transfers into my accounts that are subject to forfeiture, but does not identify the originator of 69 of those transfers other than to classify them as made by "Others." *See* Verified Complaint, ¶ 78, p. 55.

13.     Kassab Auto's export business was limited to the transactions described above with customers I knew or who had been recommended by family, close friends or existing customers. Kassab Auto never knowingly engaged in business with members or supporters of Hizbollah.

14.     Kassab Auto did not have any business relationships with the various Lebanese financial institutions and money exchanges that the Government has named as defendants and alleges were involved in the money laundering scheme. Kassab Auto also did not have business relationships with the car parks that housed the cars when they arrived in Cotonou or the companies that provided financing and currency exchange services to used car dealers / importers in Benin.

15.     Prior to reading the Verified Complaint, I had no knowledge of, nor reason to suspect, Hizbollah's alleged infiltration of the used car business in Benin or its use of these businesses to launder money derived from drug trafficking and other unlawful activities.

**The Substantial Hardship Caused by the
Pending Action and *Ex Parte* Restraining Order**

16.     Kassab Auto has been prevented since December 15, 2011, when the Government commenced this action, from conducting any business because the *Ex Parte* Restraining Order restrains "*all* assets" of the company. This restraint has essentially shut down Kassab Auto and I have been forced to watch helplessly as the business I built on my own, through hard work, is being destroyed through no fault of my own.

17.     The restrained assets include those that Kassab Auto had as of December 15, 2011, which are:

5

a) $85,000 in Kassab Auto's account at TD Bank – $50,000 was from my father to be used to purchase cars for our family export business; and

b) eight (8) cars, valued at approximately $35,000, which Kassab Auto purchased for customers at auctions and have not been released by the auction houses.

18. The *Ex Parte* Restraining Order, by its terms, also restrains any funds, property or other assets that Kassab Auto receives or acquires while the *Ex Parte* Restraining Order is in place. These prospective restraints have made it impossible for Kassab Auto to engage in any business. Under these terms, Kassab Auto cannot purchase or sell any cars regardless of the source of the purchasing funds or the identity of the purchaser.

19. I have incurred the expense of having to retain counsel to defend Kassab Auto in this action. To do so, I had to borrow money from family members. I am concerned that if I am not able to return to business immediately, I will be unable to fund Kassab Auto's defense in this action.

20. The collateral consequences of the pendency of the *In Rem* Action have also been severe and may have already caused long term damage to my business and reputation. For instance:

a) Kassab Auto and I have been blocked from participating in auctions because, I understand, the insurance companies for the auction houses have blacklisted each of the car dealers identified in the Verified Complaint, and their respective principles, deeming them "uninsurable."

    b) I have been unable to service my customers for several months and I believe that some have found alternate car dealers in the U.S., which, despite being involved in the same export used car market in Benin that is allegedly infiltrated by Hizbollah, have not had their operations restrained by the *In Rem* Action.

    c) My business and personal reputation has been tarnished by being associated with the allegations in the Verified Complaint concerning Hizbollah, drug trafficking and money laundering.

21.    In sum, I have faced substantial hardship from the direct and indirect effects of the pending *In Rem* Action and *Ex Parte* Restraining Order. To avoid further, and possibly irreversible harm to my business, I need to be relieved from the restraints on my business assets and permitted to resume my legitimate business operations.

**Cooperative Efforts to Resolve this Matter**

22.    From the outset of this action, due to the debilitating restraints of the *Ex Parte* Restraining Order and the taint of being embroiled in this litigation, I have sought to reach a prompt and reasonable resolution with the Government.

23.    In that regard, I have provided the Government with substantial information pre-discovery about Kassab Auto's business operations. I have also discussed with the Government anti-money laundering ("AML") compliance practices to undertake in our export transactions and have considered the Government's proposed AML guidelines (attached at Exhibit A).

24.    If I am granted the release of Kassab Auto's restrained assets and permitted to resume business operations pending the outcome of the litigation, I will use such assets and

conduct my business in accordance with the Government's proposed AML guidelines in all used car export transactions.

*[signature]*
ALI KASSAB

Sworn to before me this
26 day of March, 2012

*[signature]*
Notary Public

EMILY STERN
Notary Public, State of New York
No. 02ST5055697
Qualified in Kings County
Commission Expires ~~February 20~~, 20 14
March 30