Evan T. Barr
Sandra E. Cavazos
Elisabeth L. Page
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York  10036
Telephone:  212.506.3918
Facsimile:  212.506.3950

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
Telephone:  212.335.4685
Facsimile:  212.335.4501

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| LEBANESE CANADIAN BANK SAL, et al. | : | Civil Action No. 1:11-cv-9186-PAE |
| | : | |
| Defendants, | : | |
| | : | |
| ALL ASSETS OF LEBANESE CANADIAN BANK | : | |
| SAL OR ASSETS TRACEABLE THERETO, et al., | : | |
| | : | |
| Defendants *in rem*, | : | |

------------------------------------------------------------- X

MEMORANDUM OF LAW IN SUPPORT OF
LEBANESE CANADIAN BANK SAL'S MOTION TO DISMISS THE COMPLAINT

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York  10036

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
*Attorneys for Defendant-Claimant*
*Lebanese Canadian Bank SAL*

## TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 3

APPLICABLE PLEADING REQUIREMENTS ................................................................. 4

ARGUMENT ...................................................................................................................... 5

I.   THE COURT SHOULD DISMISS THE FIRST CLAIM FOR FORFEITURE OF
     ALLEGED PROCEEDS OF IEEPA VIOLATIONS ......................................... 5

II.  THE COURT SHOULD DISMISS THE SECOND CLAIM FOR FORFEITURE OF
     ALLEGED MONEY LAUNDERING PROCEEDS ...................................... 13

III. THE FORFEITURE CLAIMS AGAINST LCB SHOULD BE DISMISSED BECAUSE
     THIS COURT LACKS *IN REM* JURISDICTION .......................................... 25

IV.  THE GOVERNMENT WOULD NOT BE ENTITLED TO SEEK FORFEITURE OF
     ALL ASSETS OF LCB UNDER APPLICABLE LAW .................................. 29

V.   THE COURT SHOULD DISMISS THE CLAIM FOR CIVIL MONEY LAUNDERING
     PENALTIES ................................................................................................. 38

CONCLUSION .................................................................................................................. 43

# Table of Authorities

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................................................5

*Bassidji v. Goe,*
    413 F.3d 928 (9th Cir. 2005) .......................................................................................12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................................5

*Casio Computer Co., Ltd. v. Sayo,*
    No. 98- 3772, 2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000)............................................14, 21

*Cuellar v. United States,*
    553 U.S. 550 (2008)......................................................................................................24

*E.E.O.C. v. Arabian Am. Oil Co.,*
    499 U.S. 244 (1991)..................................................................................................26, 39

*In re 650 Fifth Ave & Related Props.,*
    777 F.Supp. 2d 529 (S.D.N.Y. 2011).................................................................................4

*In Re Terrorist Attacks on Sept. 11, 2001,*
    349 F.Supp.2d 765 (S.D.N.Y 2005)................................................................................42

*In United States v. All Funds on Deposit in United Bank of Switz.,*
    No. 01-2091, 2003 U.S. Dist. LEXIS 101 (S.D.N.Y. Jan. 6, 2003) .................................11, 32

*McCarthy v. Dun & Bradstreet Corp.,*
    482 F.3d 184 (2d Cir. 2007)...........................................................................................29

*Pelham v. Rose,*
    76 U.S. (9 Wall) 103 (1869) ...........................................................................................26

*Republic of Colom. v. Diageo N. Am. Inc.,*
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) ..............................................................................14

*Republic Nat'l Bank of Miami v. United States,*
    506 U.S. 80 (1992).............................................................................................25, 28, 29

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.,*
    119 F.3d 935 (11th Cir. 1997) ........................................................................................21

*Strauss v. Credit Lyonnais, S.A.*,
  2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)................................................42

*United States v. Klein*,
  216 Fed.Appx. 84 (2d Cir. 2007) ..........................................................34

*United States v. $1,399,313.74 in U.S. Currency*,
  591 F. Supp. 2d 365 (S.D N.Y. 2008)..............................................5, 14

*United States v. $734,578.82 in U.S. Currency*,
  286 F.3d 641 (3d Cir. 2002)...................................................................42

*United States v. $8,221,877.16 in U.S. Currency*,
  330 F.3d 141 (3d Cir. 2003)...................................................................33

*United States v. 3 Parcels in La Plata County, Colorado*,
  919 F. Supp. 1449 (D. Nev. 1995) .........................................................29

*United States v. 316 Units of Mun. Sec.*,
  725 F. Supp. 172 (S.D.N.Y. 1989).........................................................41

*United States v. Al-Arian*,
  308 F.Supp.2d 1322 (M.D. Fla. 2004) ...................................................10

*United States v. All Funds on Deposit in Any Accounts Maintained in the Names of
  Heriberto Castro Meza*,
  63 F.3d 148 (2d Cir. 1995)......................................................11, 25, 32

*United States v. Banco Internacional/Bital S.A.*,
  110 F. Supp.2d 1272 (C.D. Cal. 2000) ...........................................41, 42

*United States v. Brown*,
  186 F.3d 661 (5th Cir. 1999) .................................................................22

*United States v. Cloud*,
  680 F.3d 396 (4th Cir. 2012) .................................................................20

*United States v. Contents of Account No. 03001288, Held in the Name of Tasneem Jalal*,
  167 F. Supp. 2d 707 (D. N.J. 2001) ......................................................27

*United States v. Contents of Account No. 03001288, Held in the Name of Tasneem Jalal*,
  No. 00-2630, 2002 WL 32891643 (3d Cir. July 19, 2002).....................27

*United States v. Contents in Account No. 059-644190-69*,
  253 F. Supp. 2d 789 (D. Vt. 2003).........................................................37

*United States v. Daccarett*,
  6 F.3d 37 (2d Cir. 1993).....................................................................4, 5

*United States v. Edgmon*,
  952 F.2d 1206 (10th Cir. 1991) ...................................................................18

*United States v. Elashi*,
  440 F. Supp. 2d 536 (N.D. Tex. 2006) ...................................................10

*United States v. Elashyi*,
  554 F.3d 480 (5th Cir. 2008) ...................................................................10

*United States v. Esterman*,
  324 F.3d 565 (7th Cir. 2003) ..............................................................14, 24

*United States* v. *Funds Described in "Attach. A" to the Compl. for Forfeiture in Rem*,
  No. 05-916, 2007 WL 1877675 (M.D. Fla. June 27, 2007).......................26-27

*United States v. Funds in the Amount of $122,500.00*,
  2000 U.S. Dist. LEXIS 10435 (N.D. Ill. July 17, 2000).......................35, 37

*United States v. Garcia*,
  587 F.3d 509 (2d Cir.2009)..................................................................24

*United States v. Gilbert*,
  244 F.3d 888 (11th Cir. 2001) ..............................................................42

*United States v. Grant*,
  No. S4 05 Cr. 1192, 2008 WL 4376365 (S.D.N.Y. 2008).......................7

*United States v. Hall*,
  613 F.3d 249 (D.C. Cir. 2010)..............................................................18

*United States v. Halstead*,
  634 F.3d 270 (4th. Cir. 2011) ..............................................................20

*United States v. Heaps*,
  39 F.3d 479 (4th Cir. 1994) ...................................................................21

*United States v. Holmes*,
  44 F.3d 1150 (2d Cir. 1995)..................................................................19

*United States v. Homa Int'l Trading Corp.*,
  387 F.3d 144 (2d Cir. 2004)..................................................................10

*United States v. Huber*,
  404 F.3d 1047 (8th Cir. 2005) ..............................................................35

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993)..........................................................................25, 26

iv

*United States v. Kalish,*
    No. 05-656, 2009 U.S. Dist. LEXIS 31453 .................................................................32

*United States v. Lloyds TSB Bank, PLC,*
    639 F. Supp. 2d 314 (S.D.N.Y. 2009).................................................................39, 40

*United States v. Mahaffy,*
    No. 09-5349, 2012 WL 3125209 (2d Cir. 2012) ..................................................32

*United States v. McCarthy,*
    271 F.3d 387 (2d Cir. 2001).................................................................................17

*United States v. Napoli,*
    54 F.3d 63 (2d. Cir 1995) ....................................................................................18

*United States v. Nicolo,*
    597 F. Supp.2d 342 (W.D.N.Y. 2009) ..................................................................37

*United States v. Olaniyi-Oke,*
    199 F.3d 767 (5th Cir. 1999) ................................................................................20

*United States v. One Assortment of 89 Firearms,*
    465 U.S. 354 (1984)..............................................................................................26

*United States v. One 1973 Rolls Royce,*
    *43 F.3d 794, 801* (3d. Cir. 1994) ..........................................................................7

*United States v. One Tyrannosaurus Bataar Skeleton,*
    No. 12-4760, 2012 WL 3947563 (S.D.N.Y. Sept. 7, 2012) ...................................21

*United States v. Piervinanzi,*
    23 F.3d 670 (2d Cir. 1994).....................................................................................20

*United States v. Quinn,*
    403 F. Supp. 2d 57 (D.D.C. 2005) ........................................................................10

*United States v. Quinones,*
    635 F.3d 590 (2d Cir. 2011) *cert. denied,* 132 S. Ct. 830 (2011)...........................22

*United States. v. Real Prop. Known as 2291 Ferndown Lane, Keswick Va.,*
    No 10-cv-0037, 2011 WL 2441254 (W.D.Va. 2011)........................................7, 24

*United States v. Reyes,*
    270 F.3d 1158 (7th Cir. 2001) ..............................................................................10

*United States v. Schifferli,*
    895 F.2d 987 (4th Cir.1990) .................................................................................35

*United States v. Shellef,*
    732 F. Supp. 2d 42 (E.D.N.Y. 2010) ................................................................18

*United States v. Thorn,*
    317 F.3d 107 (2d Cir. 2003)...........................................................................22

*United States v. Ursery,*
    518 U.S. 267 (1996)......................................................................................41

*United States. v. Williams,*
    605 F.3d 556 (8th Cir. 2010) ........................................................................24

*United States v. Wyly,*
    193 F.3d 289 (5th Cir. 1999) ........................................................................37

*United States v. Zvi,*
    168 F.3d 49 (2d. Cir. 1999)...........................................................................19

