UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                          :

UNITED STATES OF AMERICA,
                          :

              Plaintiff,
                          :

        - v. -                        11 Civ. 9186 (PAE)
                          :

ALL ASSETS OF LEBANESE CANADIAN      ECF Case
BANK, SAL, et al.,                   :

              Defendants *in rem*,   :

LEBANESE CANADIAN BANK, SAL, et al.,   :

              Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTIONS BY LEBANESE CANADIAN BANK, SAL,
## ELLISSA HOLDING COMPANY, AND AYASH EXCHANGE COMPANY
## <u>TO DISMISS THE AMENDED COMPLAINT</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Sharon Cohen Levin
Michael D. Lockard
Jason H. Cowley
Alexander J. Wilson
Assistant United States Attorneys,
  - Of Counsel -

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 1

    A.  The Money Laundering Scheme Alleged in the Amended Complaint ........................ 1

    B.  Hizballah ............................................................................................................ 2

ARGUMENT ................................................................................................................... 3

    I.  Legal Standards Applicable to the Motions to Dismiss ................................................. 3

    II.  The Amended Complaint Sufficiently Pleads that the Property of LCB, Ellissa Holding Company, and Ayash Exchange are Forfeitable ............................................. 6

        A.  The Amended Complaint Sets Forth Sufficient *Mens Rea* Allegations .......... 6

        B.  The Amended Complaint Sets Forth Sufficient Allegations of IEEPA Violations ...................................................................................................... 13

        C.  The Amended Complaint Sets Forth Sufficient Allegations of Money Laundering Offenses ......................................................................................... 23

    III.  The Amended Complaint Sufficiently Pleads Civil Money Laundering Penalty Claims Against LCB, Ellissa Holding Company, and Ayash Exchange ................... 31

    IV.  The Court Has Jurisdiction Over This Action ........................................................... 34

    V.  Claimants' Remaining Contentions Should Be Rejected .......................................... 46

CONCLUSION ................................................................................................................ 48

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to motions by defendant-claimants Lebanese Canadian Bank, SAL, Ellissa Holding, and Ayash Exchange to dismiss the Amended Complaint.

## STATEMENT OF FACTS

**A.    The Money Laundering Scheme Alleged in the Amended Complaint**

The Amended Complaint alleges a wide-ranging international scheme to launder money through United States financial institutions and used car markets from 2007 through 2011.  As part of this scheme, hundreds of millions of dollars were transferred to the United States from Lebanon for the purpose of buying used cars and shipping them to West Africa.  (Am. Compl. ¶¶ 1, 32-35).  West Africa is a major hub of narcotics trafficking and money laundering, with as much as 300 metric tons of cocaine – worth approximately $13.5 billion – transiting West Africa en route to Europe each year.  (*Id.* ¶ 42).  U.S.-exported cars were sold in West Africa for cash, the cash was mixed with proceeds of narcotics trafficking and other crimes and transferred, principally through bulk cash smuggling, to Lebanon.  (*Id.*).  Cash proceeds from the sale of U.S.-exported cars, for example, were often converted to U.S. dollars and Euros on black market currency exchanges fueled by narcodollars.  (*Id.* ¶ 73).  After these cash proceeds were transferred to Lebanon, a portion was reinvested in the car-buying scheme, continuing to feed the money laundering channels that funneled narcotics and other criminal proceeds from West Africa to Lebanon.

Hizballah members and supporters were involved at various key points of the money laundering scheme, including by facilitating cash smuggling from West Africa to Lebanon and by financing and facilitating the purchase of used cars in the United States.  (*Id.* ¶¶ 2, 67-84, 86). For example, a Hizballah-affiliated network of couriers moved millions of dollars in cash from

West Africa to Lebanon (*id.* ¶¶ 74-83) and Hizballah security facilitated the receipt of cash that was flown into the Beirut International Airport from West Africa.  (*Id.* ¶¶ 43(a), 76).  Hizballah members and supporters also benefitted from the money laundering scheme by earning commissions and fees for their services, as well as profits from sales of U.S.-exported cars in West Africa.  (*Id.* ¶ 35).

In connection with this scheme, approximately $329,551,584 was sent from Lebanon financial institutions through the U.S. financial system and car markets.  The Ellissa Exchange[1] (a subsidiary of Ellissa Holding) and the Ayash Exchange originated approximately $203,269,615 in overseas transfers to the United States, or approximately 62% of the funds.  (*Id.* ¶ 64).  LCB was the Lebanese sending bank for approximately $229,872,953 in overseas transfers to the United States, or approximately 70% of the funds.  (*Id.*).

**B.    Hizballah**

Hizballah is a Lebanon-based terrorist organization formed in approximately 1982. Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.  (*Id.* ¶ 36).  According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and

---

[1]  In this brief, "LCB" will refer to defendant-claimant Lebanese Canadian Bank, SAL; "Ellissa Holding" will refer to defendant-claimant Ellissa Holding Company; "Ayash Exchange" will refer to defendant-claimant Hassan Ayash Exchange Company; "Claimants" will refer collectively to the defendant-claimants; "LCB Br." will refer to LCB's memorandum of law in support of its motion to dismiss (docket entry no. 390); "Ellissa Br." will refer to Ellissa Holding's memorandum of law in support of its motion to dismiss (docket entry no. 395); "Ayash Br." will refer to Ayash Exchange's memorandum of law in support of its motion to dismiss (docket entry no. 393); and "Am. Compl." will refer to the Government's Verified Amended Complaint (docket entry no. 372).

political support from Syria; and funding from private donations and profits from legal and illegal businesses.  (*Id.* ¶ 37).  Hizballah operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state."  (*Id.* ¶ 38).

Hizballah has been identified as a terrorist organization by the U.S. Government under numerous sanctions regulations.  (*Id.*).  Hizballah remains the most technically capable terrorist group in the world and a continued security threat to the United States.  Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history.  (*Id.* ¶ 39).  Hizballah has also developed links to money laundering and narcotics trafficking and since in or around 2006, such narcotics trafficking has been condoned through the issuance of fatwas by radical Islamic clerics.  The narcotics trade has become a source of revenue for Hizballah.  (*Id.* ¶ 40).

## ARGUMENT

### I.     Legal Standards Applicable to the Motions to Dismiss

A motion to dismiss under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court expounded on the pleading requirements necessary to survive a motion to dismiss.  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also id.* at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'[.]") (quoting FED. R. CIV. P. 1).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *accord Twombly*, 550 U.S. at 556.

When considering a Rule 12(b)(6) motion to dismiss, the court must "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth* v. *Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Gregory* v. *Daly*, 243 F.3d 687, 691 (2d Cir. 2001)); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt* v. *Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also United States* v. *$15,270,885.69 Formerly on Deposit in Account No. 8900261137*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *5 (S.D.N.Y. Aug. 31, 2000) (motion to dismiss may not be used to test the sufficiency or admissibility of the evidence). "[T]he issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd.* v. *Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citations omitted).

In a civil forfeiture action, the complaint must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.[2] Rule G(2) requires, among other things, that the complaint "state sufficiently detailed

---

[2] LCB also cites Supplemental Rule E(2)(a) in its motion to dismiss. *See, e.g.*, LCB Br. at 4-6. Supplemental Rule G, which became effective December 1, 2006, expressly provides that its provisions apply to "forfeiture action[s] in rem arising from a federal statute" and that Supplemental Rules C and E and the Rules of Civil Procedure apply only "[t]o the extent that

facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). Thus, a civil forfeiture complaint must do more than satisfy the mere notice pleading standards of the Federal Rules of Civil Procedure. *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

The complaint does not, however, need to allege facts sufficient to prove the forfeitability of the defendant property, nor is the Government required to have sufficient evidence to establish the forfeitability of property at the time the complaint is filed. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), codified in part at 18 U.S.C. § 983, expressly provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii) ("In an action governed by 18 U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property. The sufficiency of the complaint is governed by Rule G(2).").

---

this rule [Rule G] does not address an issue." SUPPL. R. G(1). Rule G(2) addresses the contents of a civil forfeiture complaint, and Rule E accordingly does not apply to that issue. *See, e.g.*, *United States* v. *All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 15 (D.D.C. 2008) (noting that Rule G supplanted the pleading provisions of Rule E(2)(a)). But because Rule G(2) was intended to carry forward the case law interpreting Rule E(2)(a), *see id.* at 15-16; *see also* SUPPL. R. G, advisory committee's note; LCB's erroneous citation to Rule E is harmless. *See also United States* v. *Mondragon*, 313 F.3d 862, 865-66 (4th Cir. 2002) (interpreting Rule E(2)(A) to require a forfeiture complaint to "allege facts sufficient to support a reasonable belief that the property is subject to forfeiture") (cited in SUPPL. R. G, advisory committee note).

Nor must the facts alleged in the complaint be sufficient to establish probable cause that specific property is subject to forfeiture.  *See, e.g.*, *Daccarett*, 6 F.3d at 47.  Instead, the complaint simply needs to establish a "reasonable belief" that the government will be able to meet its burden when it comes time for trial.  *Id.*  "In other words, the complaint need not allege facts sufficient to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate [its trial burden] for finding the property tainted."  *Id.*  Stated differently, the Government simply must plead "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  *United States* v. *Mondragon*, 313 F.3d 862, 865-67 (4th Cir. 2002) (applying SUPPL. R. E(2)(a)).

## II.     The Amended Complaint Sufficiently Pleads that the Property of LCB, Ellissa Holding Company, and Ayash Exchange are Forfeitable

### A.     The Amended Complaint Sets Forth Sufficient *Mens Rea* Allegations

Each of the Claimants argues that the Amended Complaint fails to set forth sufficient factual allegations regarding the Claimants' *mens rea* for the offense conduct alleged in the Amended Complaint.  (*E.g.*, LCB Br. at 6, 9, 12, 16).

As an initial matter, for purposes of alleging forfeiture claims based on IEEPA and money laundering offenses, the Amended Complaint does not need to allege that the Claimants had culpable knowledge.  The Amended Complaint need merely set forth sufficient facts to support a reasonable belief that, at the time of trial, the Government will be able to prove that transactions in the United States or involving U.S. persons provided goods, funds, or services to or for the benefit of Hizballah and that the proceeds of narcotics trafficking and IEEPA violations were laundered through transactions taking place at least in part in the United States.

