UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                  :

UNITED STATES OF AMERICA,

                                :

                     Plaintiff,

                                :

           - v. -                              11 Civ. 9186 (PAE)

                                :

ALL ASSETS OF LEBANESE CANADIAN        ECF Case
BANK, SAL, et al.,                      :

                 Defendants *in rem*,   :

LEBANESE CANADIAN BANK, SAL, et al.,     :

                 Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION BY ELLISSA HOLDING COMPANY
## <u>TO DISMISS THE AMENDED COMPLAINT</u>

 

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Sharon Cohen Levin
Michael D. Lockard
Jason H. Cowley
Alexander J. Wilson
Assistant United States Attorneys,
   - Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 1

    A.   The Money Laundering Scheme Alleged in the Amended Complaint ................................. 1

    B.   Hizballah ........................................................................................................................ 2

ARGUMENT ............................................................................................................................... 3

    I.   The Court Has Personal Jurisdiction Over Ellissa Holding in this Action ....................... 3

        A.   The Court Has Personal Jurisdiction Over Ellissa .................................................... 3

    II.   The Court Has *In Rem* Jurisdiction over Ellissa's Assets ............................................... 7

        A.   The Amended Complaint Describes Ellissa's Assets With Reasonable Particularity ................ 7

        B.   The Government Has Actual or Constructive Control Over Ellissa's Assets ........................... 10

        C.   Constitutional Principles Under Article III Do Not Bar this Court's Jurisdiction ...................... 12

    III.   The Amended Complaint Should Not Be Dismissed Under Rule 12(b)(6) Because It Sets Forth Sufficient Allegations to State the Alleged Claims ........................................................ 12

        A.   The Amended Complaint States Claims for Forfeiture .............................................. 15

        B.   The Amended Complaint States a Claim for a Civil Money Laundering Penalty ..................... 36

CONCLUSION ............................................................................................................................ 37

i

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant-claimant Ellissa Holding's motion to dismiss the Amended Complaint.

## STATEMENT OF FACTS

**A.      The Money Laundering Scheme Alleged in the Amended Complaint**

The Amended Complaint alleges a wide-ranging international scheme to launder money through United States financial institutions and used car markets from 2007 through 2011.  As part of this scheme, hundreds of millions of dollars were transferred to the United States from Lebanon for the purpose of buying used cars and shipping them to West Africa.  (Am. Compl. ¶¶ 1, 32-35).  West Africa is a major hub of narcotics trafficking and money laundering, with as much as 300 metric tons of cocaine – worth approximately $13.5 billion – transiting West Africa en route to Europe each year.  (*Id.* ¶ 42).  U.S.-exported cars were sold in West Africa for cash, the cash was mixed with proceeds of narcotics trafficking and other crimes and transferred, principally through bulk cash smuggling, to Lebanon.  (*Id.*).  Cash proceeds from the sale of U.S.-exported cars, for example, were often converted to U.S. dollars and Euros on black market currency exchanges fueled by narcodollars.  (*Id.* ¶ 73).  After these cash proceeds were transferred to Lebanon, a portion was reinvested in the car-buying scheme, continuing to feed the money laundering channels that funneled narcotics and other criminal proceeds from West Africa to Lebanon.

Hizballah members and supporters were involved at various key points of the money laundering scheme, including by facilitating cash smuggling from West Africa to Lebanon and by financing and facilitating the purchase of used cars in the United States.  (*Id.* ¶¶ 2, 67-84, 86). For example, a Hizballah-affiliated network of couriers moved millions of dollars in cash from West Africa to Lebanon (*id.* ¶¶ 74-83) and Hizballah security facilitated the receipt of cash that

was flown into the Beirut International Airport from West Africa.  (*Id.* ¶¶ 43(a), 76).  Hizballah members and supporters also benefitted from the money laundering scheme by earning commissions and fees for their services, as well as profits from sales of U.S.-exported cars in West Africa.  (*Id.* ¶ 35).

In connection with this scheme, approximately $329,551,584 was sent from Lebanon financial institutions through the U.S. financial system and car markets.  The Ellissa Exchange[1] (a subsidiary of Ellissa Holding) and the Ayash Exchange originated approximately $203,269,615 in overseas transfers to the United States, or approximately 62% of the funds.  (*Id.* ¶ 64).  LCB was the Lebanese sending bank for approximately $229,872,953 in overseas transfers to the United States, or approximately 70% of the funds.  (*Id.*).

## B.    Hizballah

Hizballah is a Lebanon-based terrorist organization formed in approximately 1982. Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.  (*Id.* ¶ 36).  According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and political support from Syria; and funding from private donations and profits from legal and illegal businesses.  (*Id.* ¶ 37).  Hizballah operates a network of social programs and political

---

[1]  In this brief, "Ellissa Holding" will refer to defendant-claimant Ellissa Holding Company; "LCB" will refer to Lebanese Canadian Bank, SAL; "Ayash Exchange" will refer to the Hassan Ayash Exchange Company; "Claimant" will refer to Ellissa Holding; "Ellissa Br." will refer to Ellissa Holding's memorandum of law in support of its motion to dismiss (docket entry no. 468); and "Am. Compl." will refer to the Government's Verified Amended Complaint (docket entry no. 372).

operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state." (*Id.* ¶ 38).

Hizballah has been identified as a terrorist organization by the U.S. Government under numerous sanctions regulations. (*Id.*). Hizballah remains the most technically capable terrorist group in the world and a continued security threat to the United States. Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history. (*Id.* ¶ 39). Hizballah has also developed links to money laundering and narcotics trafficking and since in or around 2006, such narcotics trafficking has been condoned through the issuance of fatwas by radical Islamic clerics. The narcotics trade has become a source of revenue for Hizballah. (*Id.* ¶ 40).

## <u>ARGUMENT</u>

### I.    The Court Has Personal Jurisdiction Over Ellissa Holding in this Action

The Court has personal jurisdiction over the *in personam* defendant Ellissa Holding in this action. On a motion to dismiss for lack of jurisdiction based solely on the pleadings and supporting affidavits, the party asserting jurisdiction "need only make a *prima facie* showing of jurisdiction." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir 1994). "All well-pleaded facts are accepted as true at this stage of the litigation." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 (2d Cir. 2012).

#### A.    The Court Has Personal Jurisdiction Over Ellissa

Ellissa Holding asserts that the Court lacks personal jurisdiction over it because it lacks constitutionally sufficient minimum contacts with the state of New York, and that therefore the *in personam* money laundering claims against it should be dismissed.[2] (Ellissa Br. at 3-6). These assertions are without merit.

---

[2] Ellissa Holding does not contest that the Government has met the statutory requirements for jurisdiction under 18 U.S.C. § 1956(b)(2). Ellissa Holding also does not present an argument

For the Court's exercise of personal jurisdiction to comport with the Due Process Clause of the United States Constitution, a defendant must have "sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cr. 2010). "In determining the strength of the contacts under the Due Process Clause," the Court must look "to the totality of Defendants' contacts with the forum state." *Id.*

Ellissa Holding has more than sufficient contacts with the Southern District of New York based on its deliberate transfer of funds through bank accounts in the District in furtherance of the money laundering scheme alleged in the Amended Complaint. As the claims set forth in the Amended Complaint "aris[e] out of or relate[ ] to the defendant[s'] contacts with the forum," it is subject to the specific jurisdiction of the Court. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 8 (1984).

As alleged in the Amended Complaint, between approximately January 2007 and early 2011, Ellissa Holding originated wire transfers totaling tens of million dollars to car buyers in the United States, knowing that the funds transferred were the proceeds of illegal activities, that the transfers were in furtherance of the money laundering scheme alleged in the Complaint, and that the money laundering scheme benefitted Hizballah. (Am. Compl. ¶¶ 9, 60-61) The wire transfers were sent from Ellissa Holding's accounts at Lebanese banks through correspondent bank accounts with U.S. financial institutions based in the Southern District of New York. (*Id.* ¶

---

for personal jurisdiction being "unreasonable" under the Due Process Clause, and so the Government's burden is satisfied by a *prima facie* showing of minimum contacts. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) ("[T]he exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts," though "it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (*quoting Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985)).