**STATUTES**

18 U.S.C. 1956(a)(1)............................................................................................20

18 U.S.C. § 20.................................................................................................33, 34

18 U.S.C. § 981(a)(2)(A) .................................................................................31, 32

18 U.S.C. § 981(a)(2)(B) .......................................................................................31

18 U.S.C. § 981(c )(3)............................................................................................35

18 U.S.C. § 983(g)................................................................................................30

18 U.S.C. § 984(a)(1)........................................................................................33, 34

18 U.S.C. § 984(b)................................................................................................35

18 U.S.C. § 1956(a)..............................................................................................16

18 U.S.C. § 1956(a)(1)(B)(i)..................................................................................24

18 U.S.C. § 1956(b)(1) .........................................................................................38

18 U.S.C. § 1956(b)(2) .........................................................................................19

18 U.S.C. § 1956(c)(7).................................................................................. *passim*

18 U.S.C. § 1956(c)(7)(B)(i)..................................................................................17

18 U.S.C. § 1956(f)(1)...........................................................................................39

18 U.S.C. § 1957 ...............................................................................................................25

50 U.S.C. §§ 1701-1705 (2006)..........................................................................................2

50 U.S.C. § 1702(a)(1)(B) ...........................................................................................6, 11

50 U.S.C. § 1705 (a) .....................................................................................................6, 7

50 U.S.C. § 1705 (c) ...........................................................................................................8

50 U.S.C. § 1702 .................................................................................................................6

**BOOKS AND ARTICLES**

12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 3242 (3d
    ed. 1998) .........................................................................................................................4

**OTHER AUTHORITIES**

C.F.R. § 595.315 ...............................................................................................................11

Fed. R. Civ. P. 9 ...................................................................................................................1

Fed. R. Civ. P. 12(b) ......................................................................................................1, 4

Supp. Rule E ...........................................................................................................1, 4, 14

Supp. Rule G ........................................................................................................... *passim*

Pursuant to Rules 9 and 12(b) of the Federal Rules of Civil Procedure and Rules E and G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Claimant-Defendant Lebanese Canadian Bank SAL ("LCB") submits this Memorandum of Law in support of its motion to dismiss the government's Complaint

## INTRODUCTION

Prior to the investigation at issue, LCB had operated successfully for more than four decades following a merger with Royal Canadian Bank, eventually growing to become Lebanon's eighth-largest financial institution, with approximately 35 branches and more than $5 billion in assets.  The actions taken by the government have effectively destroyed the bank, which is now in receivership.

This case is an attempt by the government to confiscate all of LCB's remaining assets based on its apparent belief that LCB knowingly and intentionally conducted financial transactions with, and laundered money for, customers who were either designated terrorists, money launderers for drug traffickers, or both.  The basis for that belief, however, is not evident from the government's Complaint.

The government appears to contend that LCB somehow facilitated a scheme that involved wiring funds to the U.S. to purchase used cars, the shipment of those used cars to West Africa, some kind of comingling of car sale proceeds with the proceeds of narcotics sales by a major narcotics trafficker named Ayman Joumaa, and the shipment of that cash to Lebanon, where the cycle allegedly repeated itself.  The ultimate goal of this activity is never fully explained.

How the many pieces of this supposed scheme all hang together as part of one allegedly unlawful plan is impossible to determine from the jumble of allegations in the Complaint.  But

several dispositive points are clear: first, the Complaint does not identify a single financial transaction in furtherance of this alleged scheme that was initiated by a person or entity that was actually designated pursuant to any sanctions program administered by OFAC at the time of the transaction at issue.  Indeed, the Complaint acknowledges that the currency exchange houses that initiated most of the supposedly problematic transactions were themselves not even designated by OFAC until late January 2011, which is when the supposed scheme effectively *ended,* according to the Complaint.  Nor does the Complaint identify how it allegedly was that LCB knowingly processed a transaction involving the proceeds of a narcotics offense – that is, the Complaint does not allege with particularity who at LCB actually knew that the cash received from the two currency exchange houses was from the proceeds of narcotics sales.  At bottom, the Complaint says almost nothing about LCB's supposed role in perpetrating this scheme.  Facts which might justify imposing such draconian liability upon a legitimate financial institution are simply absent.

Equally troubling, the government appears to be using civil forfeiture law as a means of regulating the affairs of a foreign financial institution which was never subject to United States regulation, and which by all accounts has always operated in compliance with the well-established banking regulations followed in Lebanon.

Quite simply, the Complaint does not allege facts demonstrating that LCB, a respected Lebanese bank with no physical presence of any kind in the United States, knew or had reason to know that it was involved in, or being used to facilitate, violations of the International Emergency Economic Powers Act ("IEEPA"), or any other federal laws.  Under those circumstances, this Court should not permit this Complaint to proceed, particularly where the

relief sought – namely, the wholesale confiscation of an entirely legitimate banking institution – cannot be tied back to a single knowing and intentional act in violation of U.S. law.

## SUMMARY OF ARGUMENT

The Complaint should be dismissed for several reasons.  As a general matter, the vagueness of the Complaint frustrates the most basic goal of the pleadings rules, which is to allow LCB to know exactly what it is alleged to have done wrong so that it can prepare a defense.  We should not be obligated to decipher how LCB could be liable under the government's theory, especially where the stakes in this case are so high: the government's attempt to seize and forfeit every single asset of the bank.

With respect to the alleged violations of IEEPA at the core of the government's case, the Complaint fails to plead specific facts which would establish any knowing and willful effort on behalf of LCB, or anyone else for that matter, to engage in commercial activity that was prohibited under U.S. law, as would be necessary for civil forfeiture here.  The government's money laundering claims (to the extent they do not merge completely with the IEEPA violations) similarly lack specific facts that could establish any knowing, willful or intentional effort to traffic in the proceeds of criminal activity, or to promote or conceal the alleged underlying predicate crimes.

Even assuming the IEEPA and money laundering allegations could withstand scrutiny, this Court lacks the necessary *in rem* subject matter jurisdiction over the bank's wholly offshore funds because the government has not (and indeed cannot) establish that these assets are within the Court's actual or constructive control.  Furthermore, the government's remarkably aggressive claim seeking to forfeit *all assets* of LCB (regardless of their source) as a consequence of the alleged violations would be precluded (or, at a minimum, dramatically limited) by applicable

statutes to include only those assets that are LCB's net profits from the alleged scheme and which could be traced back to the specific conduct at issue.

## APPLICABLE PLEADING REQUIREMENTS

The Complaint asserts both *in personam* claims against LCB and *in rem* claims against all of its assets.  Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules").  *In re 650 Fifth Ave & Related Props.,* 777 F. Supp. 2d 529, 541 (S.D.N.Y. 2011); Supp. R. E(1), G(1).  Supplemental Rule G(2)(f) requires the government to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).  Further, the government must "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  Supp. R. E(2)(a).

Because of the "drastic nature of the civil forfeiture remedy," the pleading requirements imposed by the Supplemental Rules are "more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure."  *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993); *650 Fifth Ave.*, 777 F.Supp.2d at 542; *see also* 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 3242 (3d ed. 1998) ("[the Rule] requires a more particularized complaint than is demanded in civil actions generally. . . . Apparently this requirement for added specifics is thought appropriate because of the drastic nature of those remedies.  Thus, it fortifies the procedural-due-process protections against improper use of these remedies.").

Whereas a complaint may ordinarily survive a motion to dismiss if its allegations show that entitlement to the demanded relief is *plausible*, a complaint seeking forfeiture can only survive if it is *reasonable* to believe that the government *will* prevail at trial.  *See* Supp. R. G(2)(f); *see also 650 Fifth Ave.*, 777 F. Supp. 2d at 542 (civil forfeiture complaint must surpass ordinary pleading standards); *see also $1,399,313.74 in U.S. Currency,* 591 F. Supp. 2d 365, 374, 376 (S.D.N.Y. 2008) (noting that the government's conclusion that funds were subject to forfeiture "may in fact be true," yet dismissing the complaint as insufficiently pled; "A complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand").

Even as to the less stringent pleading standards applicable to the government's *in personam* claims, the allegations must be well pled and "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A Complaint "that offers labels and conclusions" and "naked assertions devoid of further factual enhancement" simply "will not do."  *Iqbal*, 556 U.S. at 678 (internal citations omitted).  Instead, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679.  If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief."  *Id*. (internal quotation marks omitted).  The "more stringent . . . pleading requirements" of the Supplemental Rules, *Daccarett*, 6 F.3d at 47, set the bar higher.

## ARGUMENT

## I.   THE COURT SHOULD DISMISS THE FIRST CLAIM FOR FORFEITURE OF ALLEGED PROCEEDS OF IEEPA VIOLATIONS

As a threshold matter, the government has not even articulated the most basic theory behind its First Claim for Forfeiture against LCB.  The Complaint asserts that the Defendant

5

Properties (including all assets of LCB) are derived from IEEPA violations.  But it never

explains, for instance, the nature of the violation, including such basic questions as which

"designated" person engaged in which transactions, and who specifically had the requisite

willfulness which must be proved as a predicate to forfeiture.  Most importantly, the Complaint

never explains how LCB (which merely processed transactions that – even as described in the

Complaint – would seem on their face to be entirely routine and legitimate) would have known

that some of its depositors might have transgressed U.S. regulations.

That said, to the extent a theory is decipherable, the government's first claim for *in rem*

forfeiture should be dismissed because the allegations contained in the Complaint, even if true,

do not establish the existence of underlying criminal violations of IEEPA that would give rise to

proceeds subject to forfeiture.

## A.      Pertinent Statutory Provisions

Title 50, United States Code, Section 1702 gives the President certain powers to respond

to threats relating to a declared national emergency, including (as relevant here) the power to

block various transactions "by any person, or with respect to any property, subject to the

jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).  As stated in the Complaint,

various Executive Orders and regulations issued pursuant to IEEPA prohibit certain conduct with

designated foreign terrorist organizations including Hizballah.[1]  Section 1705(a) makes it

---

[1]  In particular, the Complaint refers to (1) the Terrorism Sanction Regulations; (2) the Foreign
Terrorist Organization Sanctions Regulations; (3) the Global Terrorism Sanctions Regulations,
and (4) the Iran and Syria Non-Proliferation Act.  *See* Compl. ¶¶ 14-29.  The Iran and Syria Non-
Proliferation Act, which penalizes the transfer of certain equipment and technology, would
appear to be wholly irrelevant to the issues in this case and should be stricken.