Property traceable to the proceeds of those IEEPA violations or traceable to property involved in the money laundering transactions is then subject to forfeiture.  The claimants will have an opportunity to assert an innocent ownership defense at trial, but the Amended Complaint does not need to negate the claimants' potential affirmative defenses in order to sufficiently plead forfeiture claims.  *See* 18 U.S.C. § 983(d) (claimant bears the burden of proving it is an innocent owner by a preponderance of the evidence); *see also*, *e.g.*, *United States* v. *Real Property Located at 216 Kenmore Ave.*, 657 F. Supp. 2d 1060, 1066-67 (D. Minn. 2009) (forfeiture complaint adequately alleged forfeiture claims, "notwithstanding any arguments and evidence the [claimants] might later offer to the contrary"); *United States* v. *316 Units of Mun. Sec.*, 725 F. Supp. 172, 177 (S.D.N.Y. 1989) ("Because the government proceeds against allegedly tainted property in a forfeiture proceeding, it is not necessary for the government to show that the present owner of the property participated in a violation of the statute or was even aware of the violation.") (citing *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 680 (1974)); *United States* v. *$734,578.82 in U.S. Currency*, 286 F.3d 641, 657 (3d Cir. 2002) ("forfeiture is not conditioned upon the culpability of the owner of the defendant property").

But though the Amended Complaint does not need to allege the claimants' culpable knowledge to support the forfeiture claims, the allegations in the Amended Complaint do, in fact, support a reasonable belief that the Government will be able to prove that LCB, Ellissa Holding, and Ayash Exchange knew they were involved in money laundering transactions for the benefit of Hizballah.

LCB.  As alleged in the Amended Complaint, LCB had deep ties with a number of Hizballah members and entities.  For example, LCB provided banking services for the Yousser Company for Finance and Investment ("Yousser Finance") and Bayt al-Mal, described by OFAC

in its 2006 designation of those entities as "Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." (Am. Compl. ¶ 47(a)). Yousser Finance director Hussain al-Shami, a guarantor of LCB's loans to Yousser Finance and Bayt al-Mal, is a "senior Hizballah leader who has served as a member of Hizballah's Shura council and as the head of several of Hizballah-controlled organizations . . . ." (*Id.*).[3] Other LCB clients include the Farah Company, a subsidiary of Yousser Finance (*id.* ¶ 47(b)); the Lebanese Arab Company for Touristic Services SARL, owned in turn by the Al Mabarat Association, whose directors included Mohammed Fadlallah, Hizballah's spiritual leader and designated by OFAC in 1995[4] (*id.* ¶ 47(c)); Rayan (Offshore) LLC, owned by, among others, Nawaf Moussaoui, a Hizballah public spokesperson and Hizballah-party Parliament member (*id.* ¶ 47(d)); Matrix SAL Off-shore, owned by business associates of OFAC-designees Ali Tajideen, a Hizballah commander, and his brother Husayn Tajideen – both Hizballah fundraisers whose company, Tajco SARL, purchased and developed real estate in Lebanon for Hizballah in order to generate funds for the organization (*id.* ¶ 47(e)); and Nazem Ibrahim Ahmad, who, along with his African diamonds company, Sierra Gem Diamonds Company, was associated with a Lebanese clan having close ties to Hizballah and to money laundering and diamond smuggling. (*Id.* ¶ 47(f)).

LCB not only maintained these numerous banking relationships with Hizballah leaders and Hizballah-controlled entities, but also accorded them special exemptions from currency transaction reporting requirements, one of the most basic anti-money laundering tools of

---

[3] In 2007, OFAC also designated another al-Shami-run entity, al-Qard al-Hassan Association, as a SDGT. Al-Qard al-Hassan was essentially a successor to Yousser Finance and Bayt al-Mal after their designations. *See* 72 Fed. Reg. 60715 (Oct. 25, 2007).

[4] LCB argues that it had no dealings with entities or individuals that were OFAC-designated during the time they were LCB clients (LCB Mot. at 10), but Fadlallah was, in addition to being a prominent Hizballah leader and a director of LCB clients, designated in 1995.

financial institutions.  In September 2003, LCB granted Yousser Finance, the Farah Company, al-Shami, the Al Mabarat Association, the Lebanese Arab Touristic Company, Al-Aytam (another Fadlallah-founded company), and the Al-Shahid Foundation (designated by OFAC as a SDGT in 2007) exemptions from cash transaction reporting requirements that permitted them to conduct hundreds of thousands of dollars' worth of transactions on a weekly or even daily basis with no reporting on the sources of the cash.  (*Id.* ¶ 47(g)).

LCB also dismissed a U.N. report raising money laundering allegations about LCB client Nazem Ibrahim Ahmad as "part of the propaganda war launched by the Jewish state against Lebanon" (*id.* ¶ 47(g)); paid lip service to OFAC compliance following the designations of Yousser Finance and al-Shami as SDGTs but continued to maintain banking relationships with them (*id.* ¶ 47(h)); and turned a blind eye to serious money laundering concerns about the Ellissa Exchange raised in LCB's own internal due diligence report (*id.* ¶ 48(b), (c)).  LCB's own due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut; that LCB had limited "know your customer" files for these clients; and that another Lebanese bank had closed its accounts with the Ellissa Exchange.  The report further described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.  (*Id.*).  Despite the report, the Ellissa Exchange accounts continued operating with inadequate diligence and supervision.  (*Id.*).

In addition, when the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") identified LCB as an entity of primary money laundering concern, the agency noted that exchanges and companies related to narcotics kingpin Ayman Joumaa

originated over $66 million in wire transfers from Lebanese banks since January 2006, with approximately one-half of the wire transfers and approximately 94% of the funds originating from LCB, indicating that LCB was the favored bank for these Joumaa-related entities, particularly for illicit banking activity.  (Am. Compl. ¶ 47(i)).  Just as LCB was the favored bank for wire transfers by a drug kingpin's organization, it was also the favored bank for wire transfers in furtherance of the money laundering scheme.  Of the approximately $329,551,584 sent through the U.S. financial system and car markets as part of this money laundering scheme, the Ellissa Exchange (a subsidiary of Ellissa Holding) and the Ayash Exchange originated approximately $203,269,615 in overseas transfers to the United States, or approximately 62% of the funds.  (Am. Compl. ¶ 64).  LCB was the Lebanese sending bank for approximately $229,872,953 in overseas transfers to the United States, or approximately 70% of the funds. (*Id.*).

LCB unpersuasively attempts to dismiss the significance of these allegations.  For example, LCB argues that certain individuals and entities were not OFAC-designated at the time they were LCB clients.  (LCB Br. at 10, 16-17).  Not only does the Amended Complaint allege that LCB did business at least with two companies of an OFAC-designated Hizballah leader after his designation (*e.g.*, Am. Compl. ¶ 47(h) & (g)), but the depth and breadth of LCB's Hizballah relationships – and the special treatment LCB afforded these clients by eviscerating their cash reporting requirements – clearly permits the inference that LCB was fully aware of the nature of its clients.  These allegations also permit the reasonable inference that LCB likely was aware of the massive Hizballah-related scheme to launder money through U.S. financial institutions and used car markets.  (Am. Compl. ¶¶ 32-35).

That LCB cannot, even now, acknowledge its profound failures of anti-money laundering controls would be troubling, were the bank still in operation.  But the relevant issue for purposes of the motion to dismiss is simply whether the facts alleged in the Amended Complaint permit a reasonable belief that the Government will be able to prove at trial that LCB knew that it was processing financial transactions involving crime proceeds.  The allegations plainly do.

Ayash Exchange.  As alleged in the Amended Complaint, the Ayash Exchange was designated by OFAC under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, because of its role as a money launderer for the Ayman Joumaa drug trafficking organization.  (Am. Compl. ¶ 3; see also id. ¶¶ 43(a) & (b) (describing Joumaa's indictment for narcotics trafficking and money laundering offenses)).  The Ayash Exchange's principal offices were located adjacent to Joumaa's Caesar Park Hotel in Beirut, Lebanon.  (Id. ¶ 53).

Hassan Ayash, the head of the exchange, has touted his family ties to Hassan Nasrallah, the Secretary General of Hizballah, as well as his connections to "important people" in Lebanon that help him provide services for clients of the exchange house.  (Id. ¶ 54).  The exchange is selective about new clients, requiring a referral from an existing client.  (Id. ¶ 55).  In approximately 2009, Hassan Chokr, a Hizballah weapons dealer who reports to senior Hizballah members in Lebanon, referred Alwar Pouryan, a supplier of weapons to Hizballah, to another exchange house located in the United Arab Emirates, telling Pouryan to invoke Oussama Salhab and the "Hassan Exhange company Lebanon" – the Ayash Exchange.  (Id. ¶ 83).

The Ayash Exchange became LCB's principal source of foreign currencies, particularly U.S. dollars, at the direction of LCB's Associate General Manager for Branches and Operations, Ahmad Safa – the same individual that gave a number of Hizballah companies massive exemptions from cash transactions reporting requirements.  (Id. ¶¶ 47(g), 48(d)).  Of the

approximately $329 million transferred from Lebanon to the United States between 2007 and 2011 in connection with the purchase and export of used cars, the Ayash Exchange accounted for more than $141 million, or approximately 43% of the total.  (*Id.* ¶¶ 56, 64).

Ellissa Holding.  As alleged in the Amended Complaint, Ellissa Holding, including the Ellissa Exchange, was also designated by OFAC under the Kingpin Designation Act because of its role as a money launderer for the Ayman Joumaa drug trafficking organization.  (Am. Compl. ¶ 3).  In addition to the Ellissa Exchange, Ellissa Holding owned companies that shipped cars to West Africa and a car park in West Africa where the cars were stored and sold.  (*Id.* ¶ 58).  In approximately December 2010, three individuals were arrested in Paris traveling from Ghana en route to Lebanon with approximately $6.5 million and €48,500 in undeclared currency; one of these individuals carried a business card from Ellissa Megastore.  (*Id.* ¶ 74).  A 2006 LCB due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut; that LCB had limited "know your customer" files for these clients; and that another Lebanese bank had closed its accounts with the Ellissa Exchange; and described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.  (*Id.* ¶¶ 48(b), (c)).

Of the approximately $329 million transferred from Lebanon to the United States between 2007 and 2011 in connection with the purchase and export of used cars, the Ellissa Exchange accounted for more than $61.7 million, or approximately 19% of the total.  (*Id.* ¶¶ 60, 64).  Youssef Nehme, a self-proclaimed Hizballah supporter and close associate of Ellissa

Holding's owner, Ali Kharroubi, himself originated at least $21,832,344 in wire transfers into the United States to buy and ship used cars.  (*Id.* ¶ 86(f)).