4

9).  Ellissa Exchange sent at least 890 wire transfers totaling approximately $51,684,819 through 12 correspondent bank accounts located in New York. (Declaration of Christopher Miller dated January 8, 2013[3] at  ¶ 3).

Addressing similar circumstances, the New York Court of Appeals recently held in *Licci* v. *Lebanese Canadian Bank* that the use of an LCB correspondent bank account in New York in furtherance of criminal activity was sufficient to support personal jurisdiction under N.Y. C.P.L.R. § 302(a), the New York long-arm statute. As the Second Circuit has expressly held, where personal jurisdiction is proper under the relevant provision of the New York long-arm statute, "the constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *see also HSH Nordbank AG New York Branch v. Street*, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, 4 (S.D.N.Y. July 18, 2012) ("the personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous").  In other words, sufficient contacts with New York to satisfy § 302(a)(1) of the New York long-arm statute are also sufficient for personal jurisdiction under the Due Process Clause.

In *Licci*, Israelis injured by Hizballah rocket attacks brought an action against LCB alleging various claims based on LCB's having knowingly conducted "dozens of international wire transfers" totaling "several million dollars" on behalf of an alleged Hizballah front group, thereby facilitating the Hizballah rocket attacks. *Licci*, 673 F.3d at 56.  The Second Circuit certified to the New York Court of Appeals the questions of whether this conduct met the requirements for personal jurisdiction under the New York long-arm statute.  *See id.* at 75-76.

---

[3] The Miller Declaration was filed with the Government's previous opposition to the motions to dismiss the Amended Complaint filed by LCB, Ellissa Holding and Ayash,

The New York Court of Appeals first found that LCB's use of a New York correspondent account, as alleged by the plaintiffs, would constitute transacting business in New York, reflecting the "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Canadian Bank*, 984 N.E. 2d 893, 2012 WL 5844997 (N.Y. Nov. 20, 2012). Next, the Court found that the plaintiff's claims under the Anti–Terrorism Act, the Alien Tort Statute, or for negligence or breach of statutory duty in violation of Israeli law arose from LCB's transaction of business in New York. *Id*. LCB's conduct was sufficient under the New York long-arm statute, and, by implication, sufficient to support personal jurisdiction under the Due Process Clause.

Ellissa Holding's contacts here are, if anything, more substantial than those addressed in *Licci*. Rather than wire transfers sent through a single New York account, as was the case in *Licci*, Ellissa Holding directed the wiring of over $60 million through multiple banks to the United States through correspondent accounts in New York. Moreover, unlike LCB, Ellissa was the actual account holder that purposefully directed that these wires be sent to the United States. Additionally, while the ultimate wrong in *Licci* was the plaintiffs' injury due to rocket attacks, here the heart of the wrongdoing claimed by the Government is precisely the transfer of funds in furtherance of the alleged money laundering and IEEPA conspiracy.

Nor is Ellissa Holding equivalent to individuals who rely blindly on their banks, and lacking any personal purpose of availing themselves of the New York forum. *Cf. Universal Trading & Inv. Co., Inc. v. Tymoshenko*, No. 11 Civ. 7877 (PAC), 2012 WL 6186471, *3 (S.D.N.Y. December 12, 2012) (no personal jurisdiction over foreign individual holding foreign accounts simply because her bank moved money through New York via a correspondent account

between a foreign source and a foreign destination).  Ellissa Holding is a financial institution, an exchange house whose business involved, in part, the transfer of funds to the United States. Ellissa Holding purposefully availed itself of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States," and so is subject to the personal jurisdiction of the Court.

## II.    The Court Has *In Rem* Jurisdiction over Ellissa's Assets

In order to adjudicate this forfeiture action, the Court must have *in rem* jurisdiction over the defendant *in rem*.  As the Supreme Court has stated the traditional rule, "in order to institute and perfect proceedings *in rem*, . . . the thing should be actually or constructively within the reach of the Court.'" *United States v. James Daniel Good Real Property,* 510 U.S. 43, 47 (1993) (quoting *The Brig Ann,* 13 U.S. (9 Cranch) 289, 291 (1815)).  The Claimant argues that the Amended Complaint should be dismissed for lack of *in rem* jurisdiction over its assets.  As the Government has plainly alleged facts establishing that the Court has *in rem* jurisdiction over assets of this party, these arguments are without merit.

### A.    The Amended Complaint Describes Ellissa's Assets With Reasonable Particularity

Title 28, United States Code, Section 1355 "clearly confer[s] *in rem* jurisdiction on district courts in forfeiture proceedings with respect to property located within" the United States.  *United States v. All Funds on Deposit in any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148, 152 (2d Cir. 1995).  Schedule A to the Amended Complaint lists specific assets belonging to the defendant, including 350 cars consigned to Ellissa Holding located at various locations in the United States (the "Ellissa Cars").  (Am. Compl., Schedule A).

The Ellissa Cars, as assets located in the United States, are subject to the *in rem* jurisdiction of the Court.

Ellissa Holding does not contest that the Ellissa Cars are within the *in rem* jurisdiction of the Court, but asserts that "these cars do not belong to Ellissa." (Ellissa Br. at 7.).  The bare denial of that fact by counsel for Ellissa in its brief is irrelevant at this stage of the proceeding. On a motion to dismiss, the Court must accept as true the Government's allegation that the Ellissa Cars are assets of Ellissa Holding.

Additionally, the fact that the remainder of Ellissa Holding's known assets are located outside of the United States does not deprive this court of *in rem* jurisdiction such that dismissal of the action would be warranted.  The case law on this issue in the admiralty context supports precisely the opposite conclusion: that *in rem* jurisdiction over a part of the *res* warrants the exercise of jurisdiction over the whole, with the ultimate portion subject to the Court's jurisdiction to be determined when the Court reaches the merits of the case.  *See R.M.S. Titanic, Inc.* v. *Haver*, 171 F.3d 964, 967-68 (4th Cir. 1999).  In *R.M.S. Titanic*, the Fourth Circuit addressed whether a district court had "constructive" *in rem* jurisdiction over the wreck of the Titanic, when the Titanic itself lay in international waters but items salvaged from it had been brought within the territory of the district court.  *Id*. at 951-52.  The court first found that it was appropriate to exercise jurisdiction over an entire ship and its contents based on the location of the salvaged items, applying the legal fiction that "the *res* is not divided and that therefore possession of some of it is constructively possession of all." *Id*. at 964.  The court found that this principle could not support *in rem* jurisdiction over the Titanic in international waters sufficient to enter a final judgment, however, as the district court's jurisdiction did not extend extraterritorially.  *Id*. at 967.  Rather than find a total lack of jurisdiction and require dismissal,

however, the Fourth Circuit held that the district court could exercise "constructive in rem" jurisdiction over the wreck in international waters, permitting it to entertain the action and take preliminary actions regarding the property, but that the "ultimate resolution could only occur at such time as property is removed from the wreck and brought within the jurisdiction of an admiralty court, giving it exclusive *in rem* jurisdiction over the property." *Id*. at 967-968.

To the extent the Court finds that it lacks *in rem* jurisdiction over all assets of the Claimant, a similar result is appropriate here. The Government has asserted a claim against the entirety of the assets of Ellissa Holding, based on its involvement in the money laundering scheme. *See, e.g.*, *United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995) (business used to sell stolen auto parts and launder proceeds forfeited under 18 U.S.C. § 981).[4] As the Government has alleged that Ellissa does, in fact, have an ownership interest in assets present within the *in rem* jurisdiction of the Court in the form of the Ellissa Cars, it is appropriate for the Court to exercise "constructive *in rem*" jurisdiction over the remainder of Ellissa Holding's assets overseas while the Government completes discovery regarding the nature and locations of all assets, and makes efforts to bring all possible assets within the jurisdiction of the Court prior to the ultimate resolution of the case on the merits. *See R.M.S. Titanic*, 171 F.3d at 967-68.