"unlawful for a person to violate, attempt to violate, conspire to violate or cause a violation of any license, order, regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705 (a).

An IEEPA offense constitutes "specified unlawful activity" ("SUA") under Title 18, United States Code, Section 1956(c)(7); the proceeds of criminal offenses listed as SUA may be subject to forfeiture pursuant to Title 18, United States Code, section 981(a)(1)(C).[2]  These are the grounds asserted in the government's "First Claim for Forfeiture -- Proceeds Traceable to Violations of IEEPA."  Compl. ¶ ¶ 79-83.

Section 981(a)(1)(C) subjects to forfeiture any property which constitutes or is derived from "proceeds" traceable to any "offense" constituting "specified unlawful activity" as defined in Section 1956(c)(7).  An "offense" here means a criminal violation.  *See, e g., United States v. Grant*, No. S4 05 Cr. 1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. 2008) ("'[P]roceeds' are property that a person would not have but for the criminal offense");  *United States. v. Real Prop. Known as 2291 Ferndown Lane*, *Keswick Va*., No 10-cv-0037, 2011 WL 2441254, at *7 (W.D.Va. 2011) (interpreting the word "offense" in the context of section 1956(c)(7) as limited to criminal conduct).  This basic principle – that forfeiture applies only where a crime is alleged to have generated proceeds – appears to have been ignored throughout the Complaint, as will be seen later in our discussion of the money laundering claims.

---

[2]  To the extent any ambiguity exists as to the meaning of "offense" in this context, given the punitive nature of the instant case, the rule of lenity requires that any ambiguity be resolved in favor of the forfeiture claimant.  *See, e.g., United States v. One 1973 Rolls Royce, 43 F.3d 794, 801* (3d. Cir. 1994).

A criminal IEEPA offense occurs when a person "willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a)."  50 U.S.C. § 1705 (c).

**B.**   **The Complaint Fails to Allege Wire Transactions by Designated Persons or Entities**

The First Claim seeks to forfeit proceeds traceable to IEEPA violations arising from wire transfers purportedly made to buy and ship used cars from the United States.  As a threshold matter, however, *not a single one* of the wire transfers relating to such purchases as itemized in the Complaint (at ¶¶ 76-78) are alleged to have been originated by *any* person or entity that had been specially designated by the United States government under any of the relevant regulations at the time of the transaction in question.  Indeed, the vast majority of the wire transfers originated from the Hassan Ayash or Ellissa Exchanges, which were not listed by OFAC until January 26, 2011, a date by which the scheme had (according to the government) effectively ended.  Compl. ¶¶ 3, 31.

Furthermore, a review of the list of other alleged originators reveals a number of companies and individuals that, according to the Complaint, had not been specifically designated by the United States for terrorist related status even as of the time of the filing of this action, which is a prerequisite for IEEPA-related liability.  For example, among the car transactions listed by the government, the Complaint states that Fadi Hassan Hammoud and Mohammed Hassan Hammoud owned and operated Fadi Star, a shipping company in Benin.  Compl. ¶ 77(d). The Hammouds and Fadi Star allegedly wired $11,382,906 to the United States for buying and shipping cars.  Compl. ¶ 77(d).  But the only reason given for including the Hammouds and Fadi Star is that Mohammed Hammoud is a Hizballah "supporter" who has done business with Khodor Fakih, an alleged Hizballah member.  Compl. ¶ 77(d).  Whether such "support" was ever

known to others (or instead harbored secretly) is never explained; there certainly is no allegation relating to knowledge by LCB.

Similarly, the Complaint states that Youseef Sobhi Nehme wired approximately $21,832,344 to the United States relating to buying and shipping cars, which is nearly 10 percent of the total amount which the government claims flowed through LCB's accounts in the scheme. Compl. ¶ 77(f). The only basis for including Nehme's transactions, however, is that he "is a close associate of Ali Kharroubi" (a man who is simply identified as a co-owner of Ellissa Holding Company) and a "self-proclaimed supporter of Hizballah." Compl. ¶ 77(f), 50. Again, there is no allegation of knowledge by LCB.

IEEPA and the related regulations, however, do not create liability based on mere association with Hizballah. OFAC and the Financial Crimes Enforcement Network ("FinCEN") both have specific legal mechanisms available to them whereby individuals or entities can be designated and thus prohibited from engaging in transactions with United States persons, as was in fact done with respect to the Ellissa Exchange, for example, in January 2011. Compl. ¶¶ 3-4. Most of the individuals and entities cited in the Complaint had not been formally designated at the pertinent time. If the connection of these parties were truly so obvious such that LCB could be subject to wholesale forfeiture for doing business with them, one would expect that the government would have mustered the evidence needed to designate them under the applicable regulations. Put another way, if the government lacks sufficient knowledge to designate an individual, it is hard to fathom how LCB can be charged with such knowledge – and the Complaint sets forth no facts suggesting it should be or could be. Unless and until the designation process has been invoked against a particular person or entity, there would be no

legal basis to conclude that a wire transfer originating from such a source would contravene IEEPA.

It would be patently unfair to impose a massive civil forfeiture against a bank if, as it appears from the Complaint, the bank had no dealings with persons or entities known to have been blacklisted at the pertinent time.  The government cannot invoke forfeiture of alleged IEEPA proceeds when the prerequisites for administrative designation, let alone IEEPA-related liability, have not even been met.

## C.    The Complaint Fails to Allege Knowing and Willful Violations of IEEPA

Even assuming *arguendo* the government could allege that designated individuals or entities had been involved in the transactions at issue, the government would still have to allege that such transactions amounted to criminal violations of IEEPA in order to justify forfeiture of any resulting proceeds.  That has not been done here.

The government must prove knowledge and intent, with varying degrees of specificity, to establish a criminal violation of IEEPA.  *See, e.g., United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 145 (2d Cir. 2004) (to convict for violating embargo under IEEPA, defendant must have known transmission of funds violated Iranian embargo); *United States v. Elashyi*, 554 F.3d 480, 498 (5th Cir. 2008) (government must establish defendants knowingly dealt in property of  SDT and knew that they were prohibited from so doing); *United States v. Reyes,* 270 F.3d 1158, 1170 (7th Cir. 2001) (government must establish defendant willfully attempted to export goods knowing ultimate destination was embargoed); *United States v. Quinn*, 403 F. Supp. 2d  57, 60 (D.D.C. 2005) (IEEPA demands proof of "voluntary, intentional violation of a known legal duty"); *United States v. Al-Arian*, 308 F.Supp.2d 1322, 1340 (M.D. Fla. 2004) (government must prove defendant knew organization receiving funds was an SDT or committed

acts that caused it to be designated and had  specific intent to further its unlawful activities);

*United States v. Elashi*, 440 F. Supp. 2d 536, 548 (N.D. Tex. 2006) (to convict under IEEPA for

willful violation of executive order, government must show defendant acted with specific intent,

that is, acted with knowledge that the conduct was unlawful and therefore disregarded a known

legal obligation).[3]

The Complaint lacks any specific allegation that LCB, or indeed any of the entities or

individuals it names, ever knowingly and willfully violated IEEPA.  There is no explicit claim

that any person associated with the car dealers, exchange houses, or banks acted with the

requisite mental state to violate IEEPA's criminal provision, by willfully engaging in

transactions that were prohibited under United States laws and regulations

The government relies instead on the notion that if Hizballah associates were involved in

transferring funds to the U.S. to purchase used cars as part of a money laundering scheme, then

given Hizballah's designated status, the purported "money laundering scheme *also involves*

*violations of [IEEPA].* "  Compl. ¶ 2 (emphasis added).  This theory plainly does not suffice to

allege the existence of criminal IEEPA offenses.

IEEPA and related regulations apply to "any person[s], or with respect to any property,

subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B); *see also* Title 31,

---

[3] *In United States v. All Funds on Deposit in United Bank of Switz.*, No. 01-2091, 2003 U.S.
Dist. LEXIS 101 (S.D.N.Y. Jan. 6, 2003), the claimant argued that "specified unlawful activity"
only occurs when a person willfully violates an order under IEEPA.  *Id.* at *6.  The Court
summarily rejected that argument noting that "a showing of willfulness is required only where a
criminal penalty is sought, whereas here, the Government seeks only a civil remedy."  We
respectfully submit that this ruling was incorrect: civil forfeiture under section 981 is only
applicable to proceeds of criminal activity, and the offenses listed in section 1956 as SUAs are
crimes, not civil infractions.  To hold otherwise would vastly expand the number of potential
forfeiture predicates.

Code of Federal Regulations, Section 595.315 (defining "U.S. person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches); or any person in the United States"); *Bassidji v. Goe*, 413 F.3d 928, 935 (9th Cir. 2005) (IEEPA regulates persons "subject to the jurisdiction of the United States"). Accordingly, at a minimum, the government must at least allege knowledge and intent by the Car Buyers.

In describing the Car Buyers' role in the purported scheme, however, the Complaint merely states as follows:

> The businesses of these Car Buyers typically have little or no property or assets other than bank accounts that are used to receive wires from overseas to buy cars, and to purchase used cars at auction. These cars are then transported to shipping ports, where they are shipped to West Africa. The Car Buyers typically do not have offices, car lots, or an inventory of used cars other than cars that are in transit to the ports. Some of the Car Buyers purchase cars for their own account, but others simply retain a fee of a few hundred dollars for each car they buy.

Compl. ¶ 76. While these allegations, if true, might show that the Car Buyers act as brokers as opposed to traditional used car dealers, that obviously does not mean that any of them were aware of the trade restrictions at issue, considered these transactions to be illegal, or took any steps to avoid detection by authorities.[4] Quite the contrary, based on the Complaint, the Car Buyers are simply buying cars here and shipping them abroad for resale. Nothing in that fact pattern appears to raise any red flags or suggests guilty knowledge on the part of the Car Buyers, let alone LCB.

---

[4] A number of the Car Buyers have settled in exchange for the release of portions of their frozen accounts. The settlement stipulations all contain language reflecting that the Car Buyers do not admit to having been aware of the source of the funds or having engaged in any illegality, and do not include any admission of wrongdoing.

Perhaps the government intends to argue that the Complaint alleges a conspiracy involving LCB, the exchange houses, and Hizballah focused on property located in the United States.  Even for a conspiracy, however, the government still would have to explain to the Court and LCB which conspirators had the requisite knowledge and intent, not just that Hizballah was somehow involved.