## B.     The Amended Complaint Sets Forth Sufficient Allegations of IEEPA Violations

### 1.      The IEEPA and Terrorism Sanctions Regulations

The IEEPA, enacted in 1977 and codified at 50 U.S.C. § 1701 et seq., confers upon the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency.  *See* 50 U.S.C. § 1701.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).  As described below, the President and the Department of Treasury have issued executive orders and regulations pursuant to the IEEPA that prohibit a broad range of conduct with respect to Hizballah, including providing goods or services to Hizballah or any transactions or dealings in property in which Hizballah has an interest.  In addition, the U.S. Department of State further designated Hizballah as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act, subjecting the interests of the organization to an additional blocking regime.  The cumulative effect of these Executive Orders, designations, and sanctions regimes are to block any property subject to United States jurisdiction in which Hizballah has any interest whatsoever, whether direct or indirect; and to prohibit any unlicensed transactions in the United States or involving U.S. persons that are for the benefit of Hizballah.  Moreover, under the terms of the sanctions regimes and pursuant to IEEPA, it is a criminal offense for any individual – whether a U.S. person or not – to conspire to violate the sanctions regimes, to seek to evade or avoid the prohibitions against U.S. transactions that benefit of Hizballah, or to cause another to violate those prohibitions.

The Executive Orders and State Department Designations.  On January 23, 1997,

President William Jefferson Clinton issued Executive Order 12947, declaring a national

emergency pursuant to the IEEPA and other statutes with respect to the Middle East peace

process.  The President found that "grave acts of violence committed by foreign terrorists that

disrupt the Middle East peace process constitute an unusual and extraordinary threat to the

national security, foreign policy, and economy of the United States" and declared a national

emergency to deal with that threat.  The Executive Order blocked all property subject to U.S.

jurisdiction in which any of 12 designated terrorist organizations, including Hizballah, had an

interest, and prohibited (1) any transaction or dealing by United States persons or within the

United States in any property of the designated organizations, including the making or

contribution of any funds, goods, or services to or for the benefit of the designees; and (2) any

transaction by any United States person or within the United States that evades or avoids or has

the purpose of evading or avoiding the prohibitions of the Order.  *See* 60 Fed. Reg. 5079 (Jan.

23, 1997).

On September 23, 2001, in the wake of the September 11, 2001, terrorist attacks,

President George W. Bush issued Executive Order 13224, finding that "grave acts of terrorism

and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New

York, Pennsylvania, and the Pentagon committed on September 11, 2001 . . . and the continuing

and immediate threat of further attacks on United States nationals or the United States constitute

an unusual and extraordinary threat to the national security, foreign policy, and economy of the

United States," and declared a national emergency to deal with that threat.  The Executive Order

identified 12 individuals and 15 entities whose assets were blocked.  The Order further

prohibited (1) any transaction or dealing by United States persons or within the United States in

property or interests in such blocked property, including the making or receiving of any

contribution of funds, goods, or services to or for the benefit of the designees; (2) any transaction

by any United States person or within the United States that evades or avoids, or has the purpose

of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Order; and

(3) any conspiracy formed to violate any of the prohibitions set forth in the Order.  *See* 66 Fed.

Reg. 49079 (Sept. 23, 2001).  On October 31, 2001, the Secretary of State identified Hizballah,

among others, as a specially designated global terrorist pursuant to Executive Order 13224

because it had committed, or posed a significant risk of committing, acts of terrorism that

threaten the security of U.S. nationals or the national security, foreign policy, or economy of the

United States.  *See* 67 Fed. Reg. 12633 (Mar. 19, 2002).

In addition, on October 8, 1997, the U.S. Department of State designated Hizballah as a

Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and

Nationality Act, codified at Title 8, United States Code, Section 1189.  *See* 62 Fed. Reg. 52650

(Oct. 8, 1997).  Section 219 of the Immigration and Nationality Act authorizes the Secretary of

State to designate as an FTO foreign organizations that engage in terrorist activity, or retain the

capability and intent to engage in terrorist activity or terrorism, and whose terrorist activity or

terrorism threatens the security of U.S. nationals or the national security of the United States.[5]

The Sanctions Regimes.  The U.S. Department of the Treasury, Office of Foreign Assets

Control ("OFAC") has adopted three regulatory regimes to implement Executive Orders 12947

---

[5]  Further demonstrating the threat to our national security posed by Hizballah, the entity
was designated by the Secretary of State from 2007 through 2009 under the Iran and Syria
Nonproliferation Act.  That Act provides for penalties on foreign persons and entities for the
transfer to or acquisition from Iran since January 1, 1999, or the transfer to or acquisition from
Syria since January 1, 2005, of equipment and technology controlled under multilateral export
control lists or otherwise having the potential to make a material contribution to the development
of weapons of mass destruction or cruise or ballistic missile systems.  *See* 50 U.S.C. § 1701 note;
72 Fed. Reg. 20158 (Apr. 23, 2007).

and 13224, along with the State Department's FTO designation of Hizballah.  Those regulations

are the Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 595 (the

"TSR"), implementing Executive Order 12947; the Foreign Terrorist Organization Sanctions

Regulations, Title 31, Code of Federal Regulations, Part 597 (the "FTOSR"), implementing the

State Department's FTO designation; and the Global Terrorism Sanctions Regulations, Title 31,

Code of Federal Regulations, Part 594 (the "GTSR"), implementing Executive Order 13224.

     The TSR generally block the property of "Specially Designated Terrorists" ("SDTs"),

consisting of the 12 organizations designated in Executive Order 12947 and any persons

designated by the Secretary of State that are found to have committed, or to pose a significant

risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East

peace process or that assist in, sponsor, or provide financial, material, or technological support

for, or services in support of, such acts of violence.  Section 595.201(a) of the TSR provides, in

relevant part:

> [N]o property or interests in property of a specially designated
> terrorist, that are in the United States, that hereafter come within
> the United States, or that are or hereafter come within the
> possession or control of U.S. persons, including their overseas
> branches, may be transferred, paid, exported, withdrawn or
> otherwise dealt in.

Section 595.204 of the TSR prohibits transactions by U.S. persons that are with, or for the

benefit of, any SDT, including Hizballah:

> Except as otherwise authorized, no U.S. person may deal in
> property or interests in property[6] of a specially designated
> terrorist, including the making or receiving of any contribution of
> funds, goods, or services to or for the benefit of a specially
> designated terrorist.

---

[6] Property is broadly defined, with a non-exclusive list of examples set forth in 31 C.F.R. § 595.310.  An "interest" in property is further defined as "an interest of any nature whatsoever, direct or indirect."  31 C.F.R. § 595.307.  *See also* 31 C.F.R. §§ 594.310 & 307.

Section 595.205 of the TSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the TSR:

> Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this part, is hereby prohibited. Any attempt to violate the prohibitions set forth in this part is hereby prohibited.  Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited.

Similar to the TSR, the GTSR generally blocks property interests of, and prohibits transactions with or for the benefit of, Specially Designated Global Terrorists ("SDGTs"),[7] including Hizballah.  Section 594.201 of the GTSR blocks "property and interests in property of [SDGTs] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches . . . ."  And similar to section 595.204 of the TSR, section 594.204 of the GTSR prohibits unlicensed transactions by U.S. persons with, or for the benefit of, an SDGT:

> Except as otherwise authorized, no U.S. person may engage in any transaction or dealing in property or interests in property of [a SDGT], including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of [a SDGT].

Section 594.205 of the GTSR, like section 595.205 of the TSR, prohibits attempts and conspiracies to violate or to evade its prohibitions:

> (a) Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction by any U.S. person or within the United States on or after the effective date that evades or avoids,

---

[7]  SDTs and SDGTs are two types of a category of individuals and entities that have been designated by OFAC under various sanctions regimes that are known as "specially designated nationals" ("SDNs") that the U.S. Treasury Department maintains on a publicly available list. *See* http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

> has the purpose of evading or avoiding, or attempts to violate any
> of the prohibitions set forth in this part is prohibited.
>
> (b) Except as otherwise authorized, and notwithstanding any
> contract entered into or any license or permit granted prior to the
> effective date, any conspiracy formed for the purpose of engaging
> in a transaction prohibited by this part is prohibited.

The FTOSR generally prohibit transactions by U.S. financial institutions in any assets in which an FTO or any of its agents has an interest, any conspiracies and attempts to violate the FTOSR, and any transaction having the purpose or effect of evading or avoiding the prohibitions of the FTOSR. *See* 31 C.F.R. §§ 597.201 & 204.

Thus, the TSR, the FTOSR, and the GTSR collectively block a broad range of property subject to the jurisdiction of the United States that involves any interests, direct or indirect, of Hizballah. *See* 31 C.F.R. §§ 595.201(a), 597.201(a), & 594.201. The regulations also prohibit any dealing (without a license) by U.S. persons in any property or interests in property of Hizballah, and specifically prohibit any transaction in the United States or any U.S. person providing funds, goods, or services "to, or for the benefit of" Hizballah. *See* 31 C.F.R. §§ 595.204 & 594.204. These prohibitions require no knowledge by the U.S. person – the unlicensed provision of funds, goods, or services to or for the benefit of Hizballah is prohibited, regardless of whether the U.S. person is aware of the unlawful purpose of the transaction.[8]

The TSR and GTSR further prohibit any transactions that have the purpose or effect of evading or avoiding, or facilitating the evasion or avoidance, of their prohibitions, as well as any conspiracy to engage in a prohibited transaction – including prohibited evasions or avoidances. 31 C.F.R. §§ 595.205 & 594.205. The IEEPA itself similarly prohibits not only direct violations

---

[8]  As discussed below, a criminal violation requires willfulness, that is, an awareness that the conduct is unlawful. But the IEEPA and the sanctions regimes by their terms prohibit transactions where the U.S. participants are unwitting of the transactions' unlawful nature.

of sanctions regimes adopted pursuant to the statute, but also attempts and conspiracies to violate

of any license, order, or regulation issued pursuant to the statute and causing others to violate any

such license, order, or regulation.  50 U.S.C. § 1705(a).  Finally, it is a crime for any person –

whether a U.S. person or non-U.S. person – to willfully commit, attempt to commit, conspire to

commit, or aid or abet in the commission of an act prohibited by the statute.  *See* 50 U.S.C. §

1705(c).