This resolution also serves the interests of judicial economy. To dismiss the Government's claims as to all assets of the entities for lack of *in rem* jurisdiction when there may be additional, as yet undisclosed assets within the jurisdiction of the Court would be a recipe for additional delay and unnecessary litigation in the future, wasting judicial resources. Any

---

[4] Ellissa Holdings' suggestion that a forfeiture claim against "all assets" of an entity is impermissibly vague (Ellissa Br. at 7) is obviously incorrect in light of *G.P.S. Automotive Corp.* and any number of similar cases.

dismissal of the Government's claims on jurisdictional grounds would be without prejudice to renewal if additional assets are located or brought within the Court's jurisdiction. *See Robinson*, 21 F.3d at 507 n.4 (2d Cir 1994). In that event, the Government would either file another amended complaint at a later stage, delaying resolution of this case, or be forced to bring a new action on essentially identical facts. The most economical course, and the one supported by the case law, is to allow the Government to continue discovery and its attempts to obtain control of the relevant assets in this action, and dismiss particular assets from the action on jurisdictional grounds at the merits stage, if appropriate.

Ellissa's Argument Regarding the Amended Complaint's Lack of Particularity In
<u>Describing Ellissa's Assets Is Without Merit</u>

Ellissa Holding also argues that the Government has failed to describe with particularity the assets of Ellissa Holding it seeks to forfeit. This argument is also without merit. The Government has plainly stated that it seeks the forfeiture of all assets of Ellissa Holding. As set forth above, such a claim for relief is entirely consistent with other forfeiture actions in which the forfeiture of all assets of a company involved in conduct such as money laundering is sought. *See, e.g.*, *All Assets of G.P.S. Automotive Corp.*, 66 F.3d at 485 (upholding evidentiary basis for forfeiture orders entered by district court and remanding for consideration of other issues). While Ellissa Holding cites language from this case in its own brief, such language had nothing to do with *in rem* jurisdiction or particularity issues with the government's pleadings. Rather, it was the context of remanding the case for fact-finding on possible quasi-double jeopardy issues. *Id.* at 491. In plainly and unequivocally seeking all assets of Ellissa Holding, the United States has clearly put Ellissa Holding on notice of the defendant property it seeks to forfeit.

**B.    The Government Has Actual or Constructive Control Over Ellissa's Assets**

Because Ellissa Holding is Subject to the Personal Jurisdiction of the Court, the Court
<u>Has Jurisdiction Over Assets Under the Control of Ellissa Holding</u>

The Second Circuit in *Meza* determined that 28 U.S.C. § 1355 did not, standing alone, confer *in rem* jurisdiction over property located in a foreign country, and that in an action against such property "the property must be within the actual or constructive control of the district court in which the action is commenced." *Meza*, 63 F.3d at 152.[5]   One way to show constructive control of foreign funds, in their entirety, is by demonstrating that "the [foreign] government will turn over at least a portion of the seized funds to the United States" *Id.* at 154.   Here, however, constructive control over foreign assets is provided not by a foreign government, but by the parties before the Court.   The Claimant has appeared before the Court as a party to this action, and is subject to personal jurisdiction in this forum.   It is therefore subject to any orders of the Court with respect to the assets under its control.   *See, e.g.*, 18 U.S.C. § 1956(b)(4) (authorizing appointment of receiver).   The Court thus has constructive control, and *in rem* jurisdiction, over such assets.

Alternatively, even if the Court were to conclude that it lacks *in rem* jurisdiction, it may continue to adjudicate the Government's interest in the assets vis-à-vis the Claimant, though not as to other parties not before the Court, as in *United States v. Real Property Located at 11205*

---

[5]   The Third, Ninth and D.C. Circuits have all rejected this approach and found that 28 U.S.C. § 1355(b)(2) itself conferred *in rem* jurisdiction over foreign assets on the district courts. *See United States v. Approximately $1.67 Million in U.S. Currency*, 513 F.3d 991, 996–98 (9th Cir. 2008); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 403 (3d Cir. 2003). *United States v. All Funds in Account in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C.Cir. 2002).   There is even some question as to whether *Meza* remains good law within the Second Circuit, as a subsequent panel indicated that 28 U.S.C. § 1355(b) was "designed to confer jurisdiction on the district courts to entertain forfeiture actions for property located overseas."  *United States v. Certain Funds Contained in Account Numbers 600-306211-006,600-306211-011 and 600-306211-014 Located at Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996); *see also United States v. Approximately $1.67 Million in U.S. Currency*, 513 F.3d at 997 n.3 (noting conflict in Second Circuit precedents).   As *Meza* has never been expressly overruled, however, the Government assumes for purposes of this motion that it applies, and does not ask the Court to adopt the majority understanding of 28 U.S.C. § 1355(b)(2).

*McPherson Lane Ojai, Cal.*, 754 F. Supp. 1483 (D.Nev. 1991).  In that case, a claimant moved to dismiss on jurisdictional grounds, and the Court found that it lacked *in rem* jurisdiction over the property claimed by the Government in a civil forfeiture action.  *Id*. at 1484.  The Court found, however, that "if we have *in personam* jurisdiction over Claimant, we may determine plaintiff's interest vis-à-vis Claimant's interest in the subject property." Id.  The court found it did have personal jurisdiction over the claimant and therefore denied the motion to dismiss.  *Id*. at 1489. The same standard would apply here to assets claimed by the Claimant which the Court determines are not within its *in rem* jurisdiction.

### C.     Constitutional Principles Under Article III Do Not Bar this Court's Jurisdiction

Ellissa Holding's argument that because a majority of its assets are located overseas, any judgment would effectively be an impressible advisory opinion is wholly without merit.  The United States could seek to enforce any judgment against Ellissa Holding or its assets in jurisdictions overseas   Judgments are obtained against foreign parties as a matter of routine and the notion that hypothetical collection issues somehow prevent a constitutional barrier to a court's jurisdiction over an active case simply has no basis in the law.

### III.    The Amended Complaint Should Not Be Dismissed Under Rule 12(b)(6) Because It Sets Forth Sufficient Allegations to State the Alleged Claims

<u>Legal Standards Applicable to Motions to Dismiss</u>

A motion to dismiss under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court expounded on the pleading requirements necessary to survive a motion to dismiss.  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A Rule

12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S.

at 678 (quoting *Twombly*, 550 U.S. at 570); *see also id.* at 684 ("Our decision in *Twombly*

expounded the pleading standard for 'all civil actions'[.]") (quoting FED. R. CIV. P. 1).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *accord*

*Twombly*, 550 U.S. at 556.

When considering a Rule 12(b)(6) motion to dismiss, the court must "must accept as true

all of the factual allegations set out in plaintiff's complaint, draw inferences from those

allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth* v.

*Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Gregory* v. *Daly*, 243 F.3d 687, 691 (2d Cir.

2001)); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right

to relief above the speculative level, . . . on the assumption that all the allegations in the

complaint are true (even if doubtful in fact).").  The trial court's task "is merely to assess the

legal feasibility of the complaint, not to assay the weight of the evidence which might be offered

in support thereof." *Levitt* v. *Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (internal

quotation marks and citations omitted); *see also United States* v. *$15,270,885.69 Formerly on*

*Deposit in Account No. 8900261137*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *5

(S.D.N.Y. Aug. 31, 2000) (motion to dismiss may not be used to test the sufficiency or

admissibility of the evidence).  "[T]he issue is not whether a plaintiff will ultimately prevail but

whether [it] is entitled to offer evidence to support the claims." *Eternity Global Master Fund*

*Ltd.* v. *Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citations omitted).