The government has not provided such an explanation.  At best, the Complaint alleges only that the bank maintained relationships with individuals or entities that may have been designated by OFAC but no allegation that LCB knew of such designation, and/or that such designation had actually been made prior to the conclusion of the scheme alleged in the Complaint.  *See, e.g*., Compl. ¶¶ 44a-e.  These facts, if true, would not establish that LCB, or anyone else, knowingly violated United States trade restrictions by facilitating unlawful car purchases in this country.  Indeed, none of these facts really have any bearing on financial activity being conducted in the United States at all, and if anything relate mostly to internal Lebanese banking matters.

In short, the Complaint fails to include any allegation that anyone in the scheme was aware that Hizballah was doing business with used car brokers in violation of American laws. By untangling a few strands of the Complaint, the government's web of interlocking international criminality starts to unravel.  The Complaint does not state a cause of action based on criminal violations of IEEPA.  Thus, the First Claim for Forfeiture must be dismissed.

## II.    THE COURT SHOULD DISMISS THE SECOND CLAIM FOR FORFEITURE OF ALLEGED MONEY LAUNDERING PROCEEDS

The Court should also dismiss the Second Claim for Forfeiture which seeks to confiscate all assets of LCB as having purportedly been involved in and/or traceable to violations of the

money laundering laws.  First, the allegations have not been set forth with anything close to the requisite specificity.  Second, the Complaint fails to properly allege SUA violations which would provide a predicate for money laundering forfeiture.  Third, the money laundering offenses merge into the underlying IEEPA predicates.  Fourth, the Complaint fails to allege knowledge of unlawful activity.  Finally, the Complaint fails to allege the requisite elements of money laundering needed to show the existence of criminal violations which served as a basis for forfeiture.

## A.     The Complaint Fails To Allege Money Laundering With Particularity

In a civil forfeiture action, the government must state its claim with particularity so that a claimant is able "to commence an investigation of the facts and to frame a responsive pleading." Supp. R. E(2)(a).  Even under less restrictive civil standards, a money laundering claim cannot be pled by conclusory allegations.  *See Republic of Colom. v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 440 (E.D.N.Y. 2007); *Casio Computer Co., Ltd. v. Sayo*, No. 98- 3772, 2000 WL 1877516 at *17 (S.D.N.Y. Oct. 13, 2000); *United States  v. $1,399,313.74 in U.S. Currency,* 591 F. Supp. 2d 365, 373-74 (S.D N.Y. 2008) (general allegations regarding currency trading insufficient to show claimant involved in laundering).

Here, the government provides the following summary of its money laundering theory:

> This *in rem* forfeiture action and civil money laundering complaint arises out of an investigation by the Drug Enforcement Administration (DEA) and other federal law enforcement agencies of a scheme to launder money through the United States financial system and the United States used car market.  As part of the scheme, funds are transferred from Lebanon to the United States in order to purchase used cars, which are then shipped to West Africa and sold for cash.  Cash proceeds of these car sales are then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon.

14

Compl. ¶ 1.  This summary raises a number of questions.  Money laundering generally involves the injection of ill-gotten funds into a legitimate business.  *See, e g., United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003).  The Complaint fails to identify, however, the unlawful activities upon which the money laundering charges are predicated, the specific transactions involving laundering, the individuals or entities possessing the requisite knowledge and intent, or any theory by which all assets of LCB were involved in laundering transactions.  In light of these deficiencies, the Second Claim for Forfeiture should be dismissed.

Ultimately, the only allegations that even remotely deal with whether LCB had the required state of mind to participate in any unlawful activity are all found in Paragraphs 44 and 45.  An analysis of each reveals that the government has failed to meet the most basic pleading requirements:

> **Paragraphs 44(a) and (b)** state that LCB maintained a banking relationship with the Yousser Company and other related entities some of which were designated by OFAC in September 2006. There is *no* claim that LCB knew of OFAC's action. More importantly, there is no allegation that LCB or Yousser Company engaged in any transaction that violated IEEPA *after* such designation.  A local banking relationship is not unlawful.

> **Paragraph 44(c)** states that LCB maintained a banking relationship with Lebanese Touristic Services SARL owned by various individuals including Mohammed Fadlallah who was designated in 1995 by Treasury. There is *no* claim that LCB knew of Fadlallah's interest in LTS or engaged in any transaction that violated IEEPA.  A local banking relationship is not unlawful.

> **Paragraph 44(d)** states that LCB maintained a banking relationship with Rayan Offshore LLC which was owned by, among others, Colonel el-Moussaoui (brother in law of an LCB board member) and Nawaf Moussaoui (a member of the Hizballah political party). There is *no* claim that any of these individuals were designated by OFAC or any other US government agency.

> **Paragraph 44(e)** states that LCB maintained a banking relationship with Matrix Sal Off-shore, a company controlled by

individuals who are only alleged to be business associates of a company controlled by an individual designated by OFAC in December 2010. It is not alleged that Matrix was controlled by a designated person, that LCB knew of OFAC's action, or that LCB engaged in any transaction that violated IEEPA.

**Paragraph 44(f)** states that LCB maintained a banking relationship with individuals and entities involved in the African diamond smuggling trade. There is no explanation as to why diamonds are connected to this case.

**Paragraph 44(g)** states that an LCB manager  granted certain exceptions to LCB's policy regarding cash transaction reports in September 2003, including for one entity which was designated in July 2007.  There is no allegation that any transaction in violation of IEEPA occurred after this designation.

**Paragraph 44(h)** states that in October 2006 LCB's Anti-Money Laundering Committee discussed recent OFAC designations of LCB clients.  But the Complaint does not allege they were ignored – instead it states that Committee members were instructed to take OFAC listings seriously.

**Paragraph 44(i)** states that Ayman Joumaa, an alleged drug trafficker, and related entities, used exchange houses with accounts at LCB.  There is no claim that LCB knew Joumaa was a drug trafficker.

**Paragraph 45** states that LCB maintained a banking relationship with Hassan Ayaash Exchange and the Ellissa Exchange which were implicated in cash smuggling and other activities. These exchanges were not designated by OFAC until January 26, 2011, which is the end of the alleged scheme.

In short, although the government tries to cloak these allegations in sinister detail,  there is nothing specific which would support a theory that LCB knew of, or tolerated, money laundering, or processed transactions for OFAC-designated persons or entities *after* those designations.

**B.**      **Absent Properly Alleged Specified Unlawful Activity, the Money Laundering Claim Should Be Dismissed**

Secondly, the Money Laundering Claim should be dismissed because the Complaint fails to include a properly alleged predicate SUA.  To establish money laundering, the government must first allege the existence of financial transactions involving the "proceeds of specified unlawful activity."  18 U.S.C. § 1956(a).  The government relies on IEEPA violations as the SUA.  *See* Compl. ¶ 12  ("This *in rem* forfeiture and civil money laundering action relates to violations of regulations and Executive Orders issued pursuant to the [IEEPA]").  As noted above, the Complaint does not adequately plead a violation of IEEPA.  Accordingly, any money laundering claim based on purported IEEPA violations would be deficient.

The government also references unspecified narcotics violations.  As elsewhere, however, the Complaint fails to provide LCB with a theory to which it could respond.  Did any of the drug trafficking take place in the United States?  Not so far as the Complaint reveals.  Was drug money wired to the United States? Again the Complaint is silent.  This is both unfair and legally insufficient.  Accordingly, with respect to a narcotics-related SUA, the Complaint does not contain an alleged "financial transaction occurring in whole or in part in the United States" as required.  *See* 18 U.S.C. § 1956(c)(7)(B)(i).

**C.**      **The Money Laundering Claim Impermissibly Merges with the Underlying Alleged IEEPA Offenses**

Even assuming the government has met its pleading requirements regarding an underlying SUA, the money laundering claim cannot be distinguished from the predicate IEEPA violations, requiring dismissal on the grounds of impermissible merger.  To prove a money laundering violation, the government must show a defendant "(1) acquired the proceeds of a specified unlawful activity and then (2) engaged in a financial transaction with those proceeds."

*United States v. Napoli*, 54 F.3d 63, 68 (2d. Cir 1995).  Funds become proceeds when they are "derived from an already completed offense, or a completed phase of an ongoing offense." *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001).  Only when the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction.  *Id.*

But absent this clear distinction between the completed underlying crime, and a subsequent financial transaction involving the proceeds, no money laundering exists.  *See, e.g., United States v. Shellef*, 732 F. Supp. 2d 42, 72-73 (E.D.N.Y. 2010) (because "money laundering involves the proceeds of unlawful activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime"), *citing Napoli,* 54 F.3d at 68; *see also United States v. Hall*, 613 F.3d 249, 254 (D.C. Cir. 2010) ("money laundering must be separate and distinct from the underlying offense that generated the money to be laundered");  *United States v. Edgmon*, 952 F.2d 1206, 1213-14 (10th Cir. 1991) (money laundering aimed "at conduct that follows in time the underlying crime" and not as an "alternative means of punishing the 'specified unlawful activity'").

In the instant case, the government's description confirms the lack of any distinction between the money laundering and IEEPA violations:

> Hizballah members and supporters are involved at various points in the money laundering scheme.  Hizballah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance and facilitate the purchase of the used cars in the United States. *Because Hizballah is a designated Foreign Terrorist Organization, a Specially Designated Terrorist, and a Specially Designated Global Terrorist…the money laundering scheme also involves violations of…IEEPA.*

Compl. ¶ 2 (emphasis added).  The government explicitly relies on the same set of transactions as *simultaneously* constituting violations of IEEPA and section 1956, which is not sufficient to establish an independent money laundering offense.  The Complaint lacks any allegation of separate financial transactions using the proceeds of a completed predicate crime.[5]

The government may claim the same transaction violated more than one statute.  But that theory has been squarely rejected by the Second Circuit in the money laundering context.  In *United States v. Holmes*, 44 F.3d  1150, 1154-55 (2d Cir. 1995), the court, in finding that convictions for both money laundering and structuring based on the same financial transactions were multiplicitous, stated:

> We cannot accept the government's implicit contention that the same financial transaction gives rise to two separate crimes simply because the defendant, at the time he deposited the money, knew that what he was doing – the prohibited conduct – was designed for two unlawful purposes: concealing proceeds *and* avoiding reporting requirements.  The [money laundering] statute punishes the conducting of a financial transaction with guilty knowledge.  Having knowledge of two improper purposes rather than one does not multiply the offense of a single financial transaction into two offenses.