The Executive Orders and the terrorism sanctions regimes were promulgated in response

to threats posed by terrorist organizations to our country's national security, and the terms of the

Orders and regulations are broad both on their face and in their application.  Courts considering

analogous sanctions regimes – against State sponsors of terrorism or other terrorist organizations

– have readily come to this conclusion.  *See, e.g., United States* v. *Ehsan*, 163 F.3d 855, 859 (4th

Cir. 1998) (Noting that Executive Order 12959, relating to the declaration of a national

emergency with respect to Iran, "is clothed with the most serious of purposes, and it is couched

in the broadest of terms.").  Thus, while the terrorism sanctions regimes prohibit transactions in

the U.S. and by U.S. persons, non-U.S. persons can also violate the sanctions by conspiring to

engage in transactions that violate the sanctions; by engaging in transactions that have the

purpose or effect of evading or avoiding, or facilitating the evasion or avoidance of, the

sanctions; by causing others to violate the sanctions; or by aiding or abetting a violation of the

sanctions.

### 2.    Forfeiture of Property Constituting and Derived from Proceeds Traceable to IEEPA Violations

Section 981(a)(1)(C) of Title 18, United States Code, provides, in part, that:

> The following property, real or personal, is subject to forfeiture to
> the United States:  . . . [a]ny property, real or personal, which
> constitutes or is derived from proceeds traceable to a violation of
> . . . any offense constituting 'specified unlawful activity' (as

19

> defined in section 1956(c)(7) of this title), or a conspiracy to
> commit such offense.

18 U.S.C. § 981(a)(1)(C).  Under Section 1956(c)(7), the term "specified unlawful activity"

("SUA") includes, among other things, "offenses under . . . section 206 (relating to penalties) of

the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  As noted above, 50

U.S.C. § 1705(a) makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or

cause a violation of any license, order, regulation, or prohibition issued under this title."  Thus,

any property which constitutes or is derived from proceeds traceable to a violation of Executive

Order12947, Executive Order 13224, or the TSR, the FTOSR, or the GTSR is forfeitable to the

United States.

     Courts apply a "but for" test to determine whether property is proceeds of an offense.

Under this test, the term "proceeds" means any property that a person would not have obtained

or retained but for the criminal offense.  *See, e.g.*, *United States* v. *Nicolo*, 597 F. Supp. 2d 342,

350 (W.D.N.Y. 2009) (applying "but for" test to determine amount of proceeds forfeitable under

§ 981(a)(1)(C)); *United States* v. *Reiner*, 397 F. Supp. 2d 101, 106-07 (D. Me. 2005) (same);

*United States* v. *Evanson*, No. 05 Cr. 00805, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008)

("proceeds are property a defendant would not have obtained or retained but for the commission

of the criminal offense").  *See also, e.g.*, *United States* v. *Hoffman-Vaile*, 568 F.3d 1335, 1344-

45 (11th Cir. 2009) (applying "but for" test to determine the amount of "proceeds" forfeitable

under the criminal forfeiture statute 18 U.S.C. § 982); *United States* v. *Grant*, S4 05 Cr. 1192

(NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008) (same); *United States* v.

*Ivanchukov*, 405 F. Supp. 2d 708, 712 (E.D. Va. 2005) (same).

### 3.      Discussion

The Amended Complaint alleges that, as part of the money laundering scheme, transactions occurred in the United States and involving U.S. persons that were for the benefit of Hizballah, including its members and supporters.  The scheme generated a channel for laundering the proceeds of narcotics trafficking and other crimes, from which Hizballah and its members and supporters received various fees and commissions for their roles in the scheme as well as proceeds from the car sales.  (Am. Compl. ¶¶ 35, 43(a), 73).  The flow of funds into the United States to buy used cars and ship them to West Africa fed this money laundering engine and was a critical and necessary part of the scheme.  The transactions in the United States to buy used cars and export them to West Africa thus provided "funds, goods, or services to or for the benefit of" Hizballah.

The Claimants argue that the Amended Complaint does not allege IEEPA violations.  The Claimants contend, first, that the Amended Complaint does not allege, or at least does not sufficiently allege, IEEPA violations because specially designated nationals (SDNs) are not alleged to have been the originators of the wires into the United States.  (LCB Br. at 8; Ayash Br. at 11, 13-14; Ellissa Br. at 12, 15-16).  As a corollary, LCB argues that, unless individual Hizballah members, agents, or supporters have been designated by OFAC, no one can reasonably be held responsible for participating in transactions with or for the benefit of Hizballah.  (LCB Br. at 10).  This contention, of course, is wrong.

Any transaction by a U.S. person or in the United States that provides goods, funds, or services to or for the benefit of Hizballah violates the TSR, the GTSR, and IEEPA.  The Amended Complaint alleges such transactions – hundreds of millions of dollars were transferred to the United States in order to buy cars and ship them from the United States to West Africa, where they were converted to cash proceeds that fueled the money laundering conspiracy.  The

21

Claimants' contention that the Amended Complaint does not allege an IEEPA violation because an OFAC-designated SDN was not a party to these transactions misunderstands both IEEPA and the allegations in the Complaint. An SDN does not have to be a direct participant in the wiring of funds to the United States; transactions in the United States or by a U.S. person violate the IEEPA if they are for the benefit of Hizballah. Similarly, such a transaction with or for the benefit of Hizballah violates the IEEPA even if the individuals acting for Hizballah are not themselves designated by OFAC at the time of the transaction.

To the extent the Claimants contend that the Amended Complaint does not sufficiently allege Hizballah's involvement in and benefit from the money laundering scheme under Rule G, that contention is also plainly wrong. The Amended Complaint explicitly alleges that Hizballah benefited from the scheme and from the United States transactions that made it possible. (Am. Compl. ¶ 35). The Amended Complaint sets forth specific facts sufficient to support a reasonable belief that the Government will be able to prove this allegation at trial, including numerous examples of Hizballah members and supporters involved in the scheme. (*See, e.g.*, *id.* ¶¶ 43(c), 48(d), 55, 67-86). The Amended Complaint further alleges that Hizballah security facilitates the receipt of bulk cash from West Africa at the Beirut International Airport (*id.* ¶¶ 43(a), 76) and that it and its members and agents benefit from fees, commissions, and other profits as a result of the scheme. (*Id.* ¶¶ 35, 43(a), 73). Whether or not these allegations would be sufficient to demonstrate at trial Hizballah's involvement or the existence of IEEPA offense is not the pertinent question on a motion to dismiss – the question is whether these allegations are sufficient to support a reasonable belief that the Government will be able to meet its burden of proof at trial. *See* Suppl. R. G(2)(f); *Levitt*, 340 F.3d at 101; *$15,270,885.69 Formerly on Deposit in Account No. 8900261137*, 2000 WL 1234593, at *5.

LCB also contends next that the Amended Complaint does not allege, or at least does not sufficiently allege, that LCB knew that goods, funds, or services were being provided to or for the benefit of Hizballah.  (LCB Br. at 10-14).  In a related argument, LCB argues that, because IEEPA prohibits transactions in the United States or by U.S. persons, the Amended Complaint cannot allege IEEPA violations unless the U.S. car buyers knew that the transactions were for the benefit of Hizballah.  (*Id.* at 12, 13).  Again, both arguments rely on incorrect understandings of the law and the Amended Complaint.   As discussed above, transactions inside the United States that were executed for the benefit of Hizballah violate the IEEPA, even if the purpose of the transactions had been concealed from the U.S. participants.

### C.  The Amended Complaint Sufficiently Alleges Money Laundering Offenses

#### 1.  Money Laundering

The elements of promotion money laundering under § 1956(a)(1)(A)(i) are: (1) an actual or attempted financial transaction; (2) involving SUA proceeds; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) an "intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(A)(i); *see, e.g.*, *United States* v. *All Funds on Deposit at Dime Sav. Bank*, 255 F. Supp. 2d 56, 70 (E.D.N.Y. 2003) (internal quotations and citations omitted).

The elements of concealment money laundering under § 1956(a)(1)(B)(i) are the same as the elements of promotion money laundering with one exception: instead of showing an intent to promote an SUA, the Government must show knowledge that the transaction was designed in whole or in part either (a) "to conceal or disguise the nature the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity," or (b) "to avoid a transaction reporting requirement under State or Federal law."  18 U.S.C. § 1956(a)(1)(B)(i); *see also, e.g.*, *United States* v. *Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997).

Section 1956(a)(2) prohibits international money laundering.  A with § 1956(a)(1), there are two kinds of international money laundering – international promotional money laundering and international concealment money laundering.  The international promotional money laundering prong of that statute, Section 1956(a)(2)(A), criminalizes the transport, transmission of "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."

Section 1956(a)(2)(B) prohibits the transport, transmission of "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States [,] knowing that the monetary instrument or funds involved [] represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed [either] (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law[.]"

Section 1957 generally prohibits anyone from knowingly engaging in "a monetary transaction [in the United States] in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]"  18 U.S.C. § 1957.

## 2.      Forfeiture of Property Involved in Money Laundering

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in a transaction or attempted transaction* in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."  18 U.S.C. § 981(a)(1)(A) (emphasis added).  Property "involved in" a money laundering offense includes, among other things, any property that facilitates the offense, including any property used to conceal, disguise,

24

or promote the money laundering.  *See In re 650 Fifth Avenue and Related Properties*, 777 F.

Supp. 2d 529, 563-64 (S.D.N.Y. 2011) ("[C]ourts in this district have held that the term

'involved in' refers to property that is itself being laundered, as well as property used to facilitate

a money laundering offense.") (citations, quotation, alterations omitted); *see also id.* at 564

("Facilitation of a laundering offense occurs when the property makes the prohibited conduct

less difficult or more or less free from obstruction or hindrance.") (quoting *United States* v.

*Huber*, 404 F.3d 1047, 1060 (8th Cir.2005)).  *See also, e.g.*, *United States* v. *McGauley*, 279 F.3d

62, 77 (1st Cir. 2002) (legitimate funds in a bank account that had been commingled with dirty

money were properly forfeited because the clean funds were used to conceal and disguise the

tainted funds); *United States* v. *Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005), *aff'd*,

514 F.3d 277 (2d Cir. 2008) (interpreting language in 18 U.S.C. § 982, the "term 'involved in'

has consistently been interpreted broadly by courts to include any property involved in, used to

commit, or used to facilitate" the offense); *United States* v. *Contents of Account Nos. 208-06070*

*& 208-06068-1-2*, 847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (legitimate funds used to disguise

the source of illegitimate funds and to make the proceeds of a green card scheme more difficult

to trace facilitated the money laundering scheme and were forfeitable under § 981).