In a civil forfeiture action, the complaint must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Rule G(2)(f).  Thus, a civil forfeiture complaint must do more than satisfy the mere notice pleading standards of the Federal Rules of Civil Procedure.  *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

The complaint does not, however, need to allege facts sufficient to prove the forfeitability of the defendant property, nor is the Government required to have sufficient evidence to establish the forfeitability of property at the time the complaint is filed.  The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), codified in part at 18 U.S.C. § 983, expressly provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. § 983(a)(3)(D); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii) ("In an action governed by 18 U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.  The sufficiency of the complaint is governed by Rule G(2).").

Nor must the facts alleged in the complaint be sufficient to establish probable cause that specific property is subject to forfeiture.  *See, e.g.*, *Daccarett*, 6 F.3d at 47.  Instead, the complaint simply needs to establish a "reasonable belief" that the government will be able to meet its burden when it comes time for trial.  *Id.*  "In other words, the complaint need not allege facts sufficient to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate [its trial burden] for finding the property tainted."  *Id.*  Stated differently, the Government simply must plead "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  *United States* v. *Mondragon*, 313 F.3d 862, 865-67 (4th Cir. 2002) (applying SUPPL. R. E(2)(a)).

### A.   The Amended Complaint States Claims for Forfeiture

#### 1.   The Amended Complaint Sets Forth Sufficient Allegations of IEEPA Violations

##### a.   Statutory Framework - The IEEPA and Terrorism Sanctions Regulations

The IEEPA, enacted in 1977 and codified at 50 U.S.C. § 1701 et seq., confers upon the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency.  *See* 50 U.S.C. § 1701.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).  As described below, the President and the Department of Treasury have issued executive orders and regulations pursuant to the IEEPA that prohibit a broad range of conduct with respect to Hizballah, including providing goods or services to Hizballah or any transactions or dealings in property in which Hizballah has an interest.  In addition, the U.S.

15

Department of State further designated Hizballah as a Foreign Terrorist Organization ("FTO")

pursuant to Section 219 of the Immigration and Nationality Act, subjecting the interests of the

organization to an additional blocking regime.  The cumulative effect of these Executive Orders,

designations, and sanctions regimes are to block any property subject to United States

jurisdiction in which Hizballah has any interest whatsoever, whether direct or indirect; and to

prohibit any unlicensed transactions in the United States or involving U.S. persons that are for

the benefit of Hizballah.  Moreover, under the terms of the sanctions regimes and pursuant to

IEEPA, it is a criminal offense for any individual – whether a U.S. person or not – to conspire to

violate the sanctions regimes, to seek to evade or avoid the prohibitions against U.S. transactions

that benefit of Hizballah, or to cause another to violate those prohibitions.

 The Executive Orders and State Department Designations.  On January 23, 1997,

President William Jefferson Clinton issued Executive Order 12947, declaring a national

emergency pursuant to the IEEPA and other statutes with respect to the Middle East peace

process.  The President found that "grave acts of violence committed by foreign terrorists that

disrupt the Middle East peace process constitute an unusual and extraordinary threat to the

national security, foreign policy, and economy of the United States" and declared a national

emergency to deal with that threat.  The Executive Order blocked all property subject to U.S.

jurisdiction in which any of 12 designated terrorist organizations, including Hizballah, had an

interest, and prohibited (1) any transaction or dealing by United States persons or within the

United States in any property of the designated organizations, including the making or

contribution of any funds, goods, or services to or for the benefit of the designees; and (2) any

transaction by any United States person or within the United States that evades or avoids or has

the purpose of evading or avoiding the prohibitions of the Order. *See* 60 Fed. Reg. 5079 (Jan. 23, 1997).

On September 23, 2001, in the wake of the September 11, 2001, terrorist attacks, President George W. Bush issued Executive Order 13224, finding that "grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001 . . . and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared a national emergency to deal with that threat. The Executive Order identified 12 individuals and 15 entities whose assets were blocked. The Order further prohibited (1) any transaction or dealing by United States persons or within the United States in property or interests in such blocked property, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of the designees; (2) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Order; and (3) any conspiracy formed to violate any of the prohibitions set forth in the Order. *See* 66 Fed. Reg. 49079 (Sept. 23, 2001). On October 31, 2001, the Secretary of State identified Hizballah, among others, as a specially designated global terrorist pursuant to Executive Order 13224 because it had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. *See* 67 Fed. Reg. 12633 (Mar. 19, 2002).

In addition, on October 8, 1997, the U.S. Department of State designated Hizballah as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and

Nationality Act, codified at Title 8, United States Code, Section 1189.  *See* 62 Fed. Reg. 52650

(Oct. 8, 1997).  Section 219 of the Immigration and Nationality Act authorizes the Secretary of

State to designate as an FTO foreign organizations that engage in terrorist activity, or retain the

capability and intent to engage in terrorist activity or terrorism, and whose terrorist activity or

terrorism threatens the security of U.S. nationals or the national security of the United States.[6]

The Sanctions Regimes.  The U.S. Department of the Treasury, Office of Foreign Assets

Control ("OFAC") has adopted three regulatory regimes to implement Executive Orders 12947

and 13224, along with the State Department's FTO designation of Hizballah.  Those regulations

are the Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 595 (the

"TSR"), implementing Executive Order 12947; the Foreign Terrorist Organization Sanctions

Regulations, Title 31, Code of Federal Regulations, Part 597 (the "FTOSR"), implementing the

State Department's FTO designation; and the Global Terrorism Sanctions Regulations, Title 31,

Code of Federal Regulations, Part 594 (the "GTSR"), implementing Executive Order 13224.

The TSR generally block the property of "Specially Designated Terrorists" ("SDTs"),

consisting of the 12 organizations designated in Executive Order 12947 and any persons

designated by the Secretary of State that are found to have committed, or to pose a significant

risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East

peace process or that assist in, sponsor, or provide financial, material, or technological support

---

[6] Further demonstrating the threat to our national security posed by Hizballah, the entity
was designated by the Secretary of State from 2007 through 2009 under the Iran and Syria
Nonproliferation Act.  That Act provides for penalties on foreign persons and entities for the
transfer to or acquisition from Iran since January 1, 1999, or the transfer to or acquisition from
Syria since January 1, 2005, of equipment and technology controlled under multilateral export
control lists or otherwise having the potential to make a material contribution to the development
of weapons of mass destruction or cruise or ballistic missile systems.  *See* 50 U.S.C. § 1701 note;
72 Fed. Reg. 20158 (Apr. 23, 2007).

for, or services in support of, such acts of violence.  Section 595.201(a) of the TSR provides, in

relevant part:

> [N]o property or interests in property of a specially designated
> terrorist, that are in the United States, that hereafter come within
> the United States, or that are or hereafter come within the
> possession or control of U.S. persons, including their overseas
> branches, may be transferred, paid, exported, withdrawn or
> otherwise dealt in.

Section 595.204 of the TSR prohibits transactions by U.S. persons that are with, or for the

benefit of, any SDT, including Hizballah:

> Except as otherwise authorized, no U.S. person may deal in
> property or interests in property[7] of a specially designated
> terrorist, including the making or receiving of any contribution of
> funds, goods, or services to or for the benefit of a specially
> designated terrorist.

Section 595.205 of the TSR further prohibits attempts and conspiracies to violate or to evade the

prohibitions of the TSR:

> Any transaction for the purpose of, or which has the effect of,
> evading or avoiding, or which facilitates the evasion or avoidance
> of, any of the prohibitions set forth in this part, is hereby
> prohibited. Any attempt to violate the prohibitions set forth in this
> part is hereby prohibited.  Any conspiracy formed for the purpose
> of engaging in a transaction prohibited by this part is hereby
> prohibited.