*Holmes*, 44 F.3d at 1155.  *See also United States v. Zvi*, 168 F.3d 49, 57 (2d. Cir. 1999) ("the 'financial transactions' that the government had to establish in order to prove domestic laundering were the very same international 'transmittals' of funds that were necessary elements of the international money laundering counts").  Similarly here, the government cannot allege

---

[5]  The Second Claim for Forfeiture also lists narcotics crimes as an SUA.  *See* Compl. ¶ 92.  The Complaint does not allege, however, that drug money was laundered through the purchase of cars.  Rather, it states that drug money was commingled with car sale proceeds by individuals in West Africa and Lebanon.  *See* Compl. ¶¶ 1-2.  With respect to such conduct, this Court would lack personal jurisdiction over LCB given that the activity occurred entirely outside the United States.  *See* 18 U.S.C. § 1956(b)(2)(limiting jurisdiction over foreign persons to certain offenses).

that the same activity – purchasing and shipping used cars from the United States to Africa – constitutes both an IEEPA predicate and a money laundering violation.[6]

Finally, insofar as the Complaint suggests that cash from car sales, mixed with drug money, was reinvested in cars, this theory also would result in merger.  *See, e.g., United States v. Halstead*, 634 F.3d 270, 279 (4th. Cir. 2011) (merger where government used transactions to pay costs of illegal activity as basis for laundering); *United States v. Cloud*, 680 F.3d 396, 406 (4th Cir. 2012) (reversing money laundering based on payments to further underlying fraud) (citing *Halstead*).  Accordingly, because the Second Claim impermissibly merges with the specified unlawful activity, it must be dismissed.

**D.     The Complaint Fails to Allege any Knowing or Intentional Transaction Involving the Proceeds of Unlawful Activity**

Even assuming that the Complaint properly alleged an unmerged predicate SUA, the Second Claim for Forfeiture still must fail because the Complaint lacks any allegation that LCB, or any other party,  knew it was dealing in the proceeds of unlawful activity at the time of the transactions at issue.

In a money laundering case, one must "[know] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity."  18 U.S.C. 1956(a)(1). *See also United States v. Olaniyi-Oke,* 199 F.3d 767, 770 (5th Cir. 1999) (government must prove defendant conducted financial transaction he knew involved the proceeds of unlawful

---

[6]  *But cf. United States v. Piervinanzi*, 23 F.3d 670, 679 (2d Cir. 1994)(where defendant was charged with fraud and money laundering in a scheme to embezzle funds by wires to offshore accounts, court rejects merger argument noting "the act of attempting to fraudulently transfer funds out of the banks was analytically distinct from the attempted transmission of the funds overseas and was itself independently illegal").  Here, by contrast, there is no distinction between the underlying IEEPA predicates and the purported laundering of proceeds.

activity) (internal citations omitted); *United States v. Heaps,* 39 F.3d 479, 484 (4th Cir. 1994) (government must show actual knowledge that money in transaction was derived from unlawful source).

As applied here, to the extent the "statutes on which the government premises forfeiture have specific *mens rea* requirements" the "Complaint must set forth a basis for believing that some person who engaged in the prohibited conduct –  not necessarily the claimant – had the requisite knowledge."   *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12-4760, 2012 WL 3947563  (S.D.N.Y. Sept. 7, 2012).

Here, the Complaint fails to allege that LCB, or anyone else, knew it was dealing in "dirty" money.  The Complaint only asserts LCB "knowingly conducted business" with individuals linked to Hizballah.  Compl. ¶ 44.  It is not unlawful for LCB to have maintained local banking relationships that do not violate IEEPA.  There are no allegations that LCB knew or had reason to know of any taint affecting the wire transfers.  *See Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 949 (11th Cir. 1997) (wires to and from bank did not provide basis to infer knowledge or reason to suspect funds' source); *Casio,* 2000 WL 1877516 at *17 (complaint fails to allege knowing transport or concealment of illegal funds).  This is no mere formality: the government must show that someone knowingly violated U.S. law, and LCB is entitled to notice so it can present evidence to the contrary.  In the absence of allegations that LCB or any other party knowingly dealt in the proceeds of some form of unlawful activity, the Second Claim for Forfeiture must be dismissed.

**E.     The Complaint Fails to Allege the Elements of Money Laundering**

Even assuming that the Complaint sufficiently alleges both the existence of unmerged specified unlawful activity, and that LCB or another party knowingly dealt in the proceeds of

some form of unlawful activity, the Second Claim must nevertheless be dismissed because the government has not pled all of the necessary elements relating to an underlying criminal violation resulting in proceeds.

There are four types of money laundering alleged.  The Complaint asserts that LCB engaged in promotional, concealment, criminal property and international money laundering. *See* Compl. ¶ 6, 86, 88.  The Complaint fails to plead a knowing and willful violation by LCB of any of these four types of money laundering.  If the government's theory is that LCB knowingly and willfully committed any of these violations, the Complaint utterly fails to support that notion.  If the government is instead claiming that it can forfeit all of LCB's assets because some other party engaged in such conduct without LCB's knowing and willful participation, it should make clear that its claim rests on that theory.

1.  Promotional Money Laundering

Under "promotional" money laundering, the government must prove the existence of a financial transaction involving SUA proceeds with "the intent to promote the carrying on of specified unlawful activity." *United States v. Quinones,* 635 F.3d 590, 597 (2d Cir. 2011) *cert. denied*, 132 S. Ct. 830 (2011).  It is not enough that a financial transaction merely promoted the carrying on of unlawful activity.  Rather, "Congress intended a stringent *mens rea* requirement for promotion money laundering."  *United States v. Brown,* 186 F.3d 661, 670 (5th Cir. 1999). "The Government must show 'that the receipt and deposit of laundered funds was made with the *intent* to promote the specified underlying unlawful activity.'"  *650 Fifth Ave,*, 77 F. Supp. at 561 (quoting *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003)).

In particular, the Complaint alleges (1) LCB generally had "poor anti-money laundering controls and, indeed, knowingly conducted business with Hizballah-controlled entities" and

parties linked to, among other things, "African diamond smuggling, money laundering, and narcotics trafficking," Compl. ¶ 44; (2) in or about September 2003, a manager granted exceptions for certain LCB clients from LCB's policy of requiring cash transaction slips for cash transactions greater than $10,000, Compl. ¶ 44(g); (3) in October 2006, the LCB Anti-Money Laundering Special Committee discussed, among other things, recent OFAC designations of LCB clients, Compl. ¶ 44(h); and (4) LCB maintained relationships with the Hassan Ayash and Ellissa Exchanges despite alleged substantial violations of LCB's anti-money laundering and compliance policies.  Compl. ¶ 45.

 These allegations do not establish promotion.  As for the first and fourth items, broad conclusory statements about the bank supposedly doing business with certain types of individuals or firms plainly do not meet the basic pleading requirements.  The second allegation relates to a policy exception which is not even expressly connected to the transactions described in the Complaint and in any event took place *four years before* the alleged scheme began in 2007.  As to the third, the mere fact that the AML committee may have discussed the status of certain clients does not implicate the bank in promoting money laundering, especially given that (as the Complaint notes), "committee members *were directed to take the OFAC listing seriously and to avoid implicating the bank with irregular situations with U.S. banking institution*," Compl. ¶ 44(h) (emphasis added).

 In sum, the Complaint does not allege that LCB affirmatively promoted the car scheme or acted with knowledge of any illegal conduct.  It merely alleges that facially valid wire transfers were processed.  Indeed, as noted above, according to certain statements in the Complaint, LCB's actions arguably would have had the tendency to *thwart*, rather than promote, unlawful activity.

### 2.   Concealment Money Laundering

The Complaint likewise fails to adequately allege concealment money laundering. Concealment money laundering prohibits engaging in a transaction involving criminal proceeds "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(B)(i).  The government must not only show that the transaction had the result of concealing unlawful activity, but that the *purpose* of the transaction was to conceal or disguise the funds.  *Cuellar v. United States,* 553 U.S. 550, 567 (2008); *see also United States v. Garcia*, 587 F.3d 509, 517 (2d Cir.2009).  Typically concealment money laundering involves unusual or convoluted transactions.  *See, e.g.*, *United States. v. Williams,* 605 F.3d 556 (8th Cir. 2010) (concealment based on division of proceeds into smaller sums and avoidance of reporting requirements).

Here, the Complaint "does not include even a conclusory allegation that the subject transaction[s] [were] made in order to conceal the source of illicit funds."  *2291 Ferndown Lane*, 2011 WL 2441254 at *6.  The Complaint fails to allege that the LCB wire transfers obscured any aspect of the funds.  Indeed, the Complaint (¶ 78) reflects that each alleged wire transfer was made in the name of the account holder, with no effort to hide the source, amount or destination. *See Esterman,* 324 F.3d at 571 (evidence that defendant transferred funds to other bank accounts not sufficient to establish laundering absent effort to disguise or conceal withdrawals or destinations of funds).

### 3.   Criminal Property Money Laundering

The Complaint also fails to plead criminal property money laundering.  That offense occurs when a person conducts a monetary transaction involving $10,000 or more in property

24

derived from an SUA, knowing the property was derived from unlawful activity.  18 U.S.C. § 1957.  As discussed above, the Complaint does not allege that LCB knew that funds deposited in or transferred from its accounts were derived from IEEPA violations or drug trafficking transactions in the United States.

4.   International Money Laundering

Finally, the Complaint alleges that LCB engaged in "international money laundering" by transferring funds across borders to promote or conceal crimes.  As explained above, the Complaint fails to adequately allege either that LCB intended to promote a specified unlawful activity, or knew that the wire transfers constituted the proceeds of illegal activity.

## III.   THE FORFEITURE CLAIMS AGAINST LCB SHOULD BE DISMISSED BECAUSE THIS COURT LACKS *IN REM* JURISDICTION

The defects in the government's forfeiture pleadings are not limited solely to failure to state a claim.  The government fails to allege a proper basis for *in rem* jurisdiction over the assets in question, all of which are located outside the United States.