Property involved in money laundering transactions includes business entities that

facilitate the laundering, including by providing the laundering transactions the veneer of

legitimacy.  *See In re 650 Fifth Avenue*, 777 F. Supp. 2d at 567 (citing *United States* v. *Swank*,

797 F. Supp. 497, 502 (E.D. Va. 1992); *United States* v. *Schlesinger*, 261 Fed. Appx. 355, 361

(2d Cir. 2008); *United States* v. *Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009); *United States* v. *All*

*Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995); *In re Restraint of Bowman*

*Gaskins Fin. Group*, 345 F. Supp. 2d 613, 624 (E.D. Va. 2004); *United States* v. *S. Side Finance*,

755 F. Supp. 791, 797-798 (N.D. Ill. 1991); *United States* v. *Parcel of Property Located at 155 Bemis Road, Manchester, N.H.*, 760 F. Supp. 245, 251 (D.N.H. 1991)).  Entities involved in promotional money laundering transactions similarly are subject to forfeiture.  *See id.* at 567-68 (citing *United States* v. *Eleven Vehicles*, 836 F. Supp. 1147, 1155 (E.D. Pa. 1993); *United States* v. *Joseph Health and Beauty Supply*, 807 F. Supp. 320, 321-22 (S.D.N.Y. 1992) (Leval, J.); *United States* v. *Baker*, 227 F.3d 955, 969 (7th Cir.2000)).

Under § 983(c), "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c).

### 3.    Discussion

The Amended Complaint seeks the forfeiture of the Defendant Property as traceable to property involved in money laundering transactions.  In particular, LCB, Ellissa Holding, and Ayash Exchange were all involved in hundreds of millions of dollars' worth of financial transactions in the United States that involved criminal proceeds, including the proceeds of narcotics trafficking, IEEPA violations, and other crimes, that were designed to promote specified unlawful activity and to conceal or disguise the nature, the location, the source or ownership, or the control of the criminal proceeds.  (Am. Compl. ¶¶ 50, 57, 61).

The Claimants nonetheless argue that the Amended Complaint does not sufficiently allege that the Defendant Property is forfeitable as traceable to property involved in money laundering offenses.  These arguments are fundamentally flawed.

### a.     The Amended Complaint Adequately Alleges
the Proceeds of SUA and Foreign Crimes

The Claimants argue that the money laundering forfeiture claims should be dismissed

because the Amended Complaint does not allege specified unlawful activities giving rise to the

laundered proceeds with sufficient particularity.  Contrary to the Claimants' arguments, the

Amended Complaint simply needs to allege facts sufficient to support a reasonable belief that, at

trial, the Government will be able to prove that they were involved in money laundering

transactions involving the proceeds of IEEPA offenses, narcotics trafficking, and other offenses.

*See* SUPPL. R. G(2)(f). A forfeiture complaint need not identify particular narcotics transactions

or particular money laundering transactions.  "Numerous courts have held that the government

need not trace seized property back to a specific illegal transaction in order to meet its burden of

proof at trial."  *United States* v. *Funds in the Amount of Forty-Five Thousand Fifty Dollars*, No.

06 Civ. 6948, 2007 WL 2323307, at *5 (N.D. Ill. Aug. 9, 2007); *see also United States* v. *Two*

*Parcels of Real Property Located in Russell Country, Alabama*, 92 F.3d 1123, 1127 (11th Cir.

1996) ("The complaints specified no date or location of any purported or intended drug dealings,

no dollar amounts, no specific types or quantities of drugs sold, and no identified participants,

other than [two individuals].  Yet, there were sufficient facts detailed in the complaint to put

claimants on notice as to the Government's basis for seizure.").  Nor must the Amended

Complaint allege that the Claimants were culpable participants in the transactions (though, as

discussed herein, it certainly does).  *See, e.g.*, *United States* v. *Approximately $25,829,681.80*,

No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *6 (S.D.N.Y. Nov. 30, 1999) ("[T]he

Government need not detail" the claimant's "involvement in the scheme.  Rather, it must allege

that the defendant-in-rem funds 'constitute or [are] derived from proceeds traceable to a

violation' of the wire fraud statute, regardless of whether that violation involved" the claimant.);

27

*see also* 18 U.S.C. § 983(d); *United States* v. *Real Property Located at 216 Kenmore Ave.*, 657

F. Supp. 2d 1060, 1066-67 (D. Minn. 2009); *United States* v. *All Funds on Deposit in Any*

*Accounts*, 801 F. Supp. 984 (E.D.N.Y. 1992).

 The Amended Complaint sets forth both violations of IEEPA as specified unlawful

activity with respect to money laundering under §§ 1956(a)(1)(A), (a)(1)(B), and 1957, and

IEEPA and narcotics trafficking as unlawful activities with respect to money laundering under

§ 1956(a)(2)(B). [9]  As set forth above, the conduct relating to IEEPA sets forth facts sufficient to

allege such an offense.  With regard to the narcotics trafficking, LCB appears only to raise issues

regarding the specificity of the allegations.  The Amended Complaint provides ample details

about the underlying narcotics activity.

 The details provided in the Amended Complaint are more than sufficient as a matter of

pleading.  As one Court of Appeals has explained, "[w]hile it is necessary in order to state a

money laundering offense to include such an allegation [of a specified unlawful activity], the

requirement is merely a categorical delineation of the type of funds that are subject to a money

laundering charge . . . details about the nature of the unlawful activity underlying the character of

the proceeds need not be alleged."  *United States* v. *Smith*, 44 F.3d 1259, 1264 -65 (4th Cir.

1995).

 **b.  The SUA and Money Laundering Offenses**
 **Are Not Merged**

 LCB also contends that the forfeiture claims premised on money laundering are invalid

because they "merge" with the forfeiture claims relating to IEEPA violations.  (LCB Br. at 18-

21).  First, as LCB concedes (LCB Br. at 18), its merger argument is inapplicable to forfeiture

---

 [9] International promotional money laundering under § 1956(a)(2)(A) does not require
proof that the funds involved in the money laundering transactions were unlawful proceeds.

premised on international money laundering, codified at 18 U.S.C. § 1956(a)(2)(A), which has no proceeds requirement.  *See United States* v. *Piervinanzi*, 23 F.3d 670, 679–80 (2d Cir. 1994) (rejecting argument that wiring money to a place outside the United States merges with the underlying bank fraud).  Second, as LCB also acknowledges (LCB Br. at 18), funds become proceeds when derived from a "completed phase of an ongoing offense."  *United States* v. *McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001); *see also United States* v. *Mankarious,* 151 F.3d 694, 706 (7th Cir.1998) (recognizing that a mail fraud offense does not have to be complete for money laundering purposes; all that matters is that the mail fraud scheme has produced proceeds in transactions distinct from those constituting money laundering); *United States* v. *Nunez*, 419 F. Supp. 2d 1258, 1268 (S.D. Cal. 2005) ("[I]t becomes clear that the money laundering statutes must be construed broadly to encompass transactions in proceeds derived from separate, completed acts in an on-going criminal scheme. Money laundering requires only that the underlying offense generate proceeds through transactions discrete from, and occurring prior to, the subsequent acts of laundering; the law does not require that the entire underlying offense be completed before its proceeds may be laundered.").  The Amended Complaint makes clear that the scheme is a multi-phased, circular series of transactions, with the funds already representing unlawful proceeds at the time they were wire transferred by LCB.

LCB's merger argument should also be rejected because it reality it relates to an evidentiary issue, not an issue that should govern the Court's consideration of a motion to dismiss.  LCB is certainly free to make evidentiary arguments as to whether certain funds constitute proceeds of a pertinent specified unlawful activity or phase of the alleged scheme, but such are arguments in the context of a motion to dismiss are simply premature.  The Government should be permitted to introduce evidence regarding how proceeds of a certain offenses were

derived and how financial transactions took with those proceeds during a separate stage of the scheme, and LCB can contest such evidence.  Indeed, even in the criminal context, several courts have noted that issues related to merger are evidentiary issues, rather than one suitable for a motion to dismiss.  *See, e.g., Smith*, 44 F.3d at 1265 ("To question whether the government, in proving the money laundering charges, establishes the fact that illegal proceeds existed before the laundering transaction is a question of proof, not a question of the adequacy of the indictment."); *United States* v. *Sabbeth*, 262 F.3d 207, 216 n. 9 (2d Cir. 2001) (rejecting similar argument and holding that the facts at issue related to a series of financial transactions, and "[t]here was nothing to prevent the jury from concluding that one of the subsequent transfers was bankruptcy fraud and that a later subsequent transfer was money laundering"); *United States* v. *Finch*, 10 Cr. 333 (SOM) (KSC), 2010 WL 3938176, at *7 (D. Haw. Sept. 30, 2010) (because merger issues are grounded in multiplicity concerns, "even if there is a merger problem (a matter this court need not and does not decide here), it does not necessarily follow that pretrial dismissal is the remedy," and deferring such issues until after a trial).

### d.    LCB's Additional *Mens Rea* Arguments Lack Merit

LCB also argues that the money-laundering forfeiture claims must fail because the Amended Complaint fails to adequately allege that LCB knew it was dealing in "dirty" money or acted with the requisite intent under the various money laundering statutes.  (LCB Br. at 21-).  As a legal matter, while this argument may have relevance to the civil money-laundering penalty claim, it has no application to the validity of the forfeiture claims LCB challenges.  As LCB plainly acknowledges later in its brief, "in an in rem forfeiture case, the government need not allege that the present owner of the property directly participated in the underlying criminal activity or was even aware of such activity."  LCB Br. at 44 (citing *United States* v. *316 Units of Mun. Sec.*, 725 F. Supp. 172, 177 (S.D.N.Y. 1989); *United States* v. *$734,578.82 in U.S.*

*Currency*, 286 F.3d 641, 657 (3d Cir. 2002).  S*ee also United States* v. *Approximately*

*$25,829,681.80*, No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *6 (S.D.N.Y. Nov. 30, 1999)

("[T]he Government need not detail" the claimant's "involvement in the scheme.  Rather, it must

allege that the defendant-in-rem funds 'constitute or [are] derived from proceeds traceable to a

violation' of the wire fraud statute, regardless of whether that violation involved" the claimant.);

*United States* v. *755 Forest Road*, 985 F.2d 70, 72 (2d Cir. 1993) ("The so-called 'innocent

owner' defense is an affirmative defense to be proven by the owner-claimant.").  Accordingly,

LCB's arguments are without merit.