Similar to the TSR, the GTSR generally blocks property interests of, and prohibits

transactions with or for the benefit of, Specially Designated Global Terrorists ("SDGTs"),[8]

including Hizballah.  Section 594.201 of the GTSR blocks "property and interests in property of

---

[7]  Property is broadly defined, with a non-exclusive list of examples set forth in 31 C.F.R. § 595.310.  An "interest" in property is further defined as "an interest of any nature whatsoever, direct or indirect."  31 C.F.R. § 595.307.   *See also* 31 C.F.R. §§ 594.310 & 307.

[8]  SDTs and SDGTs are two types of a category of individuals and entities that have been designated by OFAC under various sanctions regimes that are known as "specially designated nationals" ("SDNs") that the U.S. Treasury Department maintains on a publicly available list. *See* http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

[SDGTs] that are in the United States, that hereafter come within the United States, or that

hereafter come within the possession or control of U.S. persons, including their overseas

branches . . . ."  And similar to section 595.204 of the TSR, section 594.204 of the GTSR

prohibits unlicensed transactions by U.S. persons with, or for the benefit of, an SDGT:

> Except as otherwise authorized, no U.S. person may engage in any
> transaction or dealing in property or interests in property of [a
> SDGT], including but not limited to the making or receiving of any
> contribution of funds, goods, or services to or for the benefit of [a
> SDGT].

Section 594.205 of the GTSR, like section 595.205 of the TSR, prohibits attempts and

conspiracies to violate or to evade its prohibitions:

> (a) Except as otherwise authorized, and notwithstanding any
> contract entered into or any license or permit granted prior to the
> effective date, any transaction by any U.S. person or within the
> United States on or after the effective date that evades or avoids,
> has the purpose of evading or avoiding, or attempts to violate any
> of the prohibitions set forth in this part is prohibited.
>
> (b) Except as otherwise authorized, and notwithstanding any
> contract entered into or any license or permit granted prior to the
> effective date, any conspiracy formed for the purpose of engaging
> in a transaction prohibited by this part is prohibited.

The FTOSR generally prohibit transactions by U.S. financial institutions in any assets in

which an FTO or any of its agents has an interest, any conspiracies and attempts to violate the

FTOSR, and any transaction having the purpose or effect of evading or avoiding the prohibitions

of the FTOSR.  *See* 31 C.F.R. §§ 597.201 & 204.

Thus, the TSR, the FTOSR, and the GTSR collectively block a broad range of property

subject to the jurisdiction of the United States that involves any interests, direct or indirect, of

Hizballah.  *See* 31 C.F.R. §§ 595.201(a), 597.201(a), & 594.201.  The regulations also prohibit

any dealing (without a license) by U.S. persons in any property or interests in property of

Hizballah, and specifically prohibit any transaction in the United States or any U.S. person

providing funds, goods, or services "to, or for the benefit of" Hizballah.  *See* 31 C.F.R.

§§ 595.204 & 594.204.  These prohibitions require no knowledge by the U.S. person – the

unlicensed provision of funds, goods, or services to or for the benefit of Hizballah is prohibited,

regardless of whether the U.S. person is aware of the unlawful purpose of the transaction.[9]

      The TSR and GTSR further prohibit any transactions that have the purpose or effect of

evading or avoiding, or facilitating the evasion or avoidance, of their prohibitions, as well as any

conspiracy to engage in a prohibited transaction – including prohibited evasions or avoidances.

31 C.F.R. §§ 595.205 & 594.205.  The IEEPA itself similarly prohibits not only direct violations

of sanctions regimes adopted pursuant to the statute, but also attempts and conspiracies to violate

of any license, order, or regulation issued pursuant to the statute and causing others to violate any

such license, order, or regulation.  50 U.S.C. § 1705(a).  Finally, it is a crime for any person –

whether a U.S. person or non-U.S. person – to willfully commit, attempt to commit, conspire to

commit, or aid or abet in the commission of an act prohibited by the statute.  *See* 50 U.S.C. §

1705(c).

      The Executive Orders and the terrorism sanctions regimes were promulgated in response

to threats posed by terrorist organizations to our country's national security, and the terms of the

Orders and regulations are broad both on their face and in their application.  Courts considering

analogous sanctions regimes – against State sponsors of terrorism or other terrorist organizations

– have readily come to this conclusion.  *See, e.g., United States* v. *Ehsan*, 163 F.3d 855, 859 (4th

Cir. 1998) (Noting that Executive Order 12959, relating to the declaration of a national

emergency with respect to Iran, "is clothed with the most serious of purposes, and it is couched

---

[9]  As discussed below, a criminal violation requires willfulness, that is, an awareness that the conduct is unlawful.  But the IEEPA and the sanctions regimes by their terms prohibit transactions where the U.S. participants are unwitting of the transactions' unlawful nature.

in the broadest of terms.").  Thus, while the terrorism sanctions regimes prohibit transactions in

the U.S. and by U.S. persons, non-U.S. persons can also violate the sanctions by conspiring to

engage in transactions that violate the sanctions; by engaging in transactions that have the

purpose or effect of evading or avoiding, or facilitating the evasion or avoidance of, the

sanctions; by causing others to violate the sanctions; or by aiding or abetting a violation of the

sanctions.

### b.      Forfeiture of Property Constituting and Derived from Proceeds Traceable to IEEPA violations

Section 981(a)(1)(C) of Title 18, United States Code, provides, in part, that:

> The following property, real or personal, is subject to forfeiture to
> the United States:  . . . [a]ny property, real or personal, which
> constitutes or is derived from proceeds traceable to a violation of
> . . . any offense constituting 'specified unlawful activity' (as
> defined in section 1956(c)(7) of this title), or a conspiracy to
> commit such offense.

18 U.S.C. § 981(a)(1)(C).  Under Section 1956(c)(7), the term "specified unlawful activity"

("SUA") includes, among other things, "offenses under . . . section 206 (relating to penalties) of

the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  As noted above, 50

U.S.C. § 1705(a) makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or

cause a violation of any license, order, regulation, or prohibition issued under this title."  Thus,

any property which constitutes or is derived from proceeds traceable to a violation of Executive

Order12947, Executive Order 13224, or the TSR, the FTOSR, or the GTSR is forfeitable to the

United States.

Courts apply a "but for" test to determine whether property is proceeds of an offense.

Under this test, the term "proceeds" means any property that a person would not have obtained

or retained but for the criminal offense.  *See, e.g.*, *United States* v. *Nicolo*, 597 F. Supp. 2d 342,

350 (W.D.N.Y. 2009) (applying "but for" test to determine amount of proceeds forteitable under

§ 981(a)(1)(C)); *United States* v. *Reiner*, 397 F. Supp. 2d 101, 106-07 (D. Me. 2005) (same);

*United States* v. *Evanson*, No. 05 Cr. 00805, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008)

("proceeds are property a defendant would not have obtained or retained but for the commission

of the criminal offense").  *See also, e.g.*, *United States* v. *Hoffman-Vaile*, 568 F.3d 1335, 1344-

45 (11th Cir. 2009) (applying "but for" test to determine the amount of "proceeds" forfeitable

under the criminal forfeiture statute 18 U.S.C. § 982); *United States* v. *Grant*, S4 05 Cr. 1192

(NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008) (same); *United States* v.

*Ivanchukov*, 405 F. Supp. 2d 708, 712 (E.D. Va. 2005) (same).

### c.    The Amended Complaint Sufficiently Alleges IIEPA Violations

The Amended Complaint alleges that, as part of the money laundering scheme,

transactions occurred in the United States and involved U.S. persons that were for the benefit of

Hizballah, including its members and supporters.  The scheme generated a channel for

laundering the proceeds of narcotics trafficking and other crimes, from which Hizballah and its

members and supporters received various fees and commissions for their roles in the scheme as

well as proceeds from the car sales.  (Am. Compl. ¶¶ 35, 43(a), 73).  The flow of funds into the

United States to buy used cars and ship them to West Africa fed this money laundering engine

and was a critical and necessary part of the scheme.  The transactions in the United States to buy

used cars and export them to West Africa thus provided "funds, goods, or services to or for the

benefit of" Hizballah.