It is axiomatic that a court must have *in rem* jurisdiction over any assets allegedly subject to civil forfeiture.  *See United States v. James Daniel Good Real Prop*., 510 U.S. 43, 57 (1993) ("to institute and perfect proceedings *in rem*, . . . the thing should be actually or constructively within the reach of the Court."); *United States v. All Funds on Deposit in Any Accounts Maintained in the Names of Heriberto Castro Meza*, 63 F.3d 148, 152 (2d Cir. 1995) (hereinafter "*Meza*"); s*ee also* Supp. R.G(2) (the "complaint must . . . state the grounds for subject-matter jurisdiction [and] in rem jurisdiction over the defendant property").

Control over the *res* has always been the *sine qua non* of forfeiture actions.  "Certainly, it long has been understood that a valid seizure of the *res* is a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding."  *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84

(1992), citing, *inter alia*, *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 363

(1984).  "The seizure of the property . . . is made the foundation of the subsequent proceedings.

It is essential to give jurisdiction to the court to declare a forfeiture." *Pelham v. Rose,* 76 U.S. (9

Wall) 103, (1869).  Accordingly, "[t]he court must have actual or constructive control of the res

*when an in rem forfeiture suit is initiated*."  *James Daniel Good Real Prop.*, 510 U.S. at 58

(emphasis added).  Absent *in rem* jurisdiction, then, any forfeiture order directed at LCB's assets

would be wholly unenforceable.

This requirement is plainly more difficult to satisfy with respect to offshore assets

belonging to a non-U.S. person or company, given the skepticism which courts have always

expressed towards the extraterritorial application of United States laws.  *See, e.g., E.E.O.C. v.

Arabian Am. Oil Co.,* 499 U.S. 244, 248, (1991) (it is a "longstanding principle of American law,

that that legislation of Congress, unless a contrary intent appears, is meant to apply only within

the territorial jurisdiction of the United States"(internal citation omitted)).

The Second Circuit has explicitly held that *in rem* jurisdiction over property located in a

foreign country exists only where the district court in which the action is commenced can assert

actual or constructive control over such property.  *See Meza,* 63 F.3d at 152;  *see also* Supp. R.

G (2) (the "complaint must . . . state the grounds for . . . in rem jurisdiction over the defendant

property").

Constructive control has been found, furthermore, only where there is "demonstrated

cooperation" and compliance by the foreign nation to arrest the assets.  *See Meza,* 63 F.3d at 153

(concluding that *in rem* jurisdiction was proper "by virtue of the demonstrated cooperation of the

British government," which had given assurances "that a judgment of forfeiture . . . would be

enforced in England"); *United States* v. *Funds Described in "Attach. A" to the Compl. for*

*Forfeiture in Rem,* No. 05-916, 2007 WL 1877675, at *3 (M.D. Fla. June 27, 2007) (finding that the Bermuda government "demonstrated cooperation" where it issued an order restraining the claimant's bank account).

In *Meza,* for instance, the Second Circuit found constructive control of funds in certain bank accounts in the United Kingdom where the U.S. Department of Justice, early in its investigation and prior to the filing of its complaint, coordinated with British authorities to obtain a restraining order against the funds pursuant to a mutual assistance treaty between the United States and the United Kingdom.  Indeed, the Department of Justice itself has stressed the need for demonstrated cooperation by the foreign government in this context.  *See* Brief for Appellee in *United States v. Contents of Account No. 03001288, Held in the Name of Tasneem Jalal*, No. 00-2630, 2002 WL 32891643, at *33-41 (3d Cir. July 19, 2002) (asserting that accounts located in the United Arab Emirates were not in the actual or constructive control of the district court until UAE authorities formally advised they would seize and forfeit such funds pursuant to U.S. court order, and not just when UAE authorities had frozen the funds as an interim measure at the request of the Drug Enforcement Administration).

Here, however, the government has alleged no facts demonstrating *any* degree of control over LCB's assets.  *See Meza,* 63 F.3d at 154; *United States v. Contents of Account No. 03001288, Held in the Name of Tasneem Jalal*, 167 F. Supp. 2d 707, 712-13 (D. N.J. 2001).  The government has not alleged that any country with dominion over LCB's assets has a mutual assistance treaty with the United States, has cooperated in the past with the United States on forfeiture, or has indicated a willingness to cooperate in the present proceeding.  Absent such steps, the government cannot provide this Court with the necessary constructive control to vest it with *in rem* jurisdiction.

The government perhaps may point to the fact that it recently seized assets in the United States relating to this case.  Specifically, in August 2012, the government obtained an order pursuant to Title 18, United States Code, section 981(k) authorizing the seizure of up to $150 million on deposit in five U.S. correspondent accounts.  *See United States v. Up to $150 Million, et al.,* 12 Mag. 2157 (S.D.N.Y.).  But any funds seized pursuant to this order would not establish *in rem* jurisdiction, for at least three reasons.

First, these accounts have only a tangential relationship to this case. They are correspondent accounts for another Lebanese bank called Banque Libano Francaise ("BLF"), not LCB.  In 2011, according to the government's warrant application, BLF served as an escrow agent in connection with the acquisition of LCB by Societe Generale de Banque au Liban.  Approximately $150 million was escrowed to cover various potential liabilities.  The ultimate distribution of those funds will depend on the application of Lebanese law.  Under those circumstances, then, there is clearly no basis at present for the government to assert that any funds in these correspondent accounts constitute an appropriate stand-in for the *res* at issue in this case.

Secondly, even assuming such funds could suffice to establish jurisdiction, it is indisputable that the 981(k) seizure occurred long after the filing of the Complaint and thus does not remedy the failure to acquire and allege constructive control of the *res* as "a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding," *Republic Nat'l Bank*, 506 U.S. at 84 (emphasis in original).

Third, to the extent the government has in fact successfully seized the $150 million under section 981(k) (a point which remains in dispute) that sum is obviously only a portion of the total forfeiture claim at issue.  Seizure of a portion of assets does not create actual or constructive

control over the remainder, and more importantly does not cure the failure to obtain and allege

constructive control at the start of the case.  In *United States v. 3 Parcels in La Plata County,*

*Colorado*, 919 F. Supp. 1449 (D. Nev. 1995), the government sought to seize $320,000 owed to

claimant for the sale of tainted property, evidenced by a promissory note physically located in

Switzerland.  Although the purchaser of the property (who owed the $320,000 to the seller) made

several payments into the registry of the court, totaling approximately $10,000, that did not

remedy the government's failure to take the steps necessary to establish actual or constructive

control over the promissory note at the inception of the suit.  As the court held:

> The fact that [the purchaser] made several payments against the
> debt into the registry of the court does not dispose of the question
> whether the court ever had the requisite degree of control over the
> *res*.

919 F. Supp. at 1455.  Noting that "the court lacks jurisdiction over the portion of the debt not

paid into court," the court proceeded to dismiss the entire *in rem* forfeiture claim against the debt

"for lack of jurisdiction over the defendant property."  *Id.*  at 1455-56.  This Court should

likewise dismiss the *in rem* claim in its entirety.[7]

## IV.   THE GOVERNMENT WOULD NOT BE ENTITLED TO SEEK FORFEITURE OF ALL ASSETS OF LCB UNDER APPLICABLE LAW

Even if the Complaint properly alleged violations of IEEPA or money laundering, the

government's sweeping First Claim for Forfeiture, seeking to confiscate all assets of LCB, would

---

[7]  Nor should the Court permit the government to amend the Complaint with respect to *in rem*
jurisdiction. A court may deny leave to amend "for good reason, including futility."  *McCarthy v.
Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Leave to amend would serve no
purpose, and hence be futile, because the government has not and logically could not
demonstrate there was actual or constructive control over LCB's assets *prior* to initiating the
forfeiture action, as the law requires.  *See Republic Nat'l Bank*, 506 U.S. at 87; *Meza*, 63 F.3d at
152.  At best, the government could seek to refile its action, so long as it was not time-barred.

be either entirely precluded or, at minimum, dramatically limited, under applicable statutory provisions and well-established case law precedent.  The failure of the government to characterize the appropriate relief is another reason this Court should dismiss the First Claim.

**A.     The Government's First Claim for Forfeiture Must Be Limited To Net Gain or Profits**

The government's forfeiture claims are breathtaking.  Essentially the government is asserting that it may confiscate all of a bank's assets without even sufficiently pleading allegations showing that the bank knowingly and deliberately violated the law.  On their face, these claims would appear to be grossly disproportionate to the scope of the alleged illegal activity, and yet under the forfeiture statutes, any opportunity to challenge on the grounds of being "constitutionally excessive" must await final judgment, even though the fate of the institution whose assets have been frozen may hang in the balance.  *See* 18 U.S.C. § 983(g).[8]

There is, however, one other statutory mechanism that serves as a limiting principle under the circumstances presented here: the government's First Claim, as a matter of law, necessarily would be limited to the net proceeds – namely, the amount of money obtained by LCB from the transactions at issue less any direct costs incurred.

Specifically, section 981 contains two different definitions of  "proceeds."  First, in cases involving "illegal goods, illegal services, unlawful activities, and…fraud schemes", the term "proceeds" is defined in subsection (a)(2)(A) as "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture  and any property

---

[8]  As a direct consequence of FinCEN's proposed rule, pursuant to Section 311 of the Patriot Act issued on February 10, 2011 prohibiting U.S. financial institutions from doing business with LCB (*See* Compl. ¶¶ 4-5) , LCB was forced into a liquidation in which its shareholders undoubtedly suffered losses occasioned by the circumstances of this sale.

traceable thereto, and is not limited to the net gain or profit realized from the offense."  18

U.S.C. § 981(a)(2)(A) (hereinafter, "Gross Proceeds").

By contrast, with respect to cases "involving lawful goods or lawful services that are sold

or provided in an illegal manner," subsection (a)(2)(B) provides that the term "proceeds" means

"the amount of money acquired through the illegal transactions resulting in the forfeiture, less

the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B)

(hereinafter, "Net Proceeds").

By alleging that "all assets of LCB" are subject to forfeiture as IEEPA proceeds, the

government relies on the "Gross Proceeds" definition.  In other words, the government is taking

the position in the First Claim for Forfeiture that this case involves  "illegal goods, illegal

services, unlawful activities, and…fraud schemes."