The Amended Complaint describes numerous members of the scheme who necessarily

participated with the requisite knowledge and intent.  (*See, e.g*, Am. Compl. ¶ 43; 65-67).  For

purposes of the forfeiture claims at issue, whether or not such knowledge and intent is alleged in

regard to LCB (or any other claimant) is irrelevant.  Moreover, the Amended Complaint also

alleges that LCB had the requisite knowledge and intent relating to the money laundering

alleged.  This issue is discussed below in regard to the civil money laundering penalty claims,

where such allegations are actually relevant.

### III.    The Amended Complaint Sufficiently Pleads Civil Money Laundering Penalty Claims Against LCB, Ellissa Holding, and Ayash Exchange

The Claimants contend that the Amended Complaint does not sufficiently allege a civil

money-laundering penalty claim against them as *in personam* defendants.  (*E.g.*, LCB Br. at 40).

For the reasons discussed above, the Amended Complaint sufficiently alleges money laundering

forfeiture claims.

#### A.    The Amended Complaint Adequately Alleges *Mens Rea* with Respect to the Civil Money-Laundering Penalty Claim

The Amended Complaint also meets the lower pleading standard applicable to the civil

money-laundering claims under Rule 8.  In addition to the arguments set forth above in support

of the money laundering forfeiture claims at issue, the Amended Complaint also alleges facts sufficient to show the Claimants acted with the necessary mens rea.  As set forth above, the Amended Complaint sets forth ample facts to support an inference that LCB was a knowing participant in money laundering.  By way of example, the Amended Complaint sets forth LCB's knowing interaction with a number of persons or entities that had been, or would late be, designated by OFAC.  (Am. Compl. ¶¶ 47(a)-(e)).  LCB employees acting in their official capacity, granting exceptions to AML-related polices for certain individuals and entities affiliated with Hizaballah.   (Am. Compl. ¶ 47(g)).  In regard to Ellissa Holding, a 2006 LCB report implicated Ellissa Exchange in cash smuggling out of West Africa.   (Am. Compl. ¶ 48).  The Amended Complaint also alleges that Ellissa Holding knowingly facilitated bulk cash transfers and money laundering for Ayman Joumma and his network.  (Am. Compl. ¶ 59).  The Amended Complaint makes the same allegations regarding the Ayash Exchange and references Hassan Ayash's stated claims to having family ties to Hizballah.  (Am. Compl. ¶ 54-55).  Ellissa Holding is further alleged to utilize black market currency exchanges in and around West African car parks.  (Am. Compl. ¶ 73).  Indeed, as set forth in the Amended Complaint, three couriers, one of whom was carrying a business card for Ellissa Holding's car lot in Benin, were arrested in France for attempting to evade reporting requirements regarding over $6.5 million in U.S. currency.  (Am. Compl. ¶ 74).

Additionally, the law is clear that a money launderer need not have knowledge of the exact specified unlawful activity at issue, but only that the funds derived from criminal activity.  *See United States* v. *Maher*, 108 F.3d 1513, 1526 (2d Cir.1997) (explain that the money laundering statute "reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime") (internal quotation marks omitted);

*United States* v. *Reiss*, 186 F.3d 149, 154 (2d Cir. 1999) ("[T]he defendant need only know that the funds were criminally derived.").  Further, knowledge may be shown by proof of willful blindness, deliberate ignorance, or conscious avoidance.  *United States* v. *Flores*, 454 F.3d 149, 155-56 (3d Cir. 2006) (attorney was willfully blind to the illegal source of money he assisted client in moving through bank accounts; it was not necessary to show attorney knew the money was from drug trafficking);  *United States* v. *Tillman*, 419 Fed. App'x. 110, 2011 WL 1448144 (2nd Cir. Apr. 15, 2011) (defendant who allowed co-conspirators to make large deposits into her bank account and who then made large withdrawals after these deposits were made was, at the least, willfully blind to the nature of the activity in which she was engaged).

The facts set forth in the Amended Complaint, at the least, establish that LCB was willfully blind regarding the nature of transactions being sent though the bank.

### B.  The Court Has Subject Matter over the Civil Money-Laundering Penalty Claim

LCB further argues that the Court lacks subject-matter jurisdiction over the civil money-laundering penalty claims.  (LCB Br. at 40-43).  This contention is without merit.  Subject matter jurisdiction over the money laundering scheme at issue is established pursuant to 18 U.S.C. § 1956(f), which explicitly provides for extraterritorial jurisdiction over conduct undertaken by non-U.S. citizens that "occurs in part in the United States" and where "the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000."  The central allegations in the Amended Complaint relate to a multi-stage, circular scheme in which funds, and property traceable to such funds, were moved in and out of the United States in amounts far exceeding $10,000.

LCB's citation to *United States* v. *Lloyds TSB Bank, PLC*, 639 F. Supp. 2d 314 (S.D.N.Y. 2009) (hereafter "*Lloyds*") is readily distinguishable.  In *Lloyds*, as the court repeatedly

33

reiterated, there was "no dispute" that (1) all of the transfers at issue were into or out of accounts maintained in Switzerland and (2) that the transfers were from or to other accounts in Europe. *Lloyds*, 639 F. Supp. 2d at 318.  In reaching its conclusion that no subject matter jurisdiction existed, the court emphasized that Lloyd's conduct at issue "consisted exclusively of transfers between its branch in Geneva, Switzerland and other European banks."  *Id.* at 324.  Here, in contrast, the Amended Complaint alleges hundreds of millions of dollars moving from LCB accounts into the United States.  Because such transactions took place "in part" in the United States, subject matter jurisdiction is proper.  Also, in stark contrast to *Lloyds*, the Amended Complaint alleges that the Claimants were key players in conduct that generated the criminal proceeds at issue.  *Id.* at 319.

## IV.    The Court Has *In Rem* and Personal Jurisdiction

The Court has *in rem* jurisdiction over the forfeiture claims and personal jurisdiction over the *in personam* defendants in this action.  On a motion to dismiss for lack of jurisdiction based solely on the pleadings and supporting affidavits, the party asserting jurisdiction "need only make a *prima facie* showing of jurisdiction."  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir 1994).  "All well-pleaded facts are accepted as true at this stage of the litigation."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 (2d Cir. 2012).

### A.    Ayash Exchange and Ellissa Holding are Subject to the Personal Jurisdiction of the Court

Ellissa Holding and Ayash Exchange each assert that the Court lacks personal jurisdiction over them because they lack constitutionally sufficient minimum contacts with the state of New

York, and that therefore the *in personam* money laundering claims against them should be dismissed.[10]  (Ayash Br. at 3-6; Ellissa Br. at 3-6).  These assertions are without merit.

For the Court's exercise of personal jurisdiction to comport with the Due Process Clause of the United States Constitution, a defendant must have "sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cr. 2010).  "In determining the strength of the contacts under the Due Process Clause," the Court must look "to the totality of Defendants' contacts with the forum state."  *Id.*

Ellissa Holding and Ayash Exchange have more than sufficient contacts with the Southern District of New York based on their deliberate transfer of funds through bank accounts in the District in furtherance of the money laundering scheme alleged in the Amended Complaint.  As the claims set forth in the Amended Complaint "aris[e] out of or relate[ ] to the defendant[s'] contacts with the forum," they are subject to the specific jurisdiction of the Court. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 8 (1984).

As alleged in the Amended Complaint, between approximately January 2007 and early 2011, Ayash Exchange and Ellissa Holding originated wire transfers totaling several hundred million dollars to car buyers in the United States, knowing that the funds transferred were the proceeds of illegal activities, that the transfers were in furtherance of the money laundering

_____

[10] Ellissa Holding and Ayash Exchange do not contest that the Government has met the statutory requirements for jurisdiction under 18 U.S.C. § 1956(b)(2).  Ellissa Holding and Ayash Exchange also do not present an argument for personal jurisdiction being "unreasonable" under the Due Process Clause, and so the Government's burden is satisfied by a *prima facie* showing of minimum contacts.  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) ("[T]he exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts," though "it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

scheme alleged in the Complaint, and that the money laundering scheme benefitted Hizballah.

(Am. Compl. ¶¶ 9, 56-57, 60-61, 87.)  The wire transfers were sent from Ellissa Holdings' and

Ayash Exchange's accounts at Lebanese banks through correspondent bank accounts with U.S.

financial institutions based in the Southern District of New York.  (*Id.* ¶ 9).  In connection with

the money laundering scheme alleged in the Amended Complaint, Ayash Exchange sent at least

1472 wire transfers totaling approximately $134,284,931 through nine correspondent bank

accounts located in New York.  (Declaration of Special Agent Christopher Miller ("Miller

Decl.") ¶ 2).[11]  Ellissa Exchange sent at least 890 wire transfers totaling approximately

$51,684,819 through 12 correspondent bank accounts located in New York.  (*Id.* ¶ 3).

      Addressing similar circumstances, the New York Court of Appeals recently held in *Licci*

v. *Lebanese Canadian Bank* that the use of an LCB correspondent bank account in New York in

furtherance of criminal activity was sufficient to support personal jurisdiction under N.Y.

C.P.L.R. § 302(a), the New York long-arm statute. As the Second Circuit has expressly held,

where personal jurisdiction is proper under the relevant provision of the New York long-arm

statute, "the constitutional requirements of personal jurisdiction are satisfied because application

of N.Y. C.P.L.R. § 302(a) meets due process requirements." *D.H. Blair & Co., Inc. v.

Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *see also HSH Nordbank AG New York Branch v.

Street*, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, 4 (S.D.N.Y. July 18, 2012) ("the personal

jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances

essentially coterminous").  In other words, sufficient contacts with New York to satisfy

§ 302(a)(1) of the New York long-arm statute are also sufficient for personal jurisdiction under

the Due Process Clause.

---

     [11] Indeed, as Ayash Exchange itself concedes, $700,000 belonging it was frozen at J.P.
Morgan Chase, N.A. in Manhattan.  (Am. Compl. ¶ 5; Ayash Br. at 6).