The Claimant argues that the Amended Complaint does not allege IEEPA violations.  The

Claimant contends that the Amended Complaint does not allege, or at least does not sufficiently

allege, IEEPA violations because entities in the United States that received relevant wires,

primarily used car buyers, were not themselves listed as designated entities under the relevant

regulations, and because Ellissa Holding was not an OFAC-blocked entity when it initiated the wires in question.   (Ellissa Br. at 12, 15-16).

This contention, of course, is wrong.  Any transaction by a U.S. person or in the United States that provides goods, funds, or services to or for the benefit of Hizballah violates the TSR, the GTSR, and IEEPA.  The Amended Complaint alleges such transactions – tens of millions of dollars were transferred to the United States by Ellissa Holding in order to buy cars and ship them from the United States to West Africa, where they were converted to cash proceeds that fueled the money laundering conspiracy.  The Claimant's contention that the Amended Complaint does not allege an IEEPA violation misunderstands both IEEPA and the allegations in the Complaint.  A designated entity does not have to be a direct participant in the wiring of funds to the United States for an IEEPA violation to occur; transactions in the United States or by a U.S. person violate the IEEPA if they are *for the benefit* of Hizballah.  Similarly, such a transaction with or for the benefit of Hizballah violates the IEEPA even if the individuals acting for Hizballah are not themselves designated by OFAC at the time of the transaction.

To the extent the Claimant contends that the Amended Complaint does not sufficiently allege Hizballah's involvement in and benefit from the money laundering scheme under Rule G, that contention is also plainly wrong.  The Amended Complaint explicitly alleges that Hizballah benefited from the scheme and from the United States transactions that made it possible.  (Am. Compl. ¶ 35).  The Amended Complaint sets forth specific facts sufficient to support a reasonable belief that the Government will be able to prove this allegation at trial, including numerous examples of Hizballah members and supporters involved in the scheme.  (*See, e.g.*, *id.* ¶¶ 43(c), 48(d), 55, 67-86).  The Amended Complaint further alleges that Hizballah security facilitates the receipt of bulk cash from West Africa at the Beirut International Airport (*id.* ¶¶

24

43(a), 76) and that it and its members and agents benefit from fees, commissions, and other profits as a result of the scheme. (*Id.* ¶¶ 35, 43(a), 73). Whether or not these allegations would be sufficient to demonstrate at trial Hizballah's involvement or the existence of IEEPA offense is not the pertinent question on a motion to dismiss – the question is whether these allegations are sufficient to support a reasonable belief that the Government will be able to meet its burden of proof at trial. *See* SUPPL. R. G(2)(f); *Levitt*, 340 F.3d at 101; *$15,270,885.69 Formerly on Deposit in Account No. 8900261137*, 2000 WL 1234593, at *5.

> ### d. The Amended Complaint Sets Forth Sufficient *Mens Rea* Allegations

The claimant argues that the Amended Complaint fails to set forth sufficient factual allegations regarding the Claimant's *mens rea* for the offense conduct alleged in the Amended Complaint. (Ellissa Br. at 16).

As an initial matter, for purposes of alleging forfeiture claims based on IEEPA and money laundering offenses, the Amended Complaint does not need to allege that a claimant had culpable knowledge. The Amended Complaint need merely set forth sufficient facts to support a reasonable belief that, at the time of trial, the Government will be able to prove that transactions in the United States or involving U.S. persons provided goods, funds, or services to or for the benefit of Hizballah and that the proceeds of narcotics trafficking and IEEPA violations were laundered through transactions taking place at least in part in the United States. Property traceable to the proceeds of those IEEPA violations or traceable to property involved in the money laundering transactions is then subject to forfeiture. The Claimant will have an opportunity to assert an innocent ownership defense at trial, but the Amended Complaint does not need to negate the Claimant's potential affirmative defenses in order to sufficiently plead forfeiture claims. *See* 18 U.S.C. § 983(d) (claimant bears the burden of proving it is an innocent

owner by a preponderance of the evidence); *see also*, *e.g.*, *United States* v. *Real Property Located at 216 Kenmore Ave.*, 657 F. Supp. 2d 1060, 1066-67 (D. Minn. 2009) (forfeiture complaint adequately alleged forfeiture claims, "notwithstanding any arguments and evidence the [claimants] might later offer to the contrary"); *United States* v. *316 Units of Mun. Sec.*, 725 F. Supp. 172, 177 (S.D.N.Y. 1989) ("Because the government proceeds against allegedly tainted property in a forfeiture proceeding, it is not necessary for the government to show that the present owner of the property participated in a violation of the statute or was even aware of the violation.") (citing *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 680 (1974)); *United States* v. *$734,578.82 in U.S. Currency*, 286 F.3d 641, 657 (3d Cir. 2002) ("forfeiture is not conditioned upon the culpability of the owner of the defendant property").

Although the Amended Complaint does not need to allege a claimant's culpable knowledge to support the forfeiture claims, the allegations in the Amended Complaint do, in fact, support a reasonable belief that the Government will be able to prove that Ellissa Holding knew it was involved in money laundering transactions for the benefit of Hizballah.

As alleged in the Amended Complaint, Ellissa Holding, including the Ellissa Exchange, was also designated by OFAC under the Kingpin Designation Act because of its role as a money launderer for the Ayman Joumaa drug trafficking organization. (Am. Compl. ¶ 3). In addition to the Ellissa Exchange, Ellissa Holding owned companies that shipped cars to West Africa and a car park in West Africa where the cars were stored and sold. (*Id.* ¶ 58). In approximately December 2010, three individuals were arrested in Paris traveling from Ghana en route to Lebanon with approximately $6.5 million and €48, 500 in undeclared currency; one of these individuals carried a business card from Ellissa Megastore. (*Id.* ¶ 74). A 2006 LCB due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling

cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut; that LCB had limited "know your customer" files for these clients; and that another Lebanese bank had closed its accounts with the Ellissa Exchange; and described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.  (*Id.* ¶¶ 48(b), (c)).

Of the approximately $329 million transferred from Lebanon to the United States between 2007 and 2011 in connection with the purchase and export of used cars, the Ellissa Exchange accounted for more than $61.7 million, or approximately 19% of the total.  (*Id.* ¶¶ 60, 64).  Youssef Nehme, a self-proclaimed Hizballah supporter and close associate of Ellissa Holding's owner, Ali Kharroubi, himself originated at least $21,832,344 in wire transfers into the United States to buy and ship used cars.  (*Id.* ¶ 86(f)).

### e.    Claim One Alleges Sufficient Facts Regarding Assets of Ellissa Holding Constituting Proceeds of IEEPA Violations

Ellissa Holding also argues, without merit, that the Amended Complaint is devoid of allegations sufficient to assert that the assets of Ellissa Holding constitute the "proceeds" of IEEPA violations.  In fact, the Amended Complaint sets forth allegations regarding how assets of Ellissa Holding constitute such proceeds.  As set forth in Amended Complaint, cars shipped to West Africa, including to Ellissa's car park specifically, were sold and the resulting funds converted to U.S. dollars or Euros, typically through black market currency exchanges.  (*Id.* ¶ 73). A substantial portion of these funds moved through Hizballah or individuals affiliated with Hizballah and/or narcotics traffickers as they were funneled back to Lebanon (*Id.* ¶ 72, 74-84), where they are then deposited into accounts affiliated entities such as Ellissa and the money-laundering cycle can began anew.  Indeed, as set forth in the Amended Complaint, individuals

27

affiliated with the Ellissa's car lot in Benin have been involved in transporting bulk cash back to Lebanon. (*Id.* ¶ 74). Accordingly, funds in accounts maintained by Ellissa Holding obtained in this manner constitute proceeds of IEEPA violations.