This position was decisively rejected in the recent IEEPA civil forfeiture case of *650*

*Fifth Ave.,* 777 F.Supp.2d at 541.  In *650 Fifth Avenue*, the government sought to forfeit real

estate, partnership interests and various bank accounts as proceeds of illegal services the

claimants allegedly provided to Iran, in violation of IEEPA.  *Id.* at 534.  Specifically, the services

in question involved rent and other business income derived from the ownership and operation of

an office building in Manhattan by the Alavi Foundation and related groups which were alleged

to have been under the control of Iran.  The government contended the Gross Proceeds definition

applied to the subject assets because an IEEPA violation was enumerated as a "specified

unlawful activity" under section 1956, and hence was also an "unlawful activity" in the context

of section 981(a)(2)(A).  *Id.* at 551.  In a motion to dismiss, Claimants countered that the Net

Proceeds definition applied because the Gross Proceeds subsection refers to "unlawful activities"

rather than "specified unlawful activities" and thus had a distinct meaning.  *Id.*

After reviewing two other Southern District decisions that had addressed this issue of statutory interpretation,[9] the court ruled that the term "unlawful activities" does *not* include every crime listed as a "specified unlawful activity" and that the Gross Proceeds clause therefore did not automatically apply as the government had argued. *Id.  See also United States v. Mahaffy,* No. 09-5349, 2012 WL 3125209, at *19 (2d Cir. 2012) ("specified unlawful activity" is not coterminous with "unlawful activities" in § 981(a)(2)(A); instead, § 981(a)(2)(A) encompasses inherently unlawful activities such as robbery, that are not captured by the words "illegal goods" or "illegal services").

The court then turned to whether the IEEPA violations were "illegal services" or rather "lawful services that are sold or provided in an illegal manner." The court noted that "[t]ransferring funds, managing business affairs and real estate investments, and running a charitable organization are normally legal activities; they are only alleged to be illegal here because they were performed for the Iranian government." *650 Fifth Ave.*, 777 F. Supp. 2d at 551-52.  Having determined that the services alleged were properly characterized as  "lawful services that are sold or provided in an illegal manner," the court then ruled that any forfeiture would be limited by the Net Proceeds definition.  *Id.*

---

[9]  *See All Funds on Deposit in United Bank of Switz.*, 188 F.Supp.2d 407, 409 (S.D.N.Y. 2002) (gross proceeds definition applied regardless of whether the transactions at issue were "illegal services" or "lawful services… provided in an illegal manner"  because transactions were "specified unlawful activities" and therefore also "unlawful activities") and *United States v. Kalish*, No. 05-656, 2009 U.S. Dist. LEXIS 31453 at *19-21 (rejecting *All Funds* on the grounds that if, by the term "unlawful activities" in section 981, Congress had meant "specified unlawful activity" then it would have used that precise term instead of the looser "unlawful activities" phrase used in section 981(a)(2)(A)).  The Second Circuit in *Mahaffy* has specifically rejected the reasoning in *All Funds*.  *See Mahaffy*, 2012 WL 3125209 at *19.

The same logic must apply here.  The Defendant Properties purportedly constitute or are derived from proceeds traceable to the used car transactions.  But transferring funds for the purchase and sale of used cars, in and of itself, plainly does not involve any illegal good, service, fraud or unlawful activity.  Rather, the fund transfers, and indeed the underlying car transactions, are only problematic in that they are alleged to have been conducted in violation of IEEPA by and/or on behalf of Hizballah.

Thus, as in *650 Fifth Avenue*, any forfeiture would necessarily be limited to net proceeds. The net proceeds to be forfeited from LCB would presumably be based on the total amount in fees or other banking processing services allegedly generated for LCB as a result of the car transactions.  Because the First Claim fails to properly allege this basis for forfeiture, it should be dismissed.

**B.      The Government Is Not Entitled to Invoke the Exception for Tracing Tainted Proceeds**

The First Claim for Forfeiture cites a statute which is intended to relax, in cases involving fungible property, the normal requirement to trace tainted proceeds back to the purported underlying criminal activity.  Specifically, Title 18, United States Code, section 984(a)(1), provides, in relevant part, that:

> [i]n any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in a financial institution (as defined in section 20 of this title…(A) it shall not be necessary for the government to identify the specific property involved in the offense that is the basis for the forfeiture and (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

18 U.S.C. § 984(a)(1).  *See also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003) (section 984 simply modifies the tracing requirements that would otherwise apply in a civil forfeiture action).

With respect to any forfeiture of LCB's assets, however, the government would not be entitled to invoke this tracing exception because LCB does not qualify as a "financial institution" for the purposes of section 984(a)(1).  "Financial institution" is defined by reference to Title 18, United States Code, Section 20.  That statute contains a list of entities (such as FDIC insured depositories, certain credit unions, Federal Home Loan banks and certain small business investment companies) which may be termed "financial institutions."  *See* 18 U.S.C. § 20. Foreign banks, such as LCB, are not included on the list. The list does include a "branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of the International Banking Act of 1978.  18 U.S.C. § 20(9).  But the definitions of "branch" or "agency" in that statute both require, *inter alia*, the existence of an office or place of business in the United States. *See United States v. Klein,* 216 Fed.Appx. 84, 90, (2d Cir. 2007).

Although the Complaint alleges that LCB "maintained correspondent accounts with financial institutions in the Southern District of New York" (Compl. ¶ 5), it clearly does not allege that it maintained a "branch" or "agency" in the United States as would be required to invoke section 984's tracing exception.

Nor is this a mere technicality: the fact that LCB does not qualify as a "financial institution" for the purposes of relaxing the tracing requirement makes perfect sense given the understandable reluctance of United States courts to assert, in effect, extraterritorial jurisdiction where it is not explicitly provided for in a statute.

Accordingly, because the First Claim for Forfeiture specifically relies upon a statutory mechanism which is not applicable as against LCB's assets, and given that the Complaint fails to

specifically trace the assets it seeks to forfeit back to the alleged criminal activity, the First Claim

should be dismissed.[10]

**C.      Forfeiture of LCB assets as assets "involved" in money laundering is not permissible because the Complaint fails to allege any deliberate effort to comingle dirty and clean funds**

The Second Claim for Forfeiture seeks "all assets of LCB" on the theory they were

"involved in" money laundering.  *See* Compl. ¶ 9, 94.  Even assuming the government were able

to satisfy the tracing requirements discussed above, the forfeiture of "all assets of LCB" would

not be permissible because the Complaint fails to allege a sufficient nexus between such property

and money laundering activity in question.

Property "involved in" money laundering can include both money that was actually

laundered, as well as property that was used to facilitate the laundering.  *See 650 Fifth Ave.* 777

F. Supp.2d at 564.  Facilitation of a laundering offense occurs when the property as used makes

the underlying criminal activity "less difficult or more or less free from obstruction or

hindrance."  *United States v. Schifferli,* 895 F.2d 987, 990 (4th Cir.1990); *see also United States

v. Huber*, 404 F.3d 1047, 1060 (8th Cir. 2005).  To rely on a facilitation theory, however, the

government must allege a "substantial connection" between the property in question and the

alleged criminal offense.  *See* 18 U.S.C. § 981(c )(3); Supp. R. G(2); *see also United States v.

Funds in the Amount of $122,500.00*, 2000 U.S. Dist. LEXIS 10435, *8-9 (N.D. Ill. July 17,

---

[10]  Even assuming the government could invoke the tracing exception, under section 984(b), "[n]o action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." 18 U.S.C. § 984(b).  Although the Complaint (filed December 15, 2011) alleges generally that the car purchases took place between January 2007 and early 2011, Compl. ¶ 7, there are no dates provided for any of the specific wire transfers at issue.  Accordingly, LCB reserves the right to challenge this action as time-barred in the event the government is unable to prove the existence of an unlawful wire transfer on or after December 15, 2010.

2000) ("complaint must allege facts which reasonably support a nexus between the property seized and the related drug offense that is more than incidental or fortuitous").

As a threshold matter, the Complaint never claims LCB in its entirety was involved in the money laundering, let alone a significant portion. The Complaint only alleges that approximately $229 million in funds were laundered through accounts belonging to LCB clients during the applicable period. Compl. ¶ 43. That sum constitutes approximately 4.5 percent of the bank's total assets of $5 billion. Compl. ¶ 41. In the absence of an allegation that all assets are traceable to proceeds of the used car scheme, the government must assert (1) that LCB's assets are subject to forfeiture as facilitating property; and/or (2) that LCB's otherwise untainted assets were impermissibly commingled with criminal proceeds. The Complaint lacks sufficient allegations that would justify relief under either theory.

First, with respect to facilitation: the Complaint asserts that LCB processed the wire transfers in question; did business with questionable characters; had "poor anti-money laundering controls," granted limited exceptions from its policy requiring cash transaction slips; and was aware of certain OFAC designations. *See* Compl. ¶44, 44(g), 44(h).

But these allegations do not amount to facilitation. If they did, any bank anywhere around the world would be at risk of seizure based on the wholly unfettered discretion of the U.S. Attorney for the Southern District of New York. After all, no bank can boast of one hundred percent compliance with every AML procedure, nor is any bank immune from the possibility of betrayal by a rogue employee or branch manager.

Rather, the allegations here at most depict LCB as the instrument of misuse by others. There is no suggestion, for instance, that LCB as a whole deliberately intended to facilitate the purported cars-for-cash scheme, or any narcotics trafficking.

36

Furthermore, even assuming that the Complaint sufficiently alleged LCB had made the money laundering less difficult, the government would still have to allege and establish a substantial connection that is more than "incidental or fortuitous" between the property (namely, all assets of LCB) and the offense.  *See Funds in the Amount of $122,500.00*, 2000 U.S. Dist. LEXIS 10435, at *8-9.  No such connection has been made here.  There is no suggestion, for instance, that the bank was indispensable or even unusual in enabling the car scheme to be carried out, or that the scheme could not have accomplished through any other similarly situated bank.  *Cf. United States v. Wyly,* 193 F.3d 289, 302 (5th Cir. 1999) (facilitating property forfeitable where it was "indispensable" to the money laundering conspiracy).

Nor has the government stated a claim to forfeit "all assets of LCB" under a commingling theory.  When the government seeks the forfeiture of lawfully obtained funds on the basis of having been commingled with unlawfully obtained funds, "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture."  *United States v. Nicolo*, 597 F. Supp.2d 342, 351 (W.D.N.Y. 2009).  Forfeiture is not available unless "the innocent funds" were "used in some way to hide the nature of the tainted funds."  *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 799 (D. Vt. 2003) ("Allowing the government to obtain forfeiture of clean money merely because it was commingled with unlawfully obtained funds would render "the tracing requirement . . . a dead letter").