In *Licci*, Israelis injured by Hizballah rocket attacks brought an action against LCB alleging various claims based on LCB's having knowingly conducted "dozens of international wire transfers" totaling "several million dollars" on behalf of an alleged Hizballah front group, thereby facilitating the Hizballah rocket attacks. *Licci*, 673 F.3d at 56. The Second Circuit certified to the New York Court of Appeals the questions of whether this conduct met the requirements for personal jurisdiction under the New York long-arm statute. *See id.* at 75-76. The New York Court of Appeals first found that LCB's use of a New York correspondent account, as alleged by the plaintiffs, would constitute transacting business in New York, reflecting the "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Canadian Bank*, __ N.E. 2d __, 2012 WL 5844997 (N.Y. Nov. 20, 2012). Next, the Court found that the plaintiff's claims under the Anti–Terrorism Act, the Alien Tort Statute, or for negligence or breach of statutory duty in violation of Israeli law arose from LCB's transaction of business in New York. *Id.* LCB's conduct was sufficient under the New York long-arm statute, and, by implication, sufficient to support personal jurisdiction under the Due Process Clause.

Ellissa Holdings' and Ayash Exchange's contacts here are, if anything, more substantial than those addressed in *Licci*. Rather than dozens of wire transfers involving several million dollars sent through a single New York account, as was the case in *Licci*, Ellissa Holding and Ayash Exchange each directed hundreds of wire transfers with a value of close to $200 million through a dozen New York accounts. Moreover, while the ultimate wrong in *Licci* was the plaintiffs' injury due to rocket attacks, here the heart of the wrongdoing claimed by the

Government is precisely the transfer of funds in furtherance of the alleged money laundering and IEEPA conspiracy.

Nor are Ellissa Holding and Ayash Exchange equivalent to individuals who rely blindly on their banks, and lacking any personal purpose of availing themselves of the New York forum. *Cf. Universal Trading & Inv. Co., Inc. v. Tymoshenko*, No. 11 Civ. 7877 (PAC), 2012 WL 6186471, *3 (S.D.N.Y. December 12, 2012) (no personal jurisdiction over foreign individual holding foreign accounts simply because her bank moved money through New York via a correspondent account).  Ellissa Holding and Ayash Exchange are financial institutions, exchange houses whose business involves the transfer of funds, and who even acted as sources of foreign currencies for LCB, including U.S. dollars.  (Am. Compl. ¶¶ 48, 53, 58.)  Ellissa Holding and Ayash Exchange purposefully availed themselves of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States,"  and so are subject to the personal jurisdiction of the Court.

> **B.  The Court Has *In Rem* Jurisdiction over the Claimants' Assets**

In order to adjudicate this forfeiture action, the Court must have *in rem* jurisdiction over the defendants *in rem*.  As the Supreme Court has stated the traditional rule, "in order to institute and perfect proceedings *in rem*, . . . the thing should be actually or constructively within the reach of the Court.'" *United States v. James Daniel Good Real Property,* 510 U.S. 43, 47 (1993) (quoting *The Brig Ann,* 13 U.S. (9 Cranch) 289, 291 (1815)).  The Claimants argue that the Amended Complaint should be dismissed for lack of *in rem* jurisdiction over their assets.  As the Government has plainly alleged facts establishing that the Court has *in rem* jurisdiction over assets of those parties, these arguments are without merit.

<u>The Court Has *In Rem* Jurisdiction over Assets of the Claimants in the United States.</u>

Title 28, United States Code, Section 1355 "clearly confer[s] in rem jurisdiction on district courts in forfeiture proceedings with respect to property located within" the United States. *United States v. All Funds on Deposit in any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148, 152 (2d Cir. 1995). Schedule A to the Amended Complaint lists specific assets belonging to the relevant parties. These include (1) $150,000,000 seized by the Government pursuant to seizure warrants issued on August 15, 2012, under 18 U.S.C. § 981(k) (the "Seized Funds"); (2) $700,000 belonging to the Ayash Exchange in an account in New York (the "Ayash Funds"); and (3) 350 cars consigned to Ellissa Holding located at various locations in the United States (the "Ellissa Cars"). (Am. Compl., Schedule A at III-V.) The Seized Funds, Ayash Funds and Ellissa Cars, as assets located in the United States, are subject to the *in rem* jurisdiction of the Court.

LCB asserts that the Seized Funds are not subject to the Court's *in rem* jurisdiction because they represent a part of the purchase price paid by another bank for assets of LCB rather than proceeds of criminal activity, and thus were not subject to seizure under Section 981(k).[12] (LCB Br. at 28-29.) LCB is wrong – the purchase price funds paid for LCB's assets are forfeitable. The Amended Complaint alleges that all assets of the bank are subject to forfeiture as property involved in money laundering and to the extent that they represent proceeds of IEEPA violation. Funds paid for the purchase of those assets are themselves traceable to the offenses. *See, e.g.,* 18 U.S.C. § 981(a)(1)(A) (subjecting to forfeiture "property involved in

---

[12] LCB also argues that the ultimate distribution of the Seized Funds as between LCB and the purchaser will be determined under Lebanese law, and that this somehow makes them inappropriate for seizure under Section 981(k). (LCB Br. at 29.) The existence of multiple claimants to the assets, however, is a routine feature of forfeiture proceedings that has no bearing on either the applicability of Section 981(k) or the Court's jurisdiction.

[money laundering] *or any property traceable to such property*") (emphasis added); 981(a)(1)(C) (subjecting to forfeiture "property . . . which constitutes or is derived from *proceeds traceable to* . . . *any offense constituting 'specified unlawful activity'* . . . *or a conspiracy to commit such offense*") (emphasis added).  A United States Magistrate Judge determined that there is probable cause to find that the purchase price funds are subject to seizure and forfeiture when the warrant to seize the Seized Funds was issued under § 981(k), and that determination is more than sufficient for purposes of a motion to dismiss.

Ellissa Holding does not contest that the Ellissa Cars are within the *in rem* jurisdiction of the Court, but asserts that "these cars do not belong to Ellissa." (Ellissa Br. at 6.)  On a motion to dismiss, however, the Court must accept as true the Government's allegation that the Ellissa Cars are assets of Ellissa Holding. The bare denial of that fact by counsel for Ellissa in its brief is irrelevant at this stage of the proceeding.[13]

Because the Claimants are Subject to the Personal Jurisdiction of the Court, the Court Has Jurisdiction Over Assets Under the Control of the Claimants.  The Second Circuit in *Meza* determined that 28 U.S.C. § 1355 did not, standing alone, confer *in rem* jurisdiction over property located in a foreign country, and that in an action against such property "the property must be within the actual or constructive control of the district court in which the action is commenced." *Meza*, 63 F.3d at 152.[14]  One way to show constructive control of foreign funds,

_____

[13]  Ayash Exchange does not contest that the Ayash Funds are within the Court's *in rem* jurisdiction.  (Ayash Br. at 6.)

[14]  The Third, Ninth and D.C. Circuits have all rejected this approach and found that 28 U.S.C. § 1355(b)(2) itself conferred *in rem* jurisdiction over foreign assets on the district courts. *See United States v. Approximately $1.67 Million in U.S. Currency*, 513 F.3d 991, 996–98 (9th Cir. 2008); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 403 (3d Cir. 2003). *United States v. All Funds in Account in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C.Cir. 2002).   There is even some question as to whether *Meza* remains good law within the Second Circuit, as a subsequent panel indicated that 28 U.S.C. § 1355(b) was "designed to

in their entirety, is by demonstrating that "the [foreign] government will turn over at least a portion of the seized funds to the United States" *Id*. at 154. Here, however, constructive control over foreign assets is provided not by a foreign government, but by the parties before the Court. The Claimants have all appeared before the Court as parties to this action, and are subject to personal jurisdiction in this forum. They are therefore subject to any orders of the Court with respect to the assets under their control. *See, e.g.*, 18 U.S.C. § 1956(b)(4) (authorizing appointment of receiver). The Court thus has constructive control, and *in rem* jurisdiction, over such assets.

Alternatively, even if the Court were to conclude that it lacks *in rem* jurisdiction, it may continue to adjudicate the Government's interest in the assets vis-à-vis the Claimants, though not as to other parties not before the Court, as in *United States v. Real Property Located at 11205 McPherson Lane Ojai, Cal.*, 754 F. Supp. 1483 (D.Nev. 1991). In that case, a claimant moved to dismiss on jurisdictional grounds, and the Court found that it lacked in rem jurisdiction over the property claimed by the Government in a civil forfeiture action. *Id*. at 1484. The Court found, however, that "if we have *in personam* jurisdiction over Claimant, we may determine plaintiff's interest vis-à-vis Claimant's interest in the subject property." Id. The court found it did have personal jurisdiction over the claimant and therefore denied the motion to dismiss. *Id*. at 1489. The same standard would apply here to assets claimed by the Claimants which the Court determines are not within its *in rem* jurisdiction.

---

confer jurisdiction on the district courts to entertain forfeiture actions for property located overseas." *United States v. Certain Funds Contained in Account Numbers 600-306211-006,600-306211-011 and 600-306211-014 Located at Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996); *see also United States v. Approximately $1.67 Million in U.S. Currency*, 513 F.3d at 997 n.3 (noting conflict in Second Circuit precedents). As *Meza* has never been expressly overruled, however, the Government assumes for purposes of this motion that it applies, and does not ask the Court to adopt the majority understanding of 28 U.S.C. § 1355(b)(2).

<u>Dismissal Is Not Warranted Even If the Court Lacked *In Rem* Jurisdiction Over a Portion of a Defendant Property.</u>  Even if, *arguendo*, the Court lacked jurisdiction over a portion of the Claimants' assets, dismissal of the action would not be warranted.  While the Claimants argue the Amended Complaint should be dismissed in its entirety for lack of jurisdiction over a portion of a defendant property, the converse is in fact true: in rem jurisdiction over a portion of the res gives the Court jurisdiction at least until the merits stage of the case.