To the extent some assets of Ellissa Holding do not constitute proceeds of such violations, such factual disagreements are more suitable for resolution at summary judgment or trial rather than a motion to dismiss the Amended Complaint.

### 2. The Amended Complaint Sets Forth Sufficient Allegations of Money Laundering Offenses

The Amended Complaint seeks the forfeiture of the Defendant Property as traceable to property involved in money laundering transactions. Ellissa Holding was involved in tens of millions of dollars' worth of financial transactions in the United States that involved criminal proceeds, including the proceeds of narcotics trafficking, IEEPA violations, and other crimes, that were designed to promote specified unlawful activity and to conceal or disguise the nature, the location, the source of ownership, or the control of the criminal proceeds. (Am. Compl. ¶ 61).

The Claimants nonetheless argue that the Amended Complaint does not sufficiently allege that the Defendant Property is forfeitable as traceable to property involved in money laundering offenses. These arguments are fundamentally flawed.

### a. Money Laundering

The elements of promotion money laundering under § 1956(a)(1)(A)(i) are: (1) an actual or attempted financial transaction; (2) involving SUA proceeds; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) an "intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); *see, e.g.*, *United States*

v. *All Funds on Deposit at Dime Sav. Bank*, 255 F. Supp. 2d 56, 70 (E.D.N.Y. 2003) (internal quotations and citations omitted).

The elements of concealment money laundering under § 1956(a)(1)(B)(i) are the same as the elements of promotion money laundering with one exception: instead of showing an intent to promote an SUA, the Government must show knowledge that the transaction was designed in whole or in part either (a) "to conceal or disguise the nature the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity," or (b) "to avoid a transaction reporting requirement under State or Federal law."  18 U.S.C. § 1956(a)(1)(B)(i); *see also, e.g.*, *United States* v. *Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997).

Section 1956(a)(2) prohibits international money laundering.  A with § 1956(a)(1), there are two kinds of international money laundering – international promotional money laundering and international concealment money laundering.  The international promotional money laundering prong of that statute, Section 1956(a)(2)(A), criminalizes the transport, transmission of "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."

Section 1956(a)(2)(B) prohibits the transport, transmission of "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States [,] knowing that the monetary instrument or funds involved [] represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed [either] (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the

29

proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law[.]"

Section 1957 generally prohibits anyone from knowingly engaging in "a monetary transaction [in the United States] in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]"  18 U.S.C. § 1957.

> **b.      Forfeiture of Property Involved in Money Laundering**

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in a transaction or attempted transaction* in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."  18 U.S.C. § 981(a)(1)(A) (emphasis added).  Property "involved in" a money laundering offense includes, among other things, any property that facilitates the offense, including any property used to conceal, disguise, or promote the money laundering.  *See In re 650 Fifth Avenue and Related Properties*, 777 F. Supp. 2d 529, 563-64 (S.D.N.Y. 2011) ("[C]ourts in this district have held that the term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense.") (citations, quotation, alterations omitted); *see also id.* at 564 ("Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance.") (quoting *United States* v. *Huber*, 404 F.3d 1047, 1060 (8th Cir.2005)).  *See also, e.g.*, *United States* v. *McGauley*, 279 F.3d 62, 77 (1st Cir. 2002) (legitimate funds in a bank account that had been commingled with dirty money were properly forfeited because the clean funds were used to conceal and disguise the tainted funds); *United States* v. *Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008) (interpreting language in 18 U.S.C. § 982, the "term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate" the offense); *United States* v. *Contents of Account Nos. 208-06070*

*& 208-06068-1-2*, 847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (legitimate funds used to disguise the source of illegitimate funds and to make the proceeds of a green card scheme more difficult to trace facilitated the money laundering scheme and were forfeitable under § 981).

Property involved in money laundering transactions includes business entities that facilitate the laundering, including by providing the laundering transactions the veneer of legitimacy. *See In re 650 Fifth Avenue*, 777 F. Supp. 2d at 567 (citing *United States* v. *Swank*, 797 F. Supp. 497, 502 (E.D. Va. 1992); *United States* v. *Schlesinger*, 261 Fed. Appx. 355, 361 (2d Cir. 2008); *United States* v. *Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009); *United States* v. *All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995); *In re Restraint of Bowman Gaskins Fin. Group*, 345 F. Supp. 2d 613, 624 (E.D. Va. 2004); *United States* v. *S. Side Finance*, 755 F. Supp. 791, 797-798 (N.D. Ill. 1991); *United States* v. *Parcel of Property Located at 155 Bemis Road, Manchester, N.H.*, 760 F. Supp. 245, 251 (D.N.H. 1991)).  Entities involved in promotional money laundering transactions similarly are subject to forfeiture.  *See id.* at 567-68 (citing *United States* v. *Eleven Vehicles*, 836 F. Supp. 1147, 1155 (E.D. Pa. 1993); *United States* v. *Joseph Health and Beauty Supply*, 807 F. Supp. 320, 321-22 (S.D.N.Y. 1992) (Leval, J.); *United States* v. *Baker*, 227 F.3d 955, 969 (7th Cir.2000)).

Under § 983(c), "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c).

### c.   The Money Laundering Claims Based on Underlying IEEPA and Narcotics Violations Are Sufficiently Alleged

The Claimant argues that the money laundering forfeiture claims should be dismissed because the Amended Complaint does not allege specified unlawful activities giving rise to the

laundered proceeds with sufficient particularity.  Contrary to the Claimant's arguments, the Amended Complaint simply needs to allege facts sufficient to support a reasonable belief that, at trial, the Government will be able to prove that they were involved in money laundering transactions involving the proceeds of IEEPA offenses, narcotics trafficking, and other offenses. *See* SUPPL. R. G(2)(f). A forfeiture complaint need not identify particular narcotics transactions or particular money laundering transactions.  "Numerous courts have held that the government need not trace seized property back to a specific illegal transaction in order to meet its burden of proof at trial."  *United States* v. *Funds in the Amount of Forty-Five Thousand Fifty Dollars*, No. 06 Civ. 6948, 2007 WL 2323307, at *5 (N.D. Ill. Aug. 9, 2007); *see also United States* v. *Two Parcels of Real Property Located in Russell Country, Alabama*, 92 F.3d 1123, 1127 (11th Cir. 1996) ("The complaints specified no date or location of any purported or intended drug dealings, no dollar amounts, no specific types or quantities of drugs sold, and no identified participants, other than [two individuals].  Yet, there were sufficient facts detailed in the complaint to put claimants on notice as to the Government's basis for seizure.").  Nor must the Amended Complaint allege that the Claimant was a culpable participant in the transactions (though, as discussed herein, it certainly does).  *See, e.g.*, *United States* v. *Approximately $25,829,681.80*, No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *6 (S.D.N.Y. Nov. 30, 1999) ("[T]he Government need not detail" the claimant's "involvement in the scheme.  Rather, it must allege that the defendant-in-rem funds 'constitute or [are] derived from proceeds traceable to a violation' of the wire fraud statute, regardless of whether that violation involved" the claimant.); *see also* 18 U.S.C. § 983(d); *United States* v. *Real Property Located at 216 Kenmore Ave.*, 657 F. Supp. 2d 1060, 1066-67 (D. Minn. 2009); *United States* v. *All Funds on Deposit in Any Accounts*, 801 F. Supp. 984 (E.D.N.Y. 1992).

32

The Amended Complaint sets forth both violations of IEEPA as specified unlawful activity with respect to money laundering under §§ 1956(a)(1)(A), (a)(1)(B), and 1957, and IEEPA and narcotics trafficking as unlawful activities with respect to money laundering under § 1956(a)(2)(B). [10]  As set forth above, the conduct relating to IEEPA sets forth facts sufficient to allege such an offense.  With regard to the narcotics trafficking, Ellissa raises issues regarding the specificity of the allegations.  The Amended Complaint provides ample details about the underlying narcotics activity.