In the instant case, however, there is no allegation that LCB took any steps to disguise the nature or source of tainted funds by commingling them with legitimate assets.  There is no allegation, for example, that accounts belonging to non-designated customers were used to shield the illegal activity from scrutiny.  Indeed, the Complaint makes clear that only a very small

number of wire originators at LCB were involved in the alleged scheme, thus further demonstrating that to the extent a problem existed, it was compartmentalized and surely did not implicate the overwhelming majority of bank customers.

The Complaint does state that cash proceeds of the used car sales were combined, in Benin and other West African countries, with proceeds of narcotics trafficking and other crimes for the purpose of concealing the "true source, nature, ownership, and control of the narcotics proceeds."  Compl. ¶¶ 1, 64.  But this allegation, if true, would not support the forfeiture of all bank assets given that there is no suggestion that LCB or any of its employees played a role in such activity, or that clean assets of LCB were mixed with tainted funds.  Accordingly, the government's claim seeking to forfeit all assets of LCB based on having been "involved in" a money laundering scheme, is unjustifiable on its face and should be dismissed.

**V.   THE COURT SHOULD DISMISS THE CLAIM FOR CIVIL MONEY LAUNDERING PENALTIES**

In addition to its *in rem* forfeiture claims, the Complaint also seeks to impose an *in personam* civil penalty against LCB  of more than $200,000,000 which the government asserts was the amount involved in the money laundering scheme.  For the reasons set forth below, the Court should dismiss this claim as well.

**A.   The Court Lacks Subject Matter Jurisdiction To Impose a Civil Money Laundering Penalty Against LCB**

Title 18, United States Code, Section 1956(b)(1) authorizes the imposition of civil penalties on those found to have committed any of the offenses proscribed under section (a).  *See* 18 U.S.C. § 1956(b)(1).  The maximum amount of such a penalty is the value of the property involved in the illegal transaction or $10,000, whichever is greater.  *Id.*

As a threshold matter, this Court lacks subject matter jurisdiction to impose a civil money laundering penalty against LCB given its status as a wholly offshore financial institution.  "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *EEOC,* 499 U.S. at 248 (internal quotation marks omitted).  Section 1956(f) specifically provides for extraterritorial jurisdiction over the conduct prohibited by the money laundering statute if, *inter alia*, "the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States."  18 U.S.C. § 1956(f)(1).

Here, the Complaint fails to allege *any* conduct by LCB, either in whole or in part, occurring within the United States.  There is no allegation, for instance, that LCB or its officers or employees had any direct role with respect to the purchase or shipping of the used cars.  Nor is there any specific allegation that LCB or its officers or employees conspired with any other party to engage in money laundering occurring in, or targeted at, the United States.

In *United States v. Lloyds TSB Bank, PLC*, 639 F. Supp. 2d 314 (S.D.N.Y. 2009) the government brought a civil money laundering case against Lloyds, a British bank.  Acknowledging that the bank had no U.S. presence, the government nevertheless contended that section 1956(f) provided for extraterritorial jurisdiction because the underlying conduct occurred in part in the United States.  *Id.* at 319.  The government based its jurisdictional claim on the bank's role in laundering the fruits of an insider trading scheme perpetrated on a United States market and against a United States company.  *Id.*

Rejecting the government's argument, the court dismissed for lack of subject matter jurisdiction.  Noting that the bank had not been named as a participant in the underlying fraud in the United States, the court stated that the government had been "reduced to relying upon the

conduct in the United States of securities fraud conspirators, who transferred proceeds from the United States which were eventually deposited in [a conspirator's] accounts with the Bank in Switzerland" which was not legally sufficient.  *Id* at 324.  The court also rejected the government's reliance "on the fact that some of the proceeds eventually transferred to or from the Bank's accounts may or did pass electronically through the New York banking system." *Id.* at 324 n.4.  The court found "[t]his peripheral and transitory contact with the United States counts for nothing in *fourm non conveniens* analysis and fare no better in subject matter jurisdictional analysis." *Id.* (citation omitted).

Similarly, the only connection between LCB and the United States relates to the *processing of certain wire transfers* originated by other parties destined for accounts belonging to various car dealers.  Specifically, the Complaint states that "the Ayash Exchange and the Ellissa Exchange originated approximately $203,269,615 or more in wire transfers (the 'Exchange Funds') from accounts held at LCB, Federal Bank, BLOM, and MEAB (collectively, the 'Lebanese Banks') to bank accounts in the United States for the purchase or shipping of used cars."  Compl. ¶ 52.  The Complaint summarizes in table form "the Exchange and Non-Exchange Funds that were wired to the Lebanese Banks and then further wired to correspondent bank accounts in the United States, including in the Southern District of New York."  Compl. ¶ 54.

Like the bank in *Lloyds*, LCB is not alleged to have actively participated in the underlying criminal activity.  At most, the Complaint asserts LCB processed transactions containing illegal proceeds by wire transfers made through New York correspondent accounts. *See* Compl. ¶¶  52, 54.  Such "peripheral and transitory" conduct  does not create subject matter jurisdiction under section 1956(f) or *Lloyds.*  Accordingly, the government's claim for civil money laundering penalties must be dismissed.

**B.      The Civil Money Laundering Claim Must Be Dismissed Because the Complaint Fails to Allege Violations of the Money Laundering Laws**

Assuming that the Court has subject matter jurisdiction over an action brought under section 1956(f) against LCB, for the reasons set forth in our discussion of the deficiencies in the *in rem* forfeiture counts, the government's claim for a civil money laundering penalty (which relies on the same allegations) also should be dismissed.  We will not repeat those arguments here except to state that the Complaint fails to (1) allege the commission of an SUA; (2) allege knowing and willful money laundering violations; and (3) allege any laundering that would not otherwise be merged into the predicate offenses.  Accordingly, the civil money laundering penalty claim should be dismissed.

**C.      Even If the Complaint Established a Basis for *In Rem* Forfeiture of Money Laundering Proceeds, the Complaint Fails to Allege Sufficient Facts for an *In Personam* Money Laundering Penalty Against LCB**

Even assuming the Complaint properly alleged the existence of money laundering offenses which would permit *in rem* forfeiture, that does not result automatically in the imposition of a corresponding civil money laundering judgment.  Rather, imposition of a penalty would require the government to demonstrate that LCB knowingly and willfully participated in money laundering.

This follows from the differences between *in rem* and *in personam* actions.  An *in rem* action is remedial in nature.  *United States v. Banco Internacional/Bital S.A.*, 110 F. Supp.2d 1272, 1278 (C.D. Cal. 2000); *see also United States v. Ursery*, 518 U.S. 267 (1996) (civil forfeiture followed by criminal charge did not violate Double Jeopardy Clause because civil forfeiture was remedial, not punitive).  Thus, in an *in rem* forfeiture case, the government need not allege that the present owner of the property directly participated in the underlying criminal violation or was even aware of such activity.  *See, e.g.*, *United States v. 316 Units of Mun. Sec.*,

41

725 F. Supp. 172, 177 (S.D.N.Y. 1989); *see also United States v. $734,578.82 in U.S. Currency,* 286 F.3d 641, 657 (3d Cir. 2002) (civil forfeiture, as an action against the property itself, is not conditioned on the culpability of the owner of the defendant property). By contrast, an *in personam* action is meant as a penalty against the defendant and his property, and is thus punitive in nature. *See United States v. Gilbert*, 244 F.3d 888, 919 (11th Cir. 2001)("[b]ecause it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only that property, or portion thereof, owned by defendant); *Banco Internacional/Bital*, 110 F. Supp. 2d at 1278 (government characterizes civil money laundering penalty action as having punitive purpose).

The reported decisions citing section 1956(b) provide little guidance as to the requisite pleading standard. In comparable civil actions brought against financial institutions for supporting alleged terrorist activities, however, district courts in the Second Circuit have made clear that merely providing routine banking services dos not suffice to establish liability. *See, e.g., In Re Terrorist Attacks on Sept. 11, 2001,* 349 F.Supp.2d 765, 833 (S.D.N.Y 2005) (in action brought under Torture Victim Protection Act, Antiterrorism Act, Alien Tort Claims Act and RICO against various Middle Eastern banks and other entities alleged to have provided support to al Qaeda, court notes that "[p]roviding routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability"); *Strauss v. Credit Lyonnais, S.A.,* 2006 WL 2862704, *9 (E.D.N.Y. Oct. 5, 2006)( in action brought under Antiterrorism Act against French bank for allegedly aiding and abetting Hamas, court holds that allegations that defendant bank knowingly maintained accounts for Hamas fundraising group and knowingly transferred money to Hamas-controlled entities did not suffice to sustain an aiding and abetting claim).

Whether a civil penalty would be appropriate, then, would depend on *LCB's* specific culpability for the alleged money laundering.  Most of the Complaint relates to assertions that LCB processed wire transfers for the purchase of  cars – the kind of passive banking activity that could not fairly result in a civil penalty.  As noted above in our discussion of the money laundering forfeiture claim, the Complaint contains no allegations suggesting anything even remotely approaching a knowing and willful effort to promote unlawful activity.

Accordingly, the civil money laundering penalty claim lacks merit.

## CONCLUSION

For all of the reasons stated, the government's Complaint as against LCB should be dismissed.

Dated: October 4, 2012                                    Respectfully submitted,


/s/  E.T.B.

Evan T. Barr
Sandra E. Cavazos
Elisabeth L. Page (Admitted Pro Hac Vice)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York NY 10036
Telephone: 212.506.3918
Facsimile: 212.506.3950

John M. Hillebrecht
Patrick J. Smith
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
Telephone: 212.335.4685
Facsimile: 212.335.4501

*Attorneys for Defendant-Claimant*
*Lebanese Canadian Bank SAL*

43

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the below date, she served or caused to be served the following document in the manner indicated:

**MEMORANDUM OF LAW IN SUPPORT OF CLAIMANT
LEBANESE CANADIAN BANK SAL's MOTION TO DISMISS THE COMPLAINT**

Via ECF upon the following attorneys:

All Counsel of Record

Dated:  October 4, 2012
          New York, New York

                                          /s/  E.L.P.
                                          Elisabeth  L. Page