The Claimants assert that a forfeiture claim should be dismissed in its entirety where only a portion of a total forfeiture claim is within the Court's jurisdiction.  (LCB Br. at 30, Ayash Br. at 8).  They rely exclusively on a single district court decision, which actually stands for a completely different proposition.  *See United States v. 3 Parcels in La Plata County, Colo*., 919 F. Supp. 1449 (D. Nev. 1995).  That case concerned the forfeiture of a debt, and jurisdiction was found to be lacking because the Government had failed to comply with the requirements for obtaining jurisdiction under the provisions Supplemental Rule E(4)(c) (applicable to that action).  *Id*. at 1455.  The court held that a partial payment into the court against the debt by a Claimant did not fulfill the provision of Rule E(4)(c) that jurisdiction could be obtained by "acceptance by the marshal into the registry of the court of the debt to the extent of the amount claimed."  *Id.* at 1454-55.  The present action was brought in compliance with Supplemental Rule G, which has no such jurisdictional requirements.  The Claimants, in short, have been unable to identify a single case which has ever held that absence of *in rem* jurisdiction over part of the *res* warrants dismissal of the claim against the *res* as a whole, nor do they present any argument for why such a result would be dictated by law or logic.  The Court should reject the argument accordingly.

In fact, the case law on this issue in the admiralty context supports precisely the opposite conclusion: that *in rem* jurisdiction over a part of the *res* warrants the exercise of jurisdiction

over the whole, with the ultimate portion subject to the Court's jurisdiction to be determined

when the Court reaches the merits of the case.  *See R.M.S. Titanic, Inc.* v. *Haver*, 171 F.3d 964,

967-68 (4th Cir. 1999).  In *R.M.S. Titanic*, the Fourth Circuit addressed whether a district court

had "constructive" *in rem* jurisdiction over the wreck of the Titanic, when the Titanic itself lay in

international waters but items salvaged from it had been brought within the territory of the

district court.  *Id*. at 951-52.  The court first found that it was appropriate to exercise jurisdiction

over an entire ship and its contents based on the location of the salvaged items, applying the legal

fiction that "the *res* is not divided and that therefore possession of some of it is constructively

possession of all." *Id*. at 964.  The court found that this principle could not support *in rem*

jurisdiction over the Titanic in international waters sufficient to enter a final judgment, however,

as the district court's jurisdiction did not extend extraterritorially.  *Id*. at 967.  Rather than find a

total lack of jurisdiction and require dismissal, however, the Fourth Circuit held that the district

court could exercise "constructive in rem" jurisdiction over the wreck in international waters,

permitting it to entertain the action and take preliminary actions regarding the property, but that

the "ultimate resolution could only occur at such time as property is removed from the wreck and

brought within the jurisdiction of an admiralty court, giving it exclusive *in rem* jurisdiction over

the property." *Id*. at 967-968.

 To the extent the Court finds that it lacks *in rem* jurisdiction over all assets of the

Claimants, a similar result is appropriate here.  The Government has asserted a claim against the

entirety of the assets of each Claimant, based on their respective businesses' involvement in the

money laundering scheme.  (*See* Am. Compl. ¶¶ 104, 109, 117.)   Each entity, represented by all

its assets as a whole, is therefore a *res* claimed by the Government.  *See, e.g.*, *United States v. All

Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995) (business used to sell stolen auto

parts and launder proceeds forfeited under 18 U.S.C. § 981).[15]   As the Government has clearly

established that the entities are present within the *in rem* jurisdiction of the Court in the form of

certain specified assets, it is appropriate for the Court to exercise "constructive *in rem*"

jurisdiction over any portion of the entities located abroad while the Government completes

discovery regarding the nature and locations of all assets, and makes efforts to bring all possible

assets within the jurisdiction of the Court prior to the ultimate resolution of the case on the

merits.  *See R.M.S. Titanic*, 171 F.3d at 967-68.

      This resolution also serves the interests of judicial economy.  To dismiss the

Government's claims as to all assets of the entities for lack of *in rem* jurisdiction when there may

be additional, undisclosed assets within the jurisdiction of the Court would be a recipe for

additional delay and unnecessary litigation in the future, wasting judicial resources.[16]   Any

dismissal of the Government's claims on jurisdictional grounds would be without prejudice to

renewal if additional assets are located or brought within the Court's jurisdiction.  *See Robinson*,

21 F.3d at 507 n.4 (2d Cir 1994).  In that event, the Government would either file another

amended complaint at a later stage, delaying resolution of this case, or be forced to bring a new

action on essentially identical facts.  The most economical course, and the one supported by the

case law, is to allow the Government to continue discovery and its attempts to obtain control of

the relevant assets in this action, and dismiss particular assets from the action on jurisdictional

grounds at the merits stage, if appropriate.

---

    [15] Ellissa Holdings' suggestion that a forfeiture claim against "all assets" of an entity is impermissibly vague (Ellissa Br. at 7) is obviously incorrect in light of *G.P.S. Automotive Corp.* and any number of similar cases.

    [16] To the extent the Claimants would assert that further discovery into the location of other assets was irrelevant to the Government's remaining claims, it would also cause serious and unwarranted prejudice to the Government.

The Amended Complaint May Not Be Dismissed Based on a Purported Lack of
Jurisdiction at the Time of the Filing of the Original Complaint.  Finally, LCB argues that the
Court lacked *in rem* jurisdiction over any assets of LCB prior to the seizure of the Seized
Funds,[17] and therefore the claims against its assets must be dismissed because jurisdiction was
lacking at the "initiation" of the action.  (LCB Br. at 6.)  The Government is not aware of any
decision dismissing an action where in rem jurisdiction was lacking at the initiation of an action
but secured later, and LCB does not purport to identify such a case.[18]  Indeed, acquisition of *in
rem* jurisdiction after the filing of an action has long been the rule in admiralty cases, as reflected
in the requirement in the Supplemental Rules C(2)(c) that a complaint state that "the property is
within the district *or will be within the district while the action is pending."* Supp. Rule C(2)(c)
(emphasis added); *see also, e.g.*, *Plataro Ltd., Inc. v. Unidentified Remains of a Vessel*, 508 F.2d
1113, 1115 (5th Cir. 1975) ("To establish in rem jurisdiction in admiralty the res must be present
in the district when the suit is filed or during the pendency of the action.")  Dismissal of the
action for lack of in rem jurisdiction at time of the filing of the Complaint would, moreover, run
afoul of Congress's express statutory prohibition on the dismissal of forfeiture claims brought
under 18 U.S.C. § 981 "on the ground that the Government did not have adequate evidence at the

_____

[17]  As the LCB purchase price funds were in the same foreign account at the time of the
filing of the Complaint, and thus available for seizure via Section 981(k), there is little doubt that
they were within the constructive possession of the Court even at that time.  As there is no legal
basis for LCB's argument, however, the Court need not address this issue.

[18]  LCB cites only the Supreme Court's statement in *Republic Nat'l Bank of Miami v.
United States* that  "a valid seizure of the res is a prerequisite to the *initiation* of an *in rem* civil
forfeiture proceeding," which was made in the context of holding that when *in rem* jurisdiction
exists at the initiation of an action, losing control of the res does not terminate jurisdiction.  506
U.S. 80, 84-88 (1992).  Of course, in *James Daniel Good Real Property* the Supreme Court also
embraced the traditional rule that "in order to institute and *perfect* proceedings *in rem,*...the thing
should be actually or constructively within the reach of the Court.'" 510 U.S. at 57 (emphasis
added).  This clearly suggests that a proceeding could be initiated first, and then perfected by
bringing the *res* within the control of the Court.

time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. §

983(a)(3)(D); *see also* SUPPL. R. G(8)(b)(ii).

Even had the claim been dismissed prior to the seizure of the Seized Funds, it would have

been without prejudice, and the Government would have been entitled to file the Amended

Complaint.  Similarly, any dismissal now on jurisdictional grounds would be without prejudice.

LCB is, therefore, apparently asking that that the Amended Complaint be dismissed simply so

that the Government can re-file it as a new action the next day.  That outcome defies common

sense and lacks any legal support, and the Court should reject it accordingly.

## V.   The Extent of Forfeiture Is Not Resolvable On a Motion to Dismiss

LCB argues that the Court should dismiss the Amended Complaint because the forfeiture

of all of LCB's assets would be unjust.  (LCB Br. at 32-40).  As discussed above, to the extent

this argument relies on LCB's contention that it was nothing more than an unwitting, law-

abiding banker, that contention is completely at odds with the allegations in the Amended

Complaint.  Moreover, for purposes of the motion to dismiss, the Amended Complaint need

simply allege facts sufficient to support the reasonable belief that, at trial, the Government will

be able to prove that the Defendant Property is traceable to the proceeds of IEEPA violations and

to property involved in money laundering.  Whether the forfeiture of all assets of LCB would be

disproportionate is not a matter that can or should be resolved on a motion to dismiss.  *See, e.g.*,

*United States* v. *All Funds On Deposit at Citigroup Smith Barney Account No. 600-00338*, 617

F. Supp. 2d 103, 129-30 (E.D.N.Y. 2007) (court cannot determine excessiveness of the forfeiture

until after it determines the gravity and magnitude of the alleged offenses at trial); *United States*

v. *8 Gilcrease Lane*, 587 F. Supp. 2d 133, 148 n.10 (D.D.C. 2008) ("a § 983(g) petition to

determine whether a forfeiture is constitutionally excessive should be considered only after a

forfeiture has been decreed"); *United States* v. *Funds in the Amount of $170,926.00*, 985 F.

Supp. 810, 813 (N.D. Ill. 1997) (court should not address excessive fines challenge until the Government has established forfeitability at trial).

Moreover, the law is well-established that a business may be forfeitable in its entirety if it facilitates money laundering.  *See supra.*  The Amended Complaint alleges that LCB was involved in laundering millions of dollars of drug trafficking proceeds and IEEPA violations. LCB's participation in those transactions contributed in a substantial way to the success of the money laundering.  These allegations are sufficient to support the allegations seeking the forfeiture of all of LCB's assets, which, as alleged in the Amended Complaint, consist at this time principally of the proceeds of LCB's sale of its assets to another bank.  Moreover, the assets of LCB and the exchange houses are subject to forfeiture to the extent that they represent proceeds of the IEEPA violations.  Again, the extent to which the property of the claimants represents IEEPA proceeds cannot and should not be resolved by motion to dismiss; the extent is a fact question that must be decided after the evidence is heard.

## <u>CONCLUSION</u>

For the foregoing reasons the Government respectfully requests that the motions be

dismiss be denied.

Dated:  New York, New York
        January 9, 2013

<div style="margin-left: 50%;">

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:   _____/s/_____
      Sharon Cohen Levin
      Michael D. Lockard
      Jason H. Cowley
      Alexander J. Wilson
      Assistant United States Attorneys
      (212) 637-1060/2193/2479/2453

</div>