The details provided in the Amended Complaint are more than sufficient as a matter of pleading.  As one Court of Appeals has explained, "[w]hile it is necessary in order to state a money laundering offense to include such an allegation [of a specified unlawful activity], the requirement is merely a categorical delineation of the type of funds that are subject to a money laundering charge . . . details about the nature of the unlawful activity underlying the character of the proceeds need not be alleged."  *United States* v. *Smith*, 44 F.3d 1259, 1264 -65 (4th Cir. 1995).  To the extent Ellissa Holding argues that the Government has failed to allege that the property subject to forfeiture -- that is, the assets of Ellissa Holding – are connected to narcotics trafficking, such an argument is a straw man that is easily deconstructed.  The Government's claims as they relate to narcotics trafficking are premised on money laundering with narcotics trafficking as a specified unlawful activity.  The relevant inquiry, therefore, relates to the involvement of Ellissa Holding (and its assets) in money laundering, rather than in any underlying narcotics trafficking.  As set forth herein, the Amended Complaint provides

---

[10] International promotional money laundering under § 1956(a)(2)(A) does not require proof that the funds involved in the money laundering transactions were unlawful proceeds.

33

substantial detail in Ellissa Holding's role in laundering funds derived from, or in order to promote, the relevant specified unlawful activity.[11]

      **d.**    **The Facts Alleged Are Sufficient to Support an Inference that Ellissa Knew It was Transferring Criminal Proceeds**

Ellissa also argues that the money-laundering forfeiture claims must fail because the Amended Complaint fails to adequately allege that Ellissa knew that the money used in the transactions was "from an illegal activity" or acted with the requisite intent under the various money laundering statutes.  (Ellissa Br. at 23).  As a legal matter, while this argument may have relevance to the civil money-laundering penalty claim, it has no application to the validity of the forfeiture claims Ellissa challenges.   As set forth above, in an *in rem* forfeiture case, the government need not allege that the present owner of the property directly participated in the underlying criminal activity or was even aware of such activity."  *See United States* v. *Approximately $25,829,681.80*, No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *6 (S.D.N.Y.

---

[11] To the extent that Ellissa Holding contends that the forfeiture claims premised on money laundering are invalid because they "merge" with the forfeiture claims relating to IEEPA violations (Ellissa Br. at 19-20), such arguments are also without merit.  First, any merger argument is inapplicable to forfeiture premised on international money laundering, codified at 18 U.S.C. § 1956(a)(2)(A), which has no proceeds requirement.  *See United States* v. *Piervinanzi*, 23 F.3d 670, 679–80 (2d Cir. 1994) (rejecting argument that wiring money to a place outside the United States merges with the underlying bank fraud).  Second, funds become proceeds when derived from a "completed phase of an ongoing offense."  *United States* v. *McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001); *see also United States* v. *Mankarious,* 151 F.3d 694, 706 (7th Cir.1998) (recognizing that a mail fraud offense does not have to be complete for money laundering purposes; all that matters is that the mail fraud scheme has produced proceeds in transactions distinct from those constituting money laundering); *United States* v. *Nunez*, 419 F. Supp. 2d 1258, 1268 (S.D. Cal. 2005) ("[I]t becomes clear that the money laundering statutes must be construed broadly to encompass transactions in proceeds derived from separate, completed acts in an on-going criminal scheme. Money laundering requires only that the underlying offense generate proceeds through transactions discrete from, and occurring prior to, the subsequent acts of laundering; the law does not require that the entire underlying offense be completed before its proceeds may be laundered.").  The Amended Complaint makes clear that the scheme is a multi-phased, circular series of transactions.  Any disagreement with such characterization is a factual issue, to be resolved at a later stage of litigation.

Nov. 30, 1999) ("[T]he Government need not detail" the claimant's "involvement in the scheme. Rather, it must allege that the defendant-in-rem funds 'constitute or [are] derived from proceeds traceable to a violation' of the wire fraud statute, regardless of whether that violation involved" the claimant.); *United States* v. *755 Forest Road*, 985 F.2d 70, 72 (2d Cir. 1993) ("The so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant."). Accordingly, Ellissa's arguments are without merit.

The Amended Complaint describes numerous members of the scheme who necessarily participated with the requisite knowledge and intent. (*See, e.g*, Am. Compl. ¶ 43; 65-67). For purposes of the forfeiture claims at issue, whether or not such knowledge and intent is alleged in regard to Ellissa is irrelevant. Moreover, the Amended Complaint also alleges that Ellissa had the requisite knowledge and intent relating to the money laundering alleged. This issue is discussed below in regard to the civil money laundering penalty claims, where such allegations are actually relevant.

### e.    The Amended Complaint Sufficiently Alleges Fundamental Elements of Four Types of Money Laundering

Ellissa Holding's arguments regarding the Government's adequately alleging the elements of various types of money laundering offenses (Ellisa Br. at 24-26) are simply retreads of other arguments set forth earlier in its brief. Rather then also repeat the Government's responses to such arguments here, the Government will reiterate its response to one argument that pervades this section of Ellissa Holding's brief. If Ellissa Holding wishes to assert and prove an innocent owner defense to these money laundering claims, it may certainly do so. However, as set forth in the immediately preceding section, the Amended Complaint need not allege knowledge or intent of a potential claimant in order to provide an anticipatory rebuttal to such defenses.

35

### C.    The Amended Complaint States a Claim for a Civil Money Laundering Penalty

The Claimant contends that the Amended Complaint does not sufficiently allege a civil money-laundering penalty claim against it as an *in personam* defendant.  (Ellissa Br. at 26).  For the reasons discussed above, the Court has personal jurisdiction over Ellissa Holding in this action.  Additionally, as set forth above, the Amended Complaint also meets the pleading standard applicable to the civil money-laundering claims under Rule 8.  The Amended Complaint alleges that Ellissa Holding knowingly facilitated bulk cash transfers and money laundering for Ayman Joumma and his network.  (Am. Compl. ¶ 59).  Ellissa Holding is further alleged to utilize black market currency exchanges in and around West African car parks.  (Am. Compl. ¶ 73).  Indeed, as set forth in the Amended Complaint, three couriers, one of whom was carrying a business card for Ellissa Holding's car lot in Benin, were arrested in France for attempting to evade reporting requirements regarding over $6.5 million in U.S. currency.  (Am. Compl. ¶ 74).

Additionally, the law is clear that a money launderer need not have knowledge of the exact specified unlawful activity at issue, but only that the funds derived from criminal activity. *See United States* v. *Maher*, 108 F.3d 1513, 1526 (2d Cir.1997) (explain that the money laundering statute "reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime") (internal quotation marks omitted); *United States* v. *Reiss*, 186 F.3d 149, 154 (2d Cir. 1999) ("[T]he defendant need only know that the funds were criminally derived.").  Further, knowledge may be shown by proof of willful blindness, deliberate ignorance, or conscious avoidance.  *United States* v. *Flores*, 454 F.3d 149, 155-56 (3d Cir. 2006) (attorney was willfully blind to the illegal source of money he assisted client in moving through bank accounts; it was not necessary to show attorney knew the money

36

was from drug trafficking); *United States* v. *Tillman*, 419 Fed. App'x. 110, 2011 WL 1448144 (2nd Cir. Apr. 15, 2011) (defendant who allowed co-conspirators to make large deposits into her bank account and who then made large withdrawals after these deposits were made was, at the least, willfully blind to the nature of the activity in which she was engaged).

The facts set forth in the Amended Complaint, at the least, establish that Ellissa Holding was willfully blind regarding the nature of its money laundering conduct.

CONCLUSION

For the foregoing reasons the Government respectfully requests that the motion to dismiss be denied.

Dated:  New York, New York
        July 23, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

            By:      _____/s/_____
                              Sharon Cohen Levin
                              Michael D. Lockard
                              Jason H. Cowley
                              Alexander J. Wilson
                              Assistant United States Attorneys
                              (212) 637-1060/2193/2479/